# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| MATTHEW BATTLE, JUAN CASTANEDA, DAVID FIGUEROA, ROBERT GRIBBLE, and WALTER and JANICE HELMS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>    v.<br><br>GENERAL MOTORS, LLC,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION ...................................................................1

JURISDICTION AND VENUE ..............................................................5

THE PARTIES ........................................................................................6

FACTUAL ALLEGATIONS ..................................................................9

    A.    The Defective Eight-Speed Automatic Transmissions
        (GM 8L90 and 8L45) .....................................................13

    B.    GM's Knowledge of the Shift Defect ...............................17

        1.    GM Determined Before Class Vehicles Were Ever
              Sold that There Was No Fix for the Shift Defect
              Until 2023. ...........................................................17

        2.    GM's Service Bulletins Demonstrate Its
              Knowledge of the Shift Defect as Early as 2014,
              and a Continuing Design Defect. ..........................22

        3.    Consumer Complaints to NHTSA Demonstrate
              Consumers Have Complained about the Shift
              Defect Since 2015 to the Present. .........................40

        4.    Well-Publicized Criticism of the Shift Defect in
              Trade Publications Demonstrate GM's Knowledge
              of the Shift Defect Before 2020. ..........................99

    C.    Plaintiffs' Experiences ...................................................101

        1.    Matthew Battle's Experience ..............................101

        2.    Juan Castaneda's Experience ..............................103

        3.    David Figueroa's Experience ...............................105

        4.    Walter and Janice Helms' Experience .................107

       5.      Robert Gribble's Experience ...............................................109

   D.    Fraudulent Concealment Allegations ............................................111

   E.    GM Has Actively Concealed the Shift Defect ..............................114

   F.    The Agency Relationship Between GM US, LLC and its Network of Authorized Dealerships ..............................................117

CLASS ACTION ALLEGATIONS ..................................................................121

TOLLING OF THE STATUTES OF LIMITATIONS ......................................126

   A.    Fraudulent Concealment ..............................................................126

   B.    Estoppel .......................................................................................127

   C.    Discovery Rule ............................................................................128

CAUSES OF ACTION ....................................................................................129

COUNT 1: FRAUDULENT CONCEALMENT Under the Each Subclass State's Common Law ............................................................129

COUNT 2: VIOLATION OF CALIFNORNIA CONSUMER LEGAL REMEDIES ACT CAL. CIV. CODE § 1750, *ET SEq.* .............131

COUNT 3: VIOLATION OF CALIFORNIA BUS. & PROF. CODE, §17200 *ET SEQ.* ...................................................................................134

COUNT 4: BREACH OF IMPLIED WARARNTY PURSUANT TO THE SONG-BEVERLY CONSUMER WARRANTY ACTCAL. CIV. CODE §§ 1792 AND 1791.1, *ET SEQ.*.........................137

COUNT 5: BREACH OF EXPRESS WARRANTY, CAL. COM. CODE §§ 2313 AND 10210 ...................................................................141

COUNT 6:      BREACH OF EXPRESS WARRANTY, IND. CODE §§ 26-1-2-313 AND 26-1-2.1-210..............................................148

COUNT 7: BREACH OF THE IMPLIED WARRANTY OF
          MERCHANTABILITY IND. CODE §§ 26-1-2-314 AND 26-1-
          2.1-212 .................................................................................................. 155

COUNT 8:  Violation of Michigan Consumer Protection Act, Mich.
          Comp. Laws §445.903, *et seq.* .............................................................. 159

COUNT 9:  Breach of Implied Warranty, MICH. COMP. LAWS §
          440.2314 ............................................................................................... 162

COUNT 10:  Breach of Express Warranty, MICH. COMP. LAWS §
           440.2313 .............................................................................................. 166

COUNT 11:  Violation of New Jersey Consumer Fraud Act, N.J. Stat.
           Ann. §§ 56:8-1, *et seq.* ...................................................................... 173

COUNT 12:  Breach of Implied Warranty, N.J. Stat. Ann. § 12A:2-
           314 ....................................................................................................... 176

COUNT 13:  Breach of Express Warranty, N.J. Stat. Ann. §12A:2-
           313 ....................................................................................................... 181

COUNT 14: Violation of Washington Consumer Protection Act,
          Wash. Rev. Code §§ 19.86.010, *ET SEq.* ............................................. 187

COUNT 15:  Breach of Implied Warranty, WASH. REV. CODE §
           62A.2-314 ............................................................................................. 191

COUNT 16:  Breach of Express Warranty, Wash. Rev. Code § 62A.2-
           313 ....................................................................................................... 195

REQUEST FOR RELIEF ................................................................................ 201

JURY TRIAL DEMANDED ........................................................................... 204

1.     Plaintiffs Matthew Battle, Juan Castaneda, David Figueroa, Robert Gribble, Walter and Janice Helms, ("Plaintiffs"), for themselves and on behalf of all others similarly situated, bring this action against General Motors, LLC ("GM" or "Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

## NATURE OF THE ACTION

2.     This proposed class action is brought by new and used purchasers of 2019-2022 model year[1] vehicles designed manufactured, marketed, distributed, sold, warranted, and serviced by GM, equipped with GM's eight-speed Hydra-Matic 8L90 transmission or Hydra-Matic 8L45 transmission (collectively, "Class Vehicles"). Plaintiffs allege that the Class Vehicles' eight-speed transmissions are defective, and that GM concealed the defects.

3.     The first generation 8L90 and 8L45 transmissions built after March 1, 2019, have a design defect based on a common architecture that causes "harsh shifts"

---

[1] For the model year 2019 Class Vehicles, those only include vehicles purchased on or after March 1, 2019. Class Vehicles purchased before March 1, 2019, are part of the proposed class in *Won et al. v. General Motors, LLC*, No. 19-cv-11044-DML-DRG (E.D. Mich.) ("*Won v. GM*"), ECF No. 223 ("Won Class Cert. Brief") at 15.

in lower gears, which can feel like jerking, lurching, and/or hesitations ("Shift Defect").

4.     According to GM, the Shift Defect has been described by customers (as recent as April 2021) as follows:[2]



5.     The jerking, hesitation, surging, and lurching present a safety hazard because they affect the driver's ability to control the vehicle's speed, acceleration, and deceleration.

6.     GM has not fixed the Shift Defect, nor can it, until the planned deployment of a major redesign in MY23 models ("Gen 2"). GM has planned since

---

[2] *Won v. GM*, ECF No. 209-7, PageID.12936.

COMPLAINT- 2

at least 2018 for this redesign.[3]

> **Essence of Learning:** Lessons learned were compiled, and incremental fixes both hardware and calibration were introduced between MY16-MY20 to improve warranty and customer satisfaction. Ultimately, some of the issues could not be resolved without a major redesign of the transmission, which was approved in early 2018 (8RWD Gen 2).

7.     GM is aware that the Class Vehicles will experience the Shift Defect at levels well above GM's warranty targets.[4]

8.     The Shift Defect affects the following GM vehicles: the 2019-2022 Chevrolet Camaro, Colorado, and Silverado, and the 2019 Corvette; the 2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; and the 2019-2022 GMC Canyon and Sierra.

9.     Defendant has known about the Shift Defect since before Job One in 2013 and has deliberately not disclosed to Plaintiffs and other similarly situated customers that the Class Vehicles have defective transmissions that fail to function in a safe and reliable manner as expected.

10.     The Shift Defect manifests within the limited warranty period or shortly after the limited warranty period expires. It is covered by GM's express warranties. GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the

---

[3] *Won v. GM*, ECF No. 173-5, PageID.5934.
[4] *Id.,* ECF No. 223, PageID.15442.

vehicle due to materials or workmanship occurring during the warranty period."
Accordingly, GM's warranty covers all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Shift Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. However, when Class Members bring their vehicles to GM's authorized agents for repair, they are either told that their vehicles are behaving normally, given ineffective repairs, or are having their transmissions or components replaced with the same defective parts. GM knows those efforts won't fix the Shift Defect—an August 2020 Technical Service Bulletin ("TSB") designed to address harsh first shifts of the day notes that "[r]eplacing transmission components or complete assemblies will not improve the condition."

11.     GM knew of the Shift Defect well before the time of sale for all Class Vehicles, as early as 2013. During GM's testing of an 8L vehicle, the down shift was described as a "neck snapper." Further evidence of GM's presale knowledge of the Shift Defect includes (1) continued prelaunch testing; (2) ongoing and above target warranty claims in MY15-MY18 8L vehicles, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) customer complaints posted on internet forums, (5) its own records of customers' complaints, (6) dealership repair records and requests for technical assistance, (7) customer surveys;

(8) Service Bulletins, and (9) its Customer Satisfaction Program. GM even considered a service proposal for Class Vehicles to include valve body replacements on the 8L transmissions at $1,250.[5]

12. Despite GM's long-standing knowledge of the Shift Defect, it did not alert purchasers before (or after) their transactions, has not recalled the Class Vehicles to repair the defective transmissions.

13. Because of Defendant's misconduct, Plaintiffs and Class Members have been damaged: (1) at the point of sale by overpaying for the purchase of the Class Vehicles; (2) at the time of resale due to diminished resale prices; and (3) by receiving defective Vehicles that GM itself estimates would take over a thousand dollars to repair to get them close to targets for Gen 2.

## JURISDICTION AND VENUE

14. This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members is in the hundreds of thousands, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. 28 U.S.C. § 1332(d)(2)(A).

---

[5] *Won v. GM,* ECF No. 172-2, PageID.5733.

COMPLAINT- 5

15.    In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.

16.    This Court has personal jurisdiction over Defendant because it is headquartered in the State of Michigan; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Michigan; and otherwise intentionally avails itself of the markets within Michigan through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Michigan.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, where GM is headquartered.

## THE PARTIES

18.    Plaintiff Matthew Battle is a citizen and resident of Georgia, over the age of eighteen.  Plaintiff Battle purchased a new 2020 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 25, 2019.

19.     Plaintiff Juan Castaneda is a citizen and resident of California, over the age of eighteen years. Plaintiff Castaneda purchased a new 2021 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 21, 2020.

20.     Plaintiff David Figueroa is a citizen and resident of New Jersey, over the age of eighteen years. Plaintiff Figueroa purchased a new 2021 GMC Canyon, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about August 24, 2020.

21.     Plaintiffs Walter and Janice Helms are citizens and residents of Washington, over the age of eighteen years. Plaintiffs Walter and Janice Helms purchased a new 2021 GMC Sierra 1500, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about November 22, 2021.

22.     Plaintiff Robert Gribble is a citizen and resident of Illinois, over the age of eighteen years. Plaintiff Gribble purchased a used 2021 Chevrolet Silverado, manufactured by GM and containing an 8L90 or 8L45 transmission, on or about September 22, 2021.

23.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a Delaware limited

liability company with its principal place of business in the State of Michigan. General Motors Holdings LLC's only member is General Motors Company, a Delaware corporation with its principal place of business in the State of Michigan. General Motors Company has 100% ownership interest in General Motors Holdings LLC.

24.     General Motors LLC, itself and through its affiliates, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Michigan. General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

25.     At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Michigan and throughout the United States of America.

26.     To sell vehicles to the general public, GM enters into agreements with dealerships who are then authorized to sell GM-branded vehicles such as the Class Vehicles to consumers such as Plaintiffs. In return for the exclusive right to sell new GM-branded vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties GM provides directly to consumers. These contracts give GM a significant amount of control over the actions of the dealerships, including sales and marketing of vehicles and parts for those

vehicles. All service and repair at an authorized dealership are also completed according to GM's explicit instructions, issued through service manuals, TSBs, preliminary information bulletins ("PIs"), information service bulletins, and other documents, often only referred to by a "Document ID." Per the agreements between GM and the authorized dealers, consumers such as Plaintiffs can receive services under GM's issued warranties at dealer locations that are convenient to them.

27.    GM also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

28.    GM is the drafter of the warranties contained in the manuals it provides to consumers nationwide, the terms of which unreasonably favor GM. Consumers are not given a meaningful choice in the terms of those warranties provided by GM, and those warranties are offered on a "take it or leave it" basis.

## **FACTUAL ALLEGATIONS**

29.    GM designs, manufactures, markets, distributes, and warrants automobiles in the United States sold under various brand names, including the Buick, Cadillac, Chevrolet, and GMC brands. In calendar year 2021, GM brands Buick, Cadillac, Chevrolet, and GMC delivered 2,218,228 vehicles in the USA—

12.9% lower than the 2,547,339 vehicles delivered in 2020.[6] Combined sales of the Chevrolet Silverado and GMC Sierra LD and HD were 768,689. The company's share of the retail market in 2021 was approximately 39 percent, according to J.D. Power PIN estimates, and about 10 points higher than the next closest competitor.[7]

30.     GM has thousands of authorized dealerships across the United States, all of which are under GM's control. GM authorizes these dealerships to sell GM vehicles, parts, and accessories and to service and repair GM vehicles using GM parts. *Id.* at 3.

31.     Since 2019, GM has designed, manufactured, distributed, and sold hundreds of thousands of the Class Vehicles, which include the following models and model years: the 2019-2022 Chevrolet Camaro, Colorado, and Silverado, and the 2019 Corvette; the 2019 Cadillac ATS, ATS-V, CTS, CT6, and CTS-V; and the 2019-2022 GMC Canyon and Sierra.

32.     GM provided all purchasers of the Class Vehicles with a New Vehicle Limited Warranty with the purchase of the Class Vehicles.

---

[6]2021 (Full Year) USA: GM Sales (Chevrolet, Buick, Cadillac, GMC), https://www.best-selling-cars.com/usa/2021-full-year-usa-gm-sales-chevrolet-buick-cadillac-gmc/, last accessed Mar. 4, 2022,
[7] *Id.*

33.     The 2019 Chevrolet New Vehicle Limited Warranty for Chevrolet-brand Class Vehicles ("Chevrolet Warranty"), which included a "Bumper-to-Bumper" warranty and a Powertrain warranty, stated in relevant part:

**What Is Covered**

**Warranty Applies**

This warranty is for GM vehicles registered in the United States and normally operated in the United States, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a Cadillac dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**

The complete vehicle is covered for 3 years or 36,000 miles, whichever comes first, except for other coverages listed here under "What Is Covered" and those items listed under "What Is Not Covered" later in this section.

**Powertrain Component Warranty Coverage.**

The powertrain is covered for 5 years or 60,000 miles, whichever comes first.

*     *     *

**Transmission/Transaxle Coverage includes:** All internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle. Also covered are any actuators directly connected to the transmission (slave cylinder, etc.).

*Exclusions*: Excluded from the powertrain coverage are transmission cooling lines, hoses, radiator, sensors, wiring, and electrical connectors. Also excluded are the clutch and pressure plate as well as any Transmission Control Module and/or module programming.

*     *     *

**Other Terms:** This warranty gives you specific legal rights and you may also have other rights which vary from state to state. GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles. **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty.** (*See* Ex. 1, 2020 Chevrolet Limited Warranty and Owner Assistance Information at 2, 4-5, 13.)

34.    Later versions of the Chevrolet Warranty and the New Vehicle Limited Warranty for GMC-brand Class Vehicles ("GMC Warranty") included substantially the same terms as the Chevrolet Warranty terms excerpted above. (*See, e.g.*, Ex. 2, 2019 GMC Limited Warranty and Owner Assistance Information at 2, 4-5, 12.)

35.    The Cadillac Warranty for the Class Vehicles includes substantially the same terms as the Chevrolet and GMC-brand vehicle warranties, but with slightly longer warranty coverage, e.g., 4 year or 50,000 mile bumper-to-bumper warranty coverage and 6 year or 70,000 mile powertrain coverage.

36.    The warranties and representations contained in the Cadillac Warranty and the Chevrolet/GMC Warranties (collectively, the "Warranties") were and are material to Plaintiffs because Plaintiffs would not have purchased their Class Vehicles or would not have paid as much as they did if the transmissions in their Class Vehicles were not covered by a full warranty.

**A.    The Defective Eight-Speed Automatic Transmissions (GM 8L90 and 8L45)**

37.    In January 2014, GM began marketing the release of a new, eight-speed automatic transmission to be included in some of its vehicles for model year 2015. GM-brand vehicles for model years 2014 and older had automatic transmissions of six or fewer speeds.

38.    The engines in the Class Vehicles produce power and then send that power to the 8L90 or 8L45 automatic transmission. The transmission then takes that

power and delivers it to the rear drive transmissions of the Class Vehicle, while ensuring the engine stays within predetermined RPMs. The transmission also seeks to maximize the efficiency of the Class Vehicles' engines by balancing fuel consumption and torque.

39.     As background, transmissions use toothed gears that interact with each other to produce torque. The term "gear ratio" refers to the relationship between gears. For example, if an input gear has 20 teeth and it interacts with an output gear that has 10 teeth, the 10-tooth gear must spin twice to fully spin the 20-tooth gear. A gear ratio is then calculated by taking the number of teeth on the output gear and dividing it by the input gear. In this example, the gear ratio would be 1:2 (typically expressed as 0.5:1).

40.     Automatic transmissions automate the switching of gears using multi-plate clutches, which adjust according to the speed that the vehicle is traveling. Thus, instead of manually operating a clutch, the vehicle's transmission constantly monitors and engages and disengages gears according to the speed at which the vehicle is moving. This is done through the use of fluid pressure, which provides the necessary pressure to activate clutches and bands that in turn determines what gear to engage.

41.     GM marketed and sold its new eight-speed automatic transmissions as having "world-class performance" rivaling top performance vehicles, lightning-fast

and smooth shifting, along with improved fuel efficiency, among other representations. (*See Won v. GM*, ECF No. 41-4, PageID 3098-100)

42.   For instance, GM's own press release dated January 13, 2014 introduced the new 8L90 transmission as being "tuned for world-class shift-response times," and "deliver[ing] shift performance that rivals the dual-clutch/semi-automatic transmissions found in many supercars – but with the smoothness and refinement that comes with a conventional automatic fitted with a torque converter." In addition, the technology and design of the new 8L90 transmission "help make the new [Corvette] Z06 surprisingly fuel efficient." (*See Won v. GM*, ECF No. 41-5, PageID 3102-06). GM touted similar characteristics for its 8L45 transmission in press releases in 2015. (*See Won v. GM*, ECF No. 41-6, PageID 3108-12; *Won v. GM*, ECF No. 41-7, PageID 3114-16).

43.   In another GM press release, GM continued to represent the high quality of the new eight-speed automatic transmission:

> In fact, in the 2015 Corvette Stingray, [8L90 transmission] enables a class-leading 29-mpg EPA highway estimate – a 3.5-percent increase in fuel economy over the previous six-speed automatic – and a quicker 0-60 time of 3.7 seconds, all while delivering wide-open-throttle upshifts quicker than those of the dual-clutch transmission offered in the Porsche 911.
>
> "GM's new 8L90 eight-speed automatic represents a rare win-win-win scenario for customers," said Kavoos Kaveh, global chief engineer for eight-speed automatic transmissions. "It offers greater performance and efficiency, while weighing less than the transmission it replaces. That's

a rare accomplishment in the industry today – and one for which GM has been awarded more than two dozen patents."

****

The lower engine speed reduces fuel consumption, while a new torque converter design enhances refinement, particularly during low-speed gear changes. "The Corvette's new eight-speed automatic delivers the comfort and drivability of a true automatic transmission, as well as lightning-fast shifts and the manual control that enhance the performance-driving experience," said Kaveh. "It was designed to enhance the driving experience, with performance on par with dual-clutch designs, but without sacrificing refinement. . . . Additionally, a torque converter design with a turbine damper complements performance with excellent refinement at low engine speeds."

44.    However, the 8L90 and 8L45 transmissions deliver anything but "comfort and drivability[,]" "lightning-fast shifts[,]" and "enhanc[ed] refinement, particularly during low-speed gear changes." In fact, the Shift Defect in the 8L90 and 8L45 transmissions causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion. These conditions present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration. As an example, these conditions may make it difficult to safely merge into traffic, back out of a garage or driveway, and drivers have reported sudden lurching into intersections when attempting to gradually accelerate from a stopped position and other dangerous driving conditions.

**B.      GM's Knowledge of the Shift Defect**

**1.      GM Determined Before Class Vehicles Were Ever Sold that There Was No Fix for the Shift Defect Until 2023.**

45.      Prior to the sale of the Class Vehicles, GM knew about the Shift Defect based on: (1) similar issues with 2015-2019 MY vehicles equipped with first generation eight-speed automatic transmissions, which led GM to stop using those transmissions entirely in its performance and luxury vehicles—like the later model year Corvette, Escalade, and Yukon—and develop a "second generation" transmission for the Class Vehicles; (2) GM's exclusive knowledge of non-public, internal data about the Shift Defect, including pre-release testing data and warranty data, and investigations applying hazard metrics; (3) early consumer complaints about the Shift Defect to GM's dealers who are their agents for vehicle repairs; (4) aggregate data from GM's dealers, including dealership repair orders; (5) consumer complaints to the National Highway Traffic Safety Administration ("NHTSA") and resulting notice from NHTSA; (6) testing conducted in response to owner complaints; (7) GM service bulletins addressing shift issues in 2015-2019 MY vehicles equipped with the eight-speed transmission, as well as additional bulletins addressing shift issues in Class Vehicles; and (8) customer feedback survey from J.D. Power identifying drive quality and shifting as a weakness.

46.      For example, as early as September 2014, GM knew that the 8L90 and 8L45 transmissions were defective and that the Shift Defect would adversely affect

the drivability of the Class Vehicles and cause safety hazards. GM's testing of the 2014 of the Corvette revealed a down shift that GM testers described as a "neck snapper."[8]

47.     GM engineers knew that harsh shifts affected drive quality during development and preproduction of the Corvette.[9] Those issues—along with first shift of the day, shudder, and lunges—were among the top five issues GM engineers faced in May 2014. The issues were so bad that GM's Chief Engineer for the Corvette even considered stopping production.[10] But GM did not stop production; instead, GM put the eight-speed transmission in hundreds of thousands of vehicles starting in 2015.

48.     From 2015 to 2019, the GM 8L transmission program was at "yellow" (concerned) or "red" (not confident: targets not met) due to issues related to the now fixed Shudder Defect as well as harsh shift issues due to the Shift Defect.[11] And while GM has fixed the Shudder Defect, it still hasn't fixed the Shift Defect—which has been a problem since 2014.

49.     A GM engineer who worked on transmission calibration admitted that his group should have informed management sooner about the Shift Defect for

---

[8] *Won v. GM*, ECF No. 224-23, PageID.15661.
[9] *Id.*
[10] *Id.*
[11] *Won v. GM*, ECF No. 223, PageID.15447.

vehicles equipped first generation eight-speed transmissions.[12] The GM engineer stated: "Just sayin, we did not help ourselves when the opportunity was there. Of course nobody knew how had [sic] this POS was going to be, but blame can be assigned like a B24 bombing raid."[13]

50.    In 2016, the president of Cadillac (Johan de Nysschen) reviewed dealer complaints related by customer. He summarized the 8L story bleakly:[14]



> The dealer anger at this multitude of issues, based on the dialogue at the meeting today, is exacerbated by their perception that
>
> · we don't have fixes
> · we are telling customers it's "normal", there is no problem
> · we fix one thing, and hope it solves the problem
> · we fix one thing, then another goes wrong
> · we are trying to manage cost, not customer satisfaction
> · we are trying to avoid transmission replacement at all costs, even when justified
> · when all else fails, we buy back cars, yet still don't fix the problem for the next customer

51.    From 2017 to 2021, the Shift Defect (and the Shudder Defect) prompted numerous investigative reviews.[15] But GM concealed the Shift Defect and misrepresented to consumers that poor shifts were "normal."[16]

---

[12] *Id.*
[13] *Id.* at PageID.15446-15447.
[14] *Won v. GM*, ECF No. 249-9, PageID.19572.
[15] *Id.* at PageID.15458.
[16] *Id.*

52.     GM considered and rejected retrospective improvements for 2015 to 2017 models because they would require a transmission replacement—a very expensive fix.[17] GM's Mark Gordon lamented in February 2019 that "shift quality issues are an ongoing concern with the 8 Speed transmission. Unfortunately, these issues have been through an Op-ex and a service solution is not going to be developed due to cost."[18] A year later, in 2020, Gordon reported that "unfortunately" shift quality complaints in Class Vehicles continued to increase and would only stop once the Gen 2 redesign was completed—information he warned was "(GM Confidential)."[19]

53.     Assistant Chief Engineer Bill Goodrich who helped develop and validate the 8L transmission, appeared at auto shows to brag about 8L transmission performance in Class Vehicles without disclosing the Shift Defects or the crushing warranty rates.[20]

54.     A comparison of the Class Vehicles with the 8L transmissions and the same models with other transmissions showed that the 8L equipped vehicles had repairs per thousand vehicles at orders of magnitude higher[21]:

---

[17] *Id.* at PageID.15447.
[18] *Id.*
[19] *Id.*
[20] ECF No. 224-17, PageID.15633-37.
[21] *Id*. at PageID.15442.

| TRANSMISSION TYPE | M5U | M5X | MYC | MYD (MY 2015 NOT 2014) | MF6 (MY 2018 NOT 2016) | MW7 (MY 2015 NOT 2014) |
|---|---|---|---|---|---|---|
| MY 2014 @ 12 MIS | ABOUT 25 RPTV | ABOUT 35 RPTV | LESS THAN 3 RPTV | LESS THAN 1.2 RPTV | NA | LESS THAN 5 RPTV |
| MY 2014 @ 24 MIS | ABOUT 50 RPTV | ABOUT 65 RPTV | LESS THAN 3 RPTV | LESS THAN 1.2 RPTV | NA | LESS THAN 5 RPTV |
| MY 2014 @ 36 MIS | ABOUT 65 RPTV | ABOUT 100 RPTV | LESS THAN 3 RPTV | LESS THAN 1.2 RPTV | NA | LESS THAN 5 RPTV |
| MY 2014 @ 48 MIS | ABOUT 80 RPTV | ABOUT 109 RPTV | LESS THAN 3 RPTV | LESS THAN 1.2 RPTV | NA | LESS THAN 5 RPTV |
| MY 2014 @ 60 MIS | ABOUT 82 RPTV | NA | LESS THAN 3 RPTV | LESS THAN 1.2 RPTV | NA | LESS THAN 5 RPTV |
| | | | | | | |
| MY 2016 @ 12 MIS | ABOUT 10 RPTV | ABOUT 10 RPTV | LESS THAN 3 RPTV | LESS THAN 2 RPTV | LESS THAN 5 RPTV | LESS THAN 5 RPTV |
| MY 2016 @ 24 MIS | ABOUT 20 RPTV | ABOUT 20 RPTV | LESS THAN 3 RPTV | LESS THAN 2 RPTV | ABOUT 6 RPTV | LESS THAN 5 RPTV |
| MY 2016 @ 36 MIS | ABOUT 31 RPTV | ABOUT 31 RPTV | LESS THAN 3 RPTV | LESS THAN 2 RPTV | NA | LESS THAN 5 RPTV |
| MY 2016 @ 48 MIS | ABOUT 35 RPTV | ABOUT 35 RPTV | LESS THAN 3 RPTV | ABOUT 2 RPTV | NA | LESS THAN 5 RPTV |
| MY 2016 @ 60 MIS | NA | ABOUT  RPTV | LESS THAN 3 RPTV | NA | NA | NA |

Table 3. Selected 8LXX Harsh Shift Complaint Rates By Model and MY.

55.     The unresolved nature of the Shift Defect in GM's eight-speed transmissions are further corroborated by GM's own documents. As noted, the documents show a redesign is needed to address "Alleged Lunge/Lurch/Hesitation Upon Shifting" as "incremental fixes" to both hardware and calibration from MY 2016-2020 to "improve warranty and customer satisfaction," but that "[u]ltimately, some of the issues could not be resolved without a major redesign of the transmission, **which was approved in early 2018 (8RWD Gen 2)**."[22]

56.     Further, GM documents from 2021 make it clear that the Shift Defect is "still" something that customers are dealing with, including harsh garage shifts, harsh first shift of the day, and rough coast downs. GM also admits that the Gen 2

---

[22] ECF No. 173-5, PageID.5934 (emphasis added).

transmission redesign will be what ultimately "addresses these customer facing issues" including[23]:



57.    The redesign comes too late for purchasers of the Class Vehicles. They will be left with cars of lower value, with no clear repair, and not what they bargained for.

**2.    GM's Service Bulletins Demonstrate Its Knowledge of the Shift Defect as Early as 2014, and a Continuing Design Defect.**

58.    From September 2014 to at least February 2019, GM issued many service bulletins and service bulletin updates to its dealers in the United States, but not its customers, acknowledging problems of harsh shifting, jerking, clunking, and delays in acceleration or deceleration relating to the 8L90 and 8L45 transmissions.

---

[23] *Won v. GM,* ECF No. 209-7, PageID.12936.

### a.     Service Bulletin 14-07-30-001

59.     On or around September 1, 2014, GM issued Service Bulletin 14-07-30-001 with the subject "Information on Transmission Adaptive Functions." This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015 Cadillac Escalade, 2015 Cadillac Escalade ESV, 2015 Chevrolet Corvette, and 2015 GMC Yukon. In the bulletin, GM stated that "[s]ome customers may comment on low mileage vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare. Customers should be advised that the transmission makes use of an adaptive function that will help to refine the shift feel while driving and improve shift quality." The bulletin also included description of transmission's adaptive learning functions and a section titled "How to Adapt Your Transmission" containing GM's instructions to train the adaptive learn process "for a concern with a 1-2 upshift" and "for a concern with a 3-1 coastdown (closed throttle) shift."

60.     From October 2014 to October 2018, GM subsequently issued seven updates to Service Bulletin 14-07-30-001, numbered 14-07-30-001A through 14-07-30-001G.

61.     On or around October 8, 2014, GM issued Service Bulletin 14-07-30-001A with the same subject and covered vehicles listed on the previous version. In this bulletin, GM again noted that "[s]ome customers may comment on low mileage

vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare." This revised bulletin was issued to provide updated information in the "How to Adapt Your Transmission" section, including a chart of shifts and their corresponding clutches, along with new, more detailed instructions to train the adaptive learn process for each of these clutches.

62.     On or around December 1, 2014, GM issued Service Bulletin 14-07-30-001B with the subject "Information on Transmission Adaptive Functions and Correcting Low Mileage HarshShift." In addition to the vehicles listed on the previous versions of this bulletin, the following models equipped with 8L90 transmissions were added: 2015 Chevrolet Silverado, 2015 GMC Sierras, and 2015 GMC Yukon XLs. The revised bulletin also included instructions for resetting and "relearning" transmission adapts using diagnostic software ("Transmission Adaptive Values Learn procedure through GDS 2") instead of performing the adaptive instructions while driving the vehicle but noted that the software function would not resolve the issue in 2015 Corvettes built before September 29, 2014, which "must be driven to learn the adapts."

63.     On or about January 27, 2015, GM issued Service Bulletin 14-07-30-001C with the same subject, the same covered vehicles, and substantially the same information included in the previous version. However, this revised version added a note to the "How to Adapt Your Transmission" section stating that "[t]he

transmission fluid temperature must be between 75°C (167°F) and 85°C (185°F) during the drive procedure or adapts will not be learned."

64.     On or about May 7, 2015, GM issued Service Bulletin 14-07-30-001D with the same subject and covered vehicles listed on the previous version. In this revised bulletin, GM provided updated instructions for resetting and "relearning" transmission adapts using different diagnostic software, the Transmission Service Fast Learn procedure through GDS 2, as opposed to the Transmission Adaptive Values Learn procedure in previous bulletins.

65.     On or about July 27, 2015, GM issued Service Bulletin 14-07-30-001E with the same subject and covered vehicles listed on the previous version. It also included substantially the same instructions for resetting and "relearning" transmission adapts. However, this revised bulletin included new information explicitly acknowledging that the Warranty applied to the transmission repair, stating: "Warranty Information. For vehicles repaired under the Powertrain coverage, use the following labor operation. Reference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information," and listing the applicable labor code as 8480318.

66.     On or about March 4, 2016, GM issued Service Bulletin 14-07-30-001F with the same subject and covered vehicles listed on the previous version. This revised bulletin repeated that "[s]ome customers may comment on low mileage

vehicles with automatic transmission that shift feel to be too firm (harsh) or may slip or flare" but added that "[c]learing the shift adapts without performing a Service Fast Learn should not be considered a repair procedure as the transmission will simply relearn the previous settings." The bulletin then proceeded to outline more detailed instructions "to determine what steps should be followed" to diagnose and perform the recommended "relearn" functions to adapt the clutches. However, like the previous version, this bulletin explicitly acknowledged that the Warranty applied to the transmission repair, stating: "Warranty Information. For vehicles repaired under the Powertrain coverage, use the following labor operation. Reference the Applicable Warranties section of Investigate Vehicle History (IVH) for coverage information," and listing the applicable labor code as 8480318.

67.    On or about March 3, 2017, GM issued Service Bulletin 14-07-30-001G with the same subject as the previous version. However, this revised bulletin applied only to 2015 Chevrolet Corvettes equipped with 8L90 transmissions (RPO M5U) and instructed GM technicians, "For all truck and utility applications with the 8L90 automatic transmission, refer to 16-NA-411 for the latest information for correcting low mileage harsh shifts." This revised bulletin's substantive information, including the service instructions and warranty information, otherwise remained the same as the previous version.

### b.    Service Bulletin 14876

68.    In or around December 2014, GM Issued Service Bulletin 14876 with the subject "Service Update for Inventory Vehicles Only 8-speed Transmission Harsh Shift." Under the section titled "Purpose," GM stated that "[o]n certain 2015 model year Cadillac Escalade, Cadillac Escalade ESV, Chevrolet Corvette, Chevrolet Silverado Double Cab and Crew Cab, GMC Sierra Double Cab and Crew Cab, GMC Yukon and GMC Yukon XL vehicles equipped with 8-speed automatic transmission (M5U), the customer may complain about harsh shifting. This can occur if the vehicle experienced multiple transmission reprogramming events during manufacturing, causing the calibration to over-adjust the shift parameters. This bulletin provides a service adaptive learn procedure that should be run to reset the calibration to the baseline parameters."

### c.    Service Bulletin 15-NA-007

69.    On or around September 15, 2015, GM issued Service Bulletin 15-NA-007 in response to customer complaints reporting conditions such as delayed engagement, "Firm garage shifts, Park to Drive or Park to Reverse after the vehicle has be [sic] sitting for several hours with the engine off," a clunking noise when the engine starts, and/or an illuminated malfunction lamp relating to diagnostic transmission code P16F3. This bulletin applied to the following vehicle models equipped with 8L90 transmissions (RPO M5U): 2015 Cadillac Escalade, 2015

Chevrolet Silverado, 2015 GMC Sierra, 2015 GMC Yukon and included directions regarding a software update and programming the transmission control module ("TCM").

70.     GM re-issued three updates to this service bulletin. On or around September 30, 2015, "delayed engagement" was removed from the subject. On or around October 21, 2015, the bulletin was expanded to cover the 2015 Chevrolet Corvette. On or around January 22, 2016, the bulletin was expanded to cover the 2016 model years for the vehicles listed in the original bulletin.

### d.     Service Bulletin 16-NA-014

71.     On or around January 21, 2016, GM issued Service Bulletin 16-NA-014 with the subject "Delayed Engagement After Sitting With Engine Off." This bulletin applied to the following vehicle models equipped with an 8L45 or 8L90 transmission: 2015-2016 Cadillac Escalade, 2016 Cadillac Escalade ESV, 2016 Cadillac ATS, 2016 Cadillac CTS, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, 2015-2016 GMC Yukon and 2015-2016 GMC Yukon XL. In the bulletin, GM stated that "[s]ome customers may comment on a condition of delayed engagement when the transmission is shifted from Park to Reverse or Park to Drive after the vehicle has been sitting with the engine off. This condition may typically occur after several hours or more commonly

overnight." GM's recommended correction was to "[i]nstall a new stator shaft support assembly.

72.    GM issued an update on or around April 22, 2016 to update part numbers.

73.    On or around June 16, 2016, GM issued an update to clarify the reported condition, to identify the cause of the reported condition, and to add diagnostic procedures for the C5 clutch and torque converter. Specifically, GM stated that "[t]his condition may be caused by the torque converter draining the transmission fluid back into the transmission pan." Additionally, GM advised that customers may describe the reported condition as follows:

- Vehicle delaying into gear.

- Not wanting to move.

- Feeling like the transmission is slipping.

- Delayed engagement followed by a harsh engagement.

74.    On or around November 17, 2016, GM issued an update to clarify the applicable vehicle models and provide more detailed repair or diagnostic procedures. The updated bulletin applied to the following vehicle models within the VIN range identified in the bulletin: vehicles equipped with an 8L45 or 8L90 transmission: 2015-2016 Cadillac ATS, 2015-2016 Cadillac CTS; vehicles equipped with an 8L45 transmission: 2015-2016 Chevrolet Camaros with a 3.6L engine and VIN on or before September 28, 2015, 2015-2016 Chevrolet Camaros with a 2.0L engine and

VIN on or before November 9, 2019; vehicles equipped with an 8L90 transmission: 2015-2016 Cadillac Escalade, 2015-2016 Cadillac Escalade ESV, 2015-2016 Chevrolet Camaro, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, 2015-2016 GMC Yukon, and 2015-2016 GMC Yukon XL. GM's recommended correction was to replace parts of the transmission and/or the transmission pan, depending on the symptoms described by the customer. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

### e.    Service Bulletin 16-NA-019

75.    On or around January 25, 2016, GM issued Service Bulletin 16-NA-019 with the subject "Information on Transmission Adaptive Functions and Correcting Low Mileage Harsh Shifts, Slips, or Flares." This bulletin applied to all 2016 passenger cars and trucks under the Buick, Cadillac, Chevrolet, or GMC brands equipped with 8L90 or 8L45 automatic transmissions (RPOs M5U, M5T, M5N, M5X). Under the "Condition" section of this bulletin, GM stated, "[s]ome may comment on low mileage vehicles with an automatic transmissions [sic] that they shifting may feel too firm (harsh), slips, or flares. Customers should be advised that the transmission makes use of an adaptive function that will help to refine the shift feel while driving and improve shift quality." The bulletin also included description of transmission's adaptive learning functions and instructions for resetting and

"relearning" transmission adapts. Like PIE0353 and later versions of 14-07-30-001, this bulletin update included a "Warranty Information" section with a specific Labor Operation code.

76.    On or around August 19, 2016, GM issued an update to Service Bulletin 16-NA-019 as 16-NA-019A with "[a]dded 2017 Model Year and updated information." Specifically, the bulletin directed GM technicians to "check the ECM/TCM Software/Calibrations against what's currently in the vehicle and if the description of the update is relevant to the customer concern please perform the update prior to proceeding with the learns" outlined in the revised bulletin. The revised bulletin included the same "Warranty Information" section as the original bulletin.

### f.    Service Bulletin 16-NA-213

77.    On or around June 28, 2016, GM issued yet another Service Bulletin to address consumer comments "that the transmission has developed a harsh shift." This bulletin, 16-NA-213, applied to the following vehicle models equipped with an 8L90 or 8L45 transmission (RPOs M5U, M5T, M5N) built between July 1, 2015 to September 14, 2015: 2015-2016 Cadillac Escalade, 2015-2016 Cadillac ATS, ATS V, CTS, CTS V, 2015-2016 Chevrolet Corvette, 2015-2016 Chevrolet Silverado, and 2015-2016 GMC Sierra. The bulletin specifically noted that "there may be more

than one shift that is harsh" and that some transmissions, those with "a suspect Clutch Control Solenoid," should have the valve body replaced.

### g.   Service Bulletin PIP5437

78.   On or around November 8, 2016, GM issued another service bulletin to address the ongoing, unremedied Shift Defect. This bulletin, PIP5437, was titled "8L45 8L90 Diagnostic Tips for Harsh Shifts" to address consumer comments that "the transmission in their vehicle is not shifting correctly." The bulletin applied to the following vehicle models equipped with an 8L90 or 8L45 transmission: 2015-2016 Cadillac Escalade, 2016 Cadillac Escalade ESV, 2016 Cadillac ATS, ATS-V, CTS, and CTS-V, 2015-2017 Chevrolet Corvette, 2015-2017 Chevrolet Silverado, 2016-2017 Chevrolet Camaro, 2015-2017 GMC Sierra, and 2015-2017 GMC Yukon. The bulletin directed technicians to use software to identify the shift problems and to perform a drive learn procedure on low-mileage vehicles. On higher mileage vehicles, the bulletin instructed technicians to remove the transmission fluid pan and inspect for debris. Technicians were further instructed, "if debris is found the transmission should be disassembled for root cause and repairs. If excessive debris is not found the valve body should be replaced." This bulletin was updated on or around November 14, 2016 to cover additional vehicle models equipped with an 8L90 or 8L45 transmission, namely 2017 Cadillac Escalade, 2017 Cadillac Escalade ESV, and 2017 Cadillac ATS, ATS-V, CTS, and CTS-V.

### h.    Service Bulletin 16-NA-361

79.    Since 2016, GM has issued Service Bulletin 16-NA-361.



**Bulletin No.: 16-NA-361**
**Date: Apr-2017**

# Service Bulletin

# INFORMATION

**Subject:**    Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle

| Brand: | Model: | Model Year: | | VIN: | | Engine: | Transmission: |
|---|---|---|---|---|---|---|---|
| | | from | to | from | to | | |
| Cadillac | ATS | 2016 | 2017 | | | | Automatic 8L45, 8L90 (M5T, M5N, M5U, M5X) |
| | CTS Models | | | | | | |
| | CT6 | | | | | | |
| | Escalade Models | 2015 | | | | | |
| Chevrolet | Camaro | 2016 | 2017 | | | | |
| | Corvette | 2015 | 2017 | | | | |
| | Silverado | | | | | | |
| GMC | Sierra | 2015 | 2017 | | | | Automatic 8L90 (M5U, M5X) |
| | Yukon | | | | | | |

| Involved Region or Country | North America and N.A. Export Regions |
|---|---|
| Condition | Some customers may comment that the transmission exhibits a harsh 1-2 shift on the first shift of the day, typically under light throttle. |
| Cause | This condition is due to the initial clutch fill time of the 2-3-4-6-8 (C4) clutch. |
| Information | Some customers may experience a flare condition on the first 1-2 shift of the day or after the vehicle has been parked for several hours. The condition may have developed after the replacement of a complete transmission assembly or the replacement of the stator support to correct a delayed engagement condition. This is most likely to occur under light throttle conditions. Subsequent 1-2 shifts have acceptable shift feel. Replacing transmission components will not correct the condition. |

| Correction | **Important:** Replacing transmission components or complete assemblies will not improve the condition. |
|---|---|
| | The first 1-2 shift of the day may be harsh. The customers' vehicle should be compared to a like vehicle under the same driving conditions. **Do Not** replace any parts for this condition. |
| | **Note:** This condition will not impact the designed performance or reliability of the vehicle. |

| Version | 3 |
|---|---|
| Modified | Nov. 18, 2016 - Revised the Cause section. |
| | April 6, 2017 - Added models and Revised the Condition, Cause and Correction sections. |

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information.

WE SUPPORT VOLUNTARY TECHNICIAN CERTIFICATION

80.     Significantly*, this same bulletin has been updated nearly every year simply to add more model years*. *See, e.g., Won v. GM*, ECF No. 249-5, PageID.19558-59 (October 2019 Update); Ex. 3 (August 2020 update); Ex. 4 (January 26, 2022 update). They all share as the "Subject: Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle." They all cover automatic 8L45 and 8L90 transmissions. The latest version encompasses the models noted above in the original TSB, but extends to **2022** model years that include the 8L transmissions:

2022 Chevy Truck Silverado 1500 LTD 4WD L4-2.7L Turbo
Vehicle > Technical Service Bulletins

INFORMATION ON TRANSMISSION HARSH 1-2 SHIFT UPON FIRST START
UP/SHIFT OF THE DAY UNDER LIGHT THROTTLE

## #16-NA-361: Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle - (Jan 26, 2022)

Subject: Information on Transmission Harsh 1-2 Shift Upon First Start Up/Shift of the Day Under Light Throttle

| Brand: | Model: | Model Year: | | VIN: | | Engine: | Transmission: |
|---|---|---|---|---|---|---|---|
| | | from | to | from | to | | |
| Cadillac | ATS | 2016 | 2019 | - | - | - | Automatic 8L45 (M5N) 8L90 (M5X, MQE) |
| | CTS Models | 2016 | 2019 | | | | |
| | CT6 | 2016 | 2020 | | | | |
| | CT4 | 2020 | 2022 | | | | |
| | Escalade Models | 2015 | 2017 | | | | Automatic 8L90 (M5U, MQE) |
| Chevrolet | Camaro | 2016 | 2022 | | | | Automatic 8L45 (M5T) 8L90 (M5U, M5X, MQE) |
| | Colorado (VIN S, T) | 2017 | 2022 | | | | |
| | Corvette | 2015 | 2019 | | | | |
| | Express | 2017 | 2022 | | | | |
| | Silverado | 2015 | 2018 | | | | |
| | Silverado LD | 2019 | 2019 | | | | |

| Brand: | Model: | Model Year: | | VIN: | | Engine: | Transmission: |
|---|---|---|---|---|---|---|---|
| | | from | to | from | to | | |
| GMC | Silverado 1500 (New Model) | 2019 | 2021 | | | | |
| | Silverado 1500 LTD (RPO J21, 12th VIN Digit = 4 or less) | 2022 | 2022 | | | | |
| | Silverado 1500 New (RPO J22, 12th VIN Digit = 5 or greater) | | | | | | |
| | Canyon | 2017 | 2022 | | | | Automatic 8L45 (M5T) 8L90 (M5U, M5X, MQE) |
| | Savana | | 2022 | | | | |
| | Sierra | 2015 | 2018 | | | | |
| | Sierra Limited | 2019 | 2019 | | | | |
| | Sierra 1500 (New Model) | 2019 | 2021 | | | | |
| | Sierra 1500 Limited (RPO J21, 12th VIN Digit = 4 or less) | 2022 | 2022 | | | | |
| | Sierra 1500 New (RPO J22, 12th VIN Digit = 5 or greater) | | | | | | |
| | Yukon Models | 2015 | 2017 | | | | Automatic 8L90 (M5U, MQE) |

COMPLAINT- 36

The "Condition" and "Cause" as of is 2022 is the same as of 2017:

| Condition | Some customers may comment that the transmission exhibits a harsh 1-2 shift on the first shift of the day, typically under light throttle. |
|-----------|-------------------------------------------------------------------------------------------------------------------------------------------|
| Cause | This condition is due to the initial clutch fill time of the 2-3-4-6-8 (C4) clutch. |

And the "Correction" is the same from 2017 to 2020: **None.** Rather, just as in 2017, GM admonishes *against* a transmission replacement or any parts replacement:

| Correction | **Important:** Replacing transmission components or complete assemblies will not improve the condition.<br>The first 1-2 shift of the day may be harsh. The customers' vehicle should be compared to a like vehicle under the same driving conditions. Do Not replace any parts for this condition.<br>**Note:** This condition will not impact the designed performance or reliability of the vehicle. |
|------------|---|

81.    Thus, GM has been issuing a technical service bulletin for a Shift Defect for six years that directs dealers to do no service. GM knows that the Shift Defect cannot be fixed by replacing components, or even complete assemblies, because they are equally defective. GM knows it is selling vehicles with a Shift Defect. Yet it keeps selling those vehicles.

## i.    Service Bulletin 16-NA-411

82.    On or around January 20, 2017, GM issued Service Bulletin 16-NA-411 to provide GM technicians with yet another a procedure to reprogram the ECM and TCM to correct ongoing complaints relating to the Shift Defect. This bulletin applied to the following vehicle models equipped with an 8L90 transmission: 2015-2016 Cadillac Escalade models; 2015-2016 Chevrolet Silverado, 2015-2016 GMC Sierra, and 2015-2016 GMC Yukon models. Specifically, the bulletin addressed the following consumer comments on the following conditions:

- Harsh 1-2 upshift (except for the first 1-2 upshift of the day)
- Harsh 3-1 downshift when de-accelerating to a stop
- Harsh downshift under heavy throttle apply
- Active Fuel Management (AFM) V4 to V8 transition harshness
- Coast down downshifts

83.    Notably, the bulletin specifically acknowledged that:

The new ECM and TCM software will not improve the following conditions and should not be installed for any of the following conditions:

- Shift quality of the first 1-2 shift of the day
- Power-On lift foot upshifts (Heavy throttle application followed by a closed throttle application which results in a transmission up shift)
- Delayed/slow engagement (Refer to Bulletins 16-NA-014 and 16-NA-364)
- TCC Shudder (Refer to PIP5337 and Bulletin 16-NA-175)

- Engine or Chassis induced vibrations

- Fuel Economy

**j.    Service Bulletin 16-NA-404**

84.    On or around April 7, 2017, GM issued Service Bulletin 16-NA-404 to provide GM technicians with another procedure to reprogram the TCM to correct the diagnostic transmission code set relating to the same complaints reiterated above arising from the Shift Defect. This bulletin applied to the following vehicle models equipped with an 8L45 and 8L90 transmissions (M5T, M5N, M5U, M5X): 2017 Cadillacs ATS and CTS built before December 6, 2016; 2017 Cadillacs CT6 (Excluding RPO I16) built before November 17, 2016; 2017 Cadillacs Escalade built before December 16, 2016; 2017 Chevrolet Camaro built before December 6, 2016; 2017 Chevrolet Corvette built before December 8, 2016; 2017 Chevrolet Silverado built before December 16, 2016; 2017 Chevrolet Suburban (excluding RPO I16) built before December 16, 2016; 2017 Chevrolet Tahoe (Excluding RPO I16) built before December 16, 2016. It also applied the following vehicles built before December 16, 2016 and equipped with automatic 8L90 transmissions (M5U, M5X): 2017 GMC Sierra and 2017 GMC Yukon (excluding RPO I16). The bulletin addressed the following consumer complaints reporting:

- Harsh shift

- Delayed shift

- Unwanted downshift

- Transmission stuck in one gear

- Erratic shifting

- Hesitation between shifts

- MIL illuminated

### k.    Service Bulletin 20-NA-187

85.    On or around September 2020, GM issued service bulletin 20-NA-187 with the subject line "Delayed and/or Harsh Engagement of Transmission Shift After Vehicle Sitting with Engine Off." This bulletin applied to 2018-2021 MY Camaro and Colorado vehicles; 2018-2019 Corvette and Silverado vehicles; 2018-2019 Cadillac ATS, CTS, and CT6 vehicles; as well as GMC Canyon vehicles for 2018-2021 and Sierra vehicles for 2019-2021. It also applied to additional vehicles going back to 2018. The bulletin notes that "[s]ome customers may comment on a condition of delayed engagement when the transmission is shifted from Park to Reverse or Park to Drive after the vehicle has been sitting with the engine off," and added that customers "may describe this condition as . . . [v]ehicle delaying into gear," "[f]eeling like the transmission is slipping," and/or "[d]elayed engagement followed by a harsh engagement."

### 3.    Consumer Complaints to NHTSA Demonstrate Consumers Have Complained about the Shift Defect Since 2015 to the Present.

86.    Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement

(backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

87.     Under information and belief, GM personal communicate with NHTSA and review complaints on the website as part of GM's open investigation review process.

88.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Thus, GM knew or should have known of the many complaints about the Shift Defect logged by NHTSA ODI, and the content, consistency, and large number of those complaints alerted, or should have alerted, GM to the Shift Defect.

89.     Complaints that owners filed with the NHTSA demonstrate that the defect is widespread and dangerous and that it manifests without warning. The complaints go back to 2015 and include some models that no longer have the 8L transmissions, such as Escalades and Yukons. The complaints indicate GM's awareness of the problems with the transmission and how potentially dangerous the defective condition is for consumers. The complaints also indicate how often GM

dealers and service technicians told customers that the symptoms of the Shift Defect—harsh shifts that involve jerking, lurching, and/or hesitations—were "normal." The following is just a small sampling of the hundreds of safety-related complaints describing the Shift Defect (spelling and grammar mistakes remain as found in the original) (National Highway Traffic Safety Administration, Safety Issues & Recalls, http://www-odi.nhtsa.dot.gov/complaints/).

### a.    Cadillac ATS

90.    On October 24, 2018, the following was reported as to a 2016 Cadillac ATS:

> WHILE DRIVING VEHICLE SLOWLY OR IN STOP AND GO TRAFFIC, THE TRANSMISSION SHIFTS VERY ROUGH BETWEEN THE LOWER GEARS ON UPSHIFTS AND DOWNSHIFTS AND WILL HOLD A GEAR HANGING WHILE TRYING TO BRAKE OR ACCELEfRATE AND CAUSE THE VEHICLE TO RAPIDLY LUNGE FORWARD AND CAUSE A POTENTIAL ACCIDENT AS IT BECOMES HARD TO APPLY MORE PRESSURE TO THE BRAKES SUDDENLY[.]

91.    On May 11, 2019, the following was reported:

> VEHICLE TENDS TO DO A HARD DOWN SHIFT WHEN IT'S AROUND 10-15 MPH AND IT WILL FEEL LIKE SOMEONE HIT YOUR CAR FROM BEHIND. WHEN ACCELERATING FROM A COMPLETE STOP 10-15 MPH VEHICLE WILL STALL SOMETIMES.

92.    On August 26, 2019, the following was reported:

> TAKEN MULTIPLE TIMES TO DEALER FOR TRANSMISSION ISSUES. GM HAS REPLACED IT AT 17475 MILES. MORE TRIPS FOR ISSUES WITH NEW TRANSMISSION. IMPROPER

SHIFTING, HARD DOWN SHIFTING, HOLDING RPM GEAR LONGER THAN NORMAL.

93.     On August 9, 2019, the following was reported:

TRANSMISSION SHUDDERS ON LIGHT ACCELERATION (WORST AT AROUND 50 MPH) GENERAL ACCELERATION FEELS SIMILAR TO AN ENGINE MISFIRE WITH INTERMITTENT DROPS IN POWER. SOME TIMES TRANSMISSION CAN SHIFT HARD AND HAVE A BANG, JARRING FEELING.

94.     On September 2, 2019, the following was reported:

AT MAJOR INTERSECTION WAS AT A STOP RED LIGHT. BEGAN ACCELERATING VEHICLE STALLED AND THE LIGHT ENGINE TURNED ON, TRANSMISSION STUCK AT FIRST GEAR AND WOULD NOT ACCELERATE ABOVE 20MPH. THIS HAPPENED AS I TRIED PASSING A VEHICLE IN FRONT TO LATER MAKE A TURN. THE CAR HAS HAD THIS ISSUE SEVERAL TIMES. REPORTED TO CADILLAC THEY ASKED THAT I REPORT AS A LEMON MEANWHILE THIS IS A LEASE VEHICLE.

95.     On October 5, 2021, the following was reported:

TRANSMISSION CAUSES CAR TO SHUDDER OR SHAKE/VIBRATE AT LOWER SPEEDS AND LOWER RPM (AUTO SHIFTING) IT'S BEEN LIKE THIS SINCE IT WAS PURCHASED. IF YOU PERFORM MANUAL SHIFTING AT 2500 RPM'S OR HIGHER YOU DON'T EXPERIENCE THE SAME SHAKE/VIBRATION. RON CRAFT CADILLAC SAYS IT'S PERFORMING AS EXPECTED.

### b.     Cadillac CTS

96.     On November 7, 2020, the following was reported:

WHEN I ACCELERATED THE TRANSMISSION FELT LIKE IT GOT STUCK AND CONTINUED TO REV WHEN I ATTEMPTED TO ACCELERATE AND FELT LIKE I WAS NOT MOVING. RPM CONTINUED TO GO UP BUT NO POWER. OTHER TIMES A VIG

BUMP IS FELT WHEN I TAKE FOOT OFF GAS FOR A KOMENT
AND WHEN I PLACE IT BACK ON TO ACCELERATE THE BIG
BUMP IS FELT. HAVE TAKEN IT TO CADILLAC SEVICE TWICE
AND BOTH TIMES TRANSMISSION WAS REPROGRAMMED
BUT IT DID NOT DIX THE PROBLEM.

97.    On July 11, 2021, the following was reported:

A known issue. "Clutch slow to fill" is a defect of the 8 speed
transmission that causes the vehicle to violently buck and surge at low
speeds and is dangerous as it makes it unreliable when driving at low
speeds since it can randomly lunge forward dangerously. Dealership
replaced transmission valve body under warranty and flushed
transmission twice but problem remains. Dealership claims it can be
fixed with an "update" but tried to charge over $300 for the "update"
when it is a defect that should have been fixed under warranty for free
or have a recall.

98.    On June 24, 2021, the following was reported:

CAR HAS LOCKED IN 2ND OR 3RD GEAR TWO DIFFERENT
TIMES, BOTH AFTER LONG DRIVES (2+ HOURS AT HIGHWAY
SPEEDS) AND WOULD NOT DOWNSHIFT INTO 1ST TO STOP
MOVEMENT. THE FIRST TIME WAS A STOP LIGHT AND
ALMOST CAUSED AN ACCIDENT, THE SECOND TIME WAS IN
MY DRIVEWAY AND ALMOST HIT THE HOUSE. GOOD
BRAKES ARE THE ONLY THING THAT SAVED ME. BOTH
TIMES, THE VEHICLE SHIFTED TO 1ST WITH A LOUD BANG.
TRANSMISSION ALSO JERKS THE CAR FORWARD FROM THE
STOPPED POSITION WHEN ENGINE STARTS AT A STOP SIGN
OR LIGHT (WHEN AUTO-START./STOP IS ENABLED).

99.    On December 12, 2019, the following was reported:

THE CAR HAS 37250 MILES ON IT. 6 MONTHS AGO, IT
STARTED SHIFTING ROUGHLY BETWEEN 1ST AND 2ND
GEAR. WE TOOK IT TO WALDORF CADILLAC/GM IN
WALDORF, MD. THEY ACKNOWLEDGED IT WAS A KNOWN
ISSUE AND WOULD TAKE THE FOLLOWING STEPS: FLUSH
THE TRANSMISSION, RE-PROGRAM THE TRANSMISSION,
REPLACE THE VALVE, AND ULTIMATELY, REPLACE THE

TRANSMISSION. THEY HAVE DONE ALL THE ACTIONS EXCEPT REPLACE THE TRANSMISSION AND WON'T TAKE FURTHER ACTION. THE CAR SHIFTS SO VIOLENTLY AT TIMES THAT YOU DON'T KNOW IF YOU'RE GOING TO HIT THE CAR IN FRONT OF YOU. WE LIVE IN THE WASHINGTON DC AREA, SO TRAFFIC IS USUALLY STOP-AND-GO. WHEN THE CAR GETS TO THE TOP END OF 1ST GEAR (AROUND 9 MPH) IT HESITATES, THEN SLAMS INTO SECOND GEAR. IT HAS ALSO GOTTEN "STUCK" IN FIRST GEAR, WHILE TURNING ONTO A STREET. THE ENGINE ACCELERATED BUT THE CAR WOULDN'T SHIFT SO I HAD TO PULL OFF IMMEDIATELY OR RISK BEING HIT BY ONCOMING TRAFFIC. IT HAS ONLY DONE THIS ONCE SINCE WE STARTED HAVING PROBLEMS.

100.   On March 24, 2021, the following incident was reported:

I WAS DRIVING MY 2018 CADILLAC CTS BETWEEN 50-60MPH AND I LIGHTLY TAPPED ON THE GAS AND THE CAR STARTED SHAKING AND VIBRATING. FELT LIKE IT COULD BE A TRANSMISSION OR A ENGINE MISFIRE. MY CARS TRANSMISSION ALSO SHIFTS VERY VERY ROUGH KINDLY JERKY WHICH CREATES A UNSAFE ENVIRONMENT WHILE IN MOTION. THIS IS A CONSISTENT ISSUE AND WITH MY CAR AND ONLY HAVING 12,000 MILES ON IT I FIND REALLY CONCERNING. THIS VIBRATION ONLY HAPPENS BETWEEN 50-60MPH AND THE ROUGH TRANSMISSION SHIFTING HAPPENS AS I DRIVE IT ALONG WITH VIBRATIONS ARE COMING FROM THE ENGINE WHICH SHAKE MY ENTIRE CAR. ALL SERVICES ARE UP TO DATE. CADILLAC AND GM ARE BOTH NOT SURE OF WHAT THE ISSUE CAN BE EVEN THOUGH THERE IS A PENDING CLASS ACTION LAWSUIT FOR THE SAME ISSUE[.]

### c.    Cadillac CT6

101.   On November 1, 2018, the following was reported:

CAR WILL NOT RESPOND FOR AT LEAST 2 SECONDS DURING A SLOW, ROLLING STOP, WHEN TRYING TO ACCELERATE AGAIN. UNABLE TO PERFORM EVASIVE MANUEVER, IF

NEEDED, SECONDARY TO THE DELAY TO ACCELERATOR INPUT. HARSH 2-1 DOWNSHIFTS ALSO AT SLOW SPEEDS AND CAN EVEN FEEL AS THOUGH YOU WERE STRUCK FROM BEHIND. HIGHWAY DRIVING IS EXCELLENT; CITY DRIVING CHALLENGING WITH THE TRANSMISSION. THE DRIVER HAS TO LEARN HOW TO DRIVE THIS VEHICLE. FIND IT VERY UNUSUAL AFTER OWNING 5 OTHER CADILLACS AND NEVER HAD THIS PROBLEM. I BOUGHT THIS CAR AS A PRE-OWNED CERTIFIED VEHICLE FROM CADILLAC DEALER. THE CAR HAD 650 MILES ON IT AND I TRULY BEATIFUL/SHOWROOM CONDITION. I HAD THE TRANSMISSION RE-FLASHED, WHICH PROVIDED PERHAPS A 1-2 DAYS RELIEF. I WILL CONTINNUE TO PERSUE WITH DEALER, BUT WANTED YOU GUYS TO BE AWARE. CADILLAC SHOULD FIX THE PROBLEM; NEW/DIFFERENT TYPE OF TRANSMISSION OR RE-WORK THE 8L45/8L90'S WITH DIFFERNET VLAVES/SOFTWARE OR BUY IT BACK FROM ME.

### d.    Cadillac CT6

102.   On October 3, 2017, the following was reported:

VEHICLE'S TRANSMISSION LURCHES AND SLIPS OUT OF GEAR IN COAST CONDITIONS; DURING TURNS AND IN INTERSECTIONS.

103.   On June 27, 2018, the following incident was reported:

TRANSMISSION HAS A SIGNIFICATION CLUNK/HESITATION/DELAY SHIFTING UP FROM 1ST-2ND GEAR AND DOWN FROM 2ND-1ST GEAR. IN THE UPSHIFT, THE CAR VIOLENTLY LUNGES FORWARD ONCE THE ACCELERATION REV FROM THE PUSH OF THE PEDAL CATCHES UP WITH THE GEAR SHIFTING, NO MATTER HOW DELICATELY YOU MIGHT PUSH THE PEDAL. FEELS LIKE THE VEHICLE HAS BEEN HIT FROM BEHIND ONCE IT CATCHES. IN THE DOWNSHIFT, UPON BRAKING TO COME TO A STOP, THE CAR PULSATES AND LUNGES FORWARD AS WELL WHICH HAS CAUSED ME TO NEARLY HIT THE CAR IN FRONT OF ME ON SEVERAL OCCASIONS AND IF NO CAR IS

IN FRONT OF ME IT HAS CAUSED ME TO CREEP OUT INTO THE INTERSECTION A BIT. THIS HAS HAPPENED REGULARLY SINCE MY ACQUISITION OF THE VEHICLE IN EARLY APRIL 2018 AND THE DEALER HAS REVIEWED AND ADVISED THAT IT SHIFTS JUST FINE.

104.   On August 26, 2019, the following was reported:

HARD SHIFTS IN LOW SPEEDS, INTENSE VIBRATION , SHUDDER THROUGHOUT DRIVING SPEED. CADILLAC DEALER SAID IT IS TORGUE CONVERTER ISSUE, CAR TRANSMISSION NEEDS TO BE FLUID EXCHANGED FOR $800.

### e.   Chevrolet Corvette[24]

105.   On October 12, 2014 the following incident was reported:

AT ANY SPEED THE CAR JERKS LIKE ONE OR MORE SPARK PLUG WIRES ARE NOT FIRING(PULLED OFF) IN ALL MODES, IT IS WORSE IN (E ECONOMY MODE) PUSH THE GAS DOWN IT GETS WORSE IN ALL MODES.

I REPLACED THE PLUGS AND WIRES I STILL HAVE THIS PROBLEM, I WAS HOPING IT WAS A BAD PLUG OR WIRE, THAT HAPPENS.

I TOOK IT TO THE DEALER WHEN THE CHECK ENGINE LIGHT CAME ON I PULLED THE FUSE FOR THE EXHAUST VALVES TO KEEP THEM OPEN THEY CHECKED THEN TESTED THE CAR AND TOLD ME IT WAS FINE NO OTHER CODES WERE FOUND.

I HAVE 1800 MILES ON THE CAR NOW I TRIED EVERY 93 OCTANE FUEL AVAILABLE IN THIS AREA AND OTHER AREAS, HOPING IT WAS JUST BAD FUEL THAT MANY STATIONS CAN'T HAVE BAD FUEL FOR IT TO BE FUEL RELATED. *TR

---

[24] GM switched all Corvettes to a different eight-speed transmission, the eight-speed Tremec Dual Clutch Transmission, in 2020.

106.   Another incident involving a Chevrolet Corvette was reported on

October 27, 2015:

> 8 SPEED AUTOMATIC TRANSMISSION DOWN SHIFTS AT A
> STOP WITH SUCH FORCE IT FEELS AS YOU HAVE BEEN HIT
> FROM BEHIND BY ANOTHER CAR WHILE COMING TO A
> STOP. TRANSMISSION ALSO WILL NOT ALWAYS ENGAGE
> PROPERLY AND WILL OVER REV AND SLAM INTO GEAR
> POSSIBLY CAUSING AN ACCIDENT. TRANSMISSION AT
> TIMES WILL DISENGAGE WHILE GOING FORWARD THEN
> SLAM INTO GEAR WITH GREAT FORCE. I WAS TOLD BY A
> GM INSIDER THAT GM IS AWARE SOME TRANSMISSIONS
> ARE DEFECTIVE AND IS WORKING ON A KIT TO FIX THE
> FLUID STARVATION PROBLEM INTERNALLY BUT HAS
> DONE NOTHING TO INFORM OWNERS OF THE POTENTIAL
> DANGERS OF ERRATIC SHIFTING THAT IT'S CAUSING
> WHILE DRIVING. THIS ALSO CAUSES THE TRANSMISSION
> TO OVER HEAT AND TO ILLUMINATE A WARNING LAMP.

107.   Another incident involving a Chevrolet Corvette was reported on

February 27, 2016:

> 8-SPEED AUTOMATIC TRANSMISSION ALWAYS SHIFTS
> ERRATICALLY WHEN STARTING OUT COLD (LAZY SHIFT,
> SLOW SHIFT, ETC.) AND OCCASIONALLY DOES NOT
> DOWNSHIFT WHEN CAR COMES TO A STOP, ONLY TO SLAM
> HARD INTO 1ST WHEN GAS PEDAL IS PRESSED TO RESUME
> TRAVEL. DEALER SAYS GM CLAIMS THIS IS "NORMAL," BUT
> NO CAR I'VE EVER OWNED BEHAVES LIKE THIS. APPEARS
> TO    BE    FLUID    STARVATION    INTERNALLY.    ANY
> FIX/REPLACEMENT WOULD BE COSTLY FOR GM, SO GIVEN
> THEIR HISTORY W/FAULTY IGNITION SWITCHES, NOT
> SURPRISED THEY'RE TRYING TO AVOID IT. TRANSMISSION
> IS    DEFINITELY    NOT    NORMAL    AND    BEHAVIOR    IS
> UNPREDICTABLE + UNACCEPTABLE -- ESPECIALLY AT THIS
> PRICE. WHEN CAR IS MOVING & TRANSMISSION IS IN DRIVE
> AND TRYING TO LAZILY SHIFT GEARS, YOU TEMPORARILY
> LOSE    ABILITY    TO    APPLY    POWER,    WHICH    IS    BOTH

DANGEROUS AND UNNERVING. CLEARLY, THIS TRANSMISSION WAS PUT INTO PRODUCTION W/INADEQUATE TESTING & DEVELOPMENT. A RECALL IS NECESSARY TO FIX PROPERLY.

108.   On May 17, 2016, the following incident involving a Chevrolet Corvette was reported:

AUTOMATIC 8 SPEED TRANSMISSION HAD TO BE REPLACED AT 2000 MILES ON THE ODOMETER DUE TO HARD SHIFTS AND SHIFTING AUTOMATICALLY TO LOW GEAR AT HIGHWAY SPEEDS NEARLY BRINGING THE CAR TO A STOP IN INTERSTATE TRAFFIC, NOW 700 MILES AND 4 MONTHS LATER THE TRANSMISSION IS STUCK IN SECOND GEAR AND YOU CANT DRIVE FAST ENOUGH TO GET OUT OF THE WAY OF TRAFFIC. AND I KNOW OF SEVERAL OTHER CARS LIKE IT THAT HAVE SIMILAR PROBLEMS. THIS IS A REAL SAFETY PROBLEM AND GM SEEMS TO IGNORE IT, PROBABLY UNTIL SOMEONE GETS HURT OR KILLED.

109.   On August 8, 2016, the following incident involving a Chevrolet Corvette was reported:

AUTOMATIC A8 TRANSMISSION HAS THE FOLLOWING ISSUES: 1)MORNING SHIFT FROM REVERSE TO DRIVE SEVERELY DELAYED, BANGS IN EVENTUALLY. 2) ERRATIC SHIFTING IN NORMAL TRAFFIC 3) THE 2-1 DOWNSHIFT WHEN COMING TO A STOP RESULTS IN SEVERE BANG, LURCHES FORWARD AND IS VERY UNSAFE IN A PARKING LOT SITUATION. ALSO IN STOP AND GO TRAFFIC, SAME LURCHING FORWARD. FEELS AS IF SOMEONE HIT YOU FROM BEHIND 4) TORQUE CONVERTER LOCKUP IN 5TH AND 6TH GEAR. DEALER TORE APART THE CAR TO REPLACE THE STATOR, PERFORMED SOFTWARE UPDATE - NEITHER SOLUTION WORKED.

110.   On August 8, 2016, another incident involving a Chevrolet Corvette was reported:

THE A8 AUTOMATIC TRANSMISSION IN THE 2015 CORVETTE IS PRONE TO OCCASIONAL HARD DOWNSHIFTS FROM 2ND TO 1ST GEAR WHEN DRIVING AT SLOW SPEEDS (LESS THAN 10 MPH). SOMETIMES THE DOWNSHIFTS ARE SO VIOLENT THAT THE CAR JERKS FORWARD SEVERAL FEET. THE FIRST TIME IT HAPPENED I THOUGHT I HAD BEEN REAR ENDED BY ANOTHER CAR. THE UNPREDICTABLE BEHAVIOR OF THE TRANSMISSION IS ESPECIALLY DANGEROUS IN PROXIMITY TO PEDESTRIANS OR OTHER VEHICLES.

### f.    Chevrolet Camaro

111.    On July 5, 2016, the following incident was reported:

PURCHASED 2016 CHEVROLET CAMARO ON 6/18/2016 FEW DAYS AFTER THE ENGINE WAS RUNNING VERY ROUGH, GRINDING NOISE, TRANSMISSION SHIFTING HARD, THE CHECK ENGINE LIGHT ILLUMINATED AND SPEED REDUCED TO 5 MPH SHOWED ON DISPLAY. THIS HAS BEEN GOING ON SINCE THEN, I BROUGHT TO DEALER ON 7/1/2016 AND THE SERVICE MECHANIC TOOK BACK TO CHECK CODES AND INFORMED ME THAT NUMEROUS ERROR CODES WERE DETECTED AND TOLD ME TO GO AHEAD AND TAKE VEHICLE HOME BECAUSE IT WAS A HOLIDAY WEEKEND AND TO RETURN ON TUESDAY 7/5/2016 TO BE INSPECTED FOR REPAIR.

112.    Another incident involving a Chevrolet Camaro was reported on March

19, 2018:

I BOUGHT MY CAR IN SEPT. 2016 AFTER THE FIRST COUPLE OF MONTHS AT RANDOM TIMES THE TRANSMISSION MAKES A BOOM SOUND WHEN SLOWING DOWN FROM SPEEDS OVER 55 MPH OR DURING ACCELERATION FROM STOP AND GO RUSH HOUR TRAFFIC IT'S AS IF THE TRANSMISSION HAS TO CATCH UP WITH THE ACCELERATOR. I GET MONTHLY DIAGNOSTICS AND NOTHING SHOWS UP AS AN ISSUE.

113.   Another incident involving a Chevrolet Camaro was reported on

February 27, 2019:

> WHEN DRIVING, THE VEHICLE WILL VIBRATE/SHUDDER
> PERIODICALLY. WHEN PULLING INTO TRAFFIC, SOMETIMES
> IT DOES NOT SHIFT PROPERLY AND PRESENTS A DANGER.
> THE DEALER FLUSHED THE TRANSMISSION FLUID
> RECENTLY, BUT IT IS STARTING TO HAPPEN AGAIN.

114.   Another incident involving a Chevrolet Camaro was reported on

January 17, 2019:

> ISSUE 1 - 8 SPEED AUTOMATIC TRANSMISION IS SHIFTING
> HARD BETWEEN GEARS AND ALSO HAS A SHUTTER AT LOW
> ENGINE RPM BETWEEN 1200 TO 1500 RPM. THE SHUTTER
> WILL OCCUR IN MOST GEARS. ESPECIALLY NOTICEABLE
> WHEN USING CRUISE CONTROL. IT HAPPENS IN ALL ROADS
> IN ALL CONDITIONS AND AT VARIOUS SPEEDS + GEAR...

115.   An incident involving a 2017 Chevrolet Camaro was reported on

February 2, 2019, as follows:

> HARD SHIFTS BETWEEN 1ST & 2ND GEAR VIBRATION
> BETWEEN 1500 & 1800 RPM. THIS CAR HAS ACTIVE FUEL
> MANAGEMENT VIBRATION SEEMS TO HAPPEN WORSE
> WHEN IN 4 CYLINDER MODE. GM IS AWARE OF THE ISSUE
> AND KEEPS PROMISING A FIX WHICH HAS YET TO BE
> RELEASED. BLAME IT ON FLUID IN TRANSMISSION.

116.   On July 22, 2019, the following was reported:

> 2018 2.0LITER TURBO HAS SHIFTING ISSUES I BELIEVE. IT IS
> VERY VIOLENT SHIFTING THROUGH GEARS WHEN FIRST
> START DRIVING AND SLOWING VEHICLE DOWN, AND
> SEEMS TO CAUSE LAG WHEN ACCELERATING IN
> EVERYDAY DRIVING.

117.   On November 15, 2019, the following was reported:

GRINDING SOUND COMING FROM THE REAR END, IT DOES IT WHILE TURNING WHEN THE CAR IS COLD OR SAT FOR A FEW HOURS, I'M WORRIED THAT IT'S GOING TO LOCK UP SOME DAY WHILE TRAVELING. I BOUGHT IT NEW AND THE NOISE STARTED AT ABOUT 4000 MILES, THEY CHANGED THE FLUID AND THE NOISE NEVER WENT AWAY, I TRY TO EXPLAIN IT WHEN I TAKE IT IN, BUT THEY'RE DRIVING IT AFTER IT'S WARMED UP , SO NO NOISES EVERY TIME, THANKS, AND I HEAR ABOUT THIS FROM OTHER OWNERS.

118.   On January 21, 2021, the following was reported:

TRANSMISSION ISN'T CONTROLLED WELL. WHEN COMING TO A COMPLETE STOP THE TRANSMISSION TENDS TO SHIFT TO 1ST GEAR VIOLENTLY WHICH MAY CAUSE THE VEHICLE TO MOVE FORWARD AND HIT A CAR IN FRONT OF YOU. 2018 CAMARO 2.0

119.   On July 12, 2019, the following incident was reported:

TODAY IN THE MORNING, I WAS DRIVING ON THE HIGHWAY TO WORK AND AS I WAS DRIVING AT ABOUT 45 MPH, I HEARD A CLUNK SOUND UNDER THE CAR AND THE ENGINE UGHT CAME ON. I SLOWED DOWN AND STOPPED AT A TRAFFIC LIGHT AND THEN I BEGIN TO DRIVE AGAIN AND I NOTICED THAT MY CAR WAS DRIVING AT A HIGH RPM AND IT SEEMED LIKE WAS STUCK AT A SHIFT AND IT DIDNT WANT TO CHANGE GEARS SO I SLOWED DOWN PULLED INTO AN ENTRANCE AND TURNED OFF MY VEHICLE I LOOKED UNDER THE CAR AND I DIDNT SEE ANYTHING WRONG; NO LEAKS OR NOTHING. I TURNED IT BACK ON AND DROVE IT TO AUTO PARTS TO SEE HAVE THEM RUN A CHECK ENGINE LIGHT TEST AND 3 CODES CAME UP WHICH WAS P0964, P0966, AND P0700. AFTER THAT I TOOK IT BACK HOME AT A SLOW SPEED AND LEFT IT THERE UNTIL I GOT BACK HOME FROM WORK I STARTED MY CAR UP AND DIDNT SEE THE CHECK ENGINE LIGHT ON ANYMORE. I CALLED MY DEALERSHIP TO HAVE IT SERVICED AND CHECKED.

g.      Chevrolet Silverado

120.   On November 20, 2015, the following incident was reported as to a

2015 Chevrolet Silverado:

TRANSMISSION CANNOT FIND GEARS WHEN COASTING OR
SLOWING DOWN AND THEN HITTING ACCELERATOR. VERY
DANGEROUS WHEN IT HESITATES FOR SECONDS BEFORE
FINDING THE RIGHT GEAR AND GOING, OR IT STAYS IN TOO
HIGH OF A GEAR INSTEAD OF DOWNSHIFTING TO
ACCELERATE AND RATTLES. HAPPENS EVERY TIME I DRIVE
THE TRUCK, AND MANY OTHER PEOPLE HAVE THE SAME
ISSUE. GM DOESN'T CARE!

121.   Another incident involving a Chevrolet Silverado was reported on April

6, 2016:

HAD BEEN COMPLAINING SINCE 2 DAYS AFTER PURCHASE
THAT            TRANSMISSION            WAS
SHAKING/SHIMMYING/SPUTTERING. WAS PULLING ONTO A
COUNTY HIGHWAY OFF OF A RESIDENTIAL TYPE ROAD
(AFTER PICKING UP GRANDDAUGHTER FROM SCHOOL - SHE
WAS IN TRUCK) AND TRUCK BOGGED DOWN & WOULDN'T
GO. INTERSECTION IS AT TOP OF HILL AND AROUND A
CORNER. WAS CLEAR WHEN I STARTED PULLING OUT, BUT
WAS ALMOST HIT BY ONCOMING TRUCK BEFORE I GOT MY
TRUCK TO GET ON ACROSS THE INTERSECTION. HAS BEEN
IN SHOP TWICE TO FIX IT. FIRST TIME TO DOUBLE
TRANSMISSION FLUSH. THAT DIDN'T WORK. NEXT TIME A
FEW WEEKS LATER, A TECHNICIAN HOOKED UP A
COMPUTER TO MY TRUCK SO HE COULD MANUALLY SHIFT
GEARS WHILE RIDING WITH ME. HE FELT THE ISSUES AND
SAID HE SAW SEVERAL PROBLEMS. DEALERSHIP ENDED UP
REPLACING TORQUE CONVERTER. ALSO REPLACED VLOM
MANIFOLD - WHATEVER THAT IS? THAT'S WHAT IT SAYS
ON WORK ORDER. THE PROBLEM STILL EXISTS. I BELIEVE
THERE   ARE   BULLETINS   OUT   ON   THIS   TRUCK'S

TRANSMISSION ALREADY. I HAVE TALKED TO OTHERS WHO HAVE HAD THE SAME PROBLEM.

122.   Another incident involving a Chevrolet Silverado was reported on May 12, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. WHILE DRIVING 30 MPH, THE VEHICLE DOWNSHIFTED UNCONTROLLABLY WITHOUT WARNING. ALSO, WHILE IN THE PARK POSITION, THE VEHICLE SUDDENLY LUNGED FORWARD AND HAD TO BE RESTARTED. THE CONTACT STATED THAT THE TRANSMISSION INDEPENDENTLY ENGAGED INTO FIRST GEAR WITHOUT WARNING AND CAUSED THE VEHICLE TO SHIFT FORWARD ON MORE THAN ONE OCCASION. THE VEHICLE RECEIVED AN UNKNOWN REPAIR, BUT THE FAILURE RECURRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 14,000. ....UPDATED 0711/16 *BF

123.   Another incident involving a Chevrolet Silverado was reported on August 8, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. UPON DEPRESSING THE ACCELERATOR PEDAL, THE VEHICLE WAS EXTREMELY SLOW TO ACCELERATE WITH A DRASTIC REDUCTION IN SPEED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO TWO DEALERS WHO WERE UNABLE TO REPLICATE AND DIAGNOSE THE FAILURE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND PROVIDED NO RECOMMENDATION OR REPAIR SOLUTION. THE FAILURE MILEAGE WAS NOT AVAILABLE.

124.   Another incident involving a Chevrolet Silverado was reported on August 20, 2016:

THE TRANSMISSION HESITATES WHEN SHIFTING IN AUTOMATIC BUT WHEN IN MANUAL MODE IT SHIFTS FINE WITH NO ISSUES. THIS HAS BEEN A ON GOING ISSUE AND

PROBLEM THE SERVICE CENTER FOR A LOCAL DEALERSHIP CAN NOT FIND THE ISSUE. BUT THERE IS SOMETHING GOING ON WITH THE TRANSMISSION.

125.   Another incident involving a Chevrolet Silverado was reported on

September 14, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. WHILE DRIVING 10 MPH, THE ACCELERATOR PEDAL WAS DEPRESSED AND THE VEHICLE ACCELERATED IN EXCESS. THE VEHICLE WAS TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE WIRING HARNESS, PART OF THE TRANSMISSION, AND MULTIPLE OTHER PARTS NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED. IN ADDITION, WHILE DRIVING AT A VERY LOW SPEED, "HAUL GEARS" DISPLAYED ON THE MESSAGE BOARD AS THE VEHICLE SWITCHED INTO A LOW GEAR INDEPENDENTLY. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE WAS 3,000. THE VIN WAS UNAVAILABLE.

126.   Another incident involving a Chevrolet Silverado was reported on

September 26, 2016:

I PARK IN A 5 LEVEL PARKING GARAGE. SEVERAL MONTHS AGO, I WAS LEAVING WHEN I CAME UP TO THE RAMP TO THE NEXT LOWER LEVEL. I LET OFF ON THE ACCELERATOR BEFORE I WENT FROM FLAT TO LOWERING RAMP. THE TRUCK SHIFTED UP TO SECOND GEAR, ACCELERATED AND THROUGH ME TOWARD THE VEHICLE IN FRONT. THE TRUCK WENT OUT OF MY CONTROL. IF I WERE NOT A SAFE DRIVER I WOULD HAVE STRUCK THE VEHICLE. THIS ISSUE HAS OCCURRED ANOTHER TIME AS WELL. THERE HAVE BEEN OTHER PROBLEMS WHICH ARE NUMEROUS. I WILL ADDRESS THEM INDIVIDUAL IN FURTHER COMPLAINTS.

127.   Another incident involving a Chevrolet Silverado was reported on

September 27, 2016:

ON SEPT 21 2016 I ARRIVED AT MY HOME. I DROVE UP MY GRAVEL DRIVEWAY IN D(DRIVE) AND SLOWED TO A STOP AND MY TRUCK BEGAN TO ROLL BACKWARD UNDER MY CONTROL. I WAS CHECKING ON THE GROUND FOR LAWN DAMAGE. THE TRUCK SHUTTERED TWICE, SHUT OFF AND STARTED TO ROLL BACKWARD TOWARD A TREE. I QUICKLY REGAINED CONTROL WITH A PANIC STOP. I WAS ABLE TO PLACE THE TRUCK IN PARK AND RESTART THE TRUCK. I HAD LOST CONTROL OF THE TRUCK.

128.   Another incident involving a Chevrolet Silverado was reported on

November 9, 2016:

TRANSMISSION IS LURCHING IF DRIVING 50 MPH THEN SLOW DOWN TO 35 MPH WHEN YOU GO TO SPEED BACK UP IT LURCHES. COMPLAINED TO CHEVROLET SEVERAL TIMES THEY SAY CANNOT FIND ANYTHING WRONG.

129.   Another incident involving a Chevrolet Silverado was reported on

December 12, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. WHILE DRIVING APPROXIMATELY 45 MPH, THE CHECK ENGINE INDICATOR ILLUMINATED. THE VEHICLE STARTED TO DECELERATE WHEN DEPRESSING THE ACCELERATOR PEDAL. THE VEHICLE WAS TAKEN TO THE DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 33,000.

130.   Another incident involving a Chevrolet Silverado was reported on

December 13, 2016:

TL* THE CONTACT OWNS A 2015 CHEVROLET SILVERADO 1500. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS, THERE WAS A LOUD CLUNKING NOISE COMING FROM THE REAR OF THE VEHICLE. THE CONTACT STATED THAT THE FAILURE OCCURRED AFTER SHIFTING

GEARS. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 17,000.

131.  On May 11, 2016, the following incident was reported:

I BOUGHT A 2016 CHEVY SILVERADO 1500 LTZ Z71 AND IT VIBRATES AT IDLE AND THE TRANSMISSION IS SLIPPING. I HAD ALREADY TOOK IT TO THE DEALERSHIP TO GET IT FIX, BUT NO LUCK. GM TOLD ME THAT IS HOW THE TRUCK IS DESIGNED TO OPERATE, WHICH IS HARD TO BELIEVE. THERE IS ABSOLUTELY ZERO HELP FROM GM TO HELP ME RESOLVE THE PROBLEM. I WAS GIVEN AN OPTION TO TRADE IT IN FOR A NEW ONE AT MY OWN EXPENSES OR DEAL WITH THE PROBLEM. FORD WOULD NOT TAKE MY TRUCK AS A TRADE IN NOR WILL GMC. THIS VEHICLE CAN POTENTIALLY BY DANGEROUS AND A LIABILITY AS THE TRANSMISSION SEEM TO HAVE A MIND OF ITS OWN AND THE CONSTANT VIBRATION CANNOT POSSIBLY HE GOOD FOR ANYONE.

132.  Another incident involving a Chevrolet Silverado was reported on

October 3, 2016:

THE ISSUE(S) THAT I AM EXPERIENCING ALL APPEAR TO BE WITH THE TRUCKS 8 SPEED TRANSMISSION. THE FIRST TWO OCCUR DURING BREAKING AND THE THIRD HAPPENS WHEN ACCELERATING FROM A "COLD" START. A DESCRIPTION OF EACH OF THE THREE MAJOR ISSUES ARE OUTLINED BELOW:

1. DURING INITIAL BREAKING THE TRUCK WILL BEGIN TO SLOW DOWN AS INTENDED AND WITHOUT WARNING IT ABRUPTLY ACCELERATES/SLIDES FORWARD (SEE BREAKING PROFILES). THIS TYPICALLY HAPPENS BETWEEN 10-20 MPH.

2. DURING BREAKING JUST BEFORE COMING TO A STOP I EXPERIENCE A HARD JERK OR SHUDDER (SEE BREAKING PROFILES).

3.    DURING A "COLD" START, IN THE MORNING OR AFTER WORK, THE TRANSMISSION WILL SOMETIMES SLIP AND SHIFT HARD WHILE PULLING OUT OF MY DRIVEWAY/PARKING LOT.

THE ISSUES ARE ALL INTERMITTENT.

133.   Another incident involving a Chevrolet Silverado was reported on

October 16, 2016:

I HAD TWO EPISODES OF SUDDEN UNINTENDED ACCELERATION WHILE DRIVING HIGHWAY SPEEDS ON A HIGHWAY. TRUCK IS WEEKS OLD- 1500MILES ONLY. BRAKES STILL WORKED SO I WAS ABLE TO STOP. RPMS CONTINUED TO ESCALATE IN NEUTRAL AND PARK. HAD TO TURN OFF ENGINE QUICKLY TO ABORT THE PROBLEM. I'M TAKING THE TRUCK IN FOR EVALUATION TOMORROW. MY WIFE AND TWO OLDEST SONS WERE IN THE VEHICLE. *TR

134.   Another incident involving a Chevrolet Silverado was reported on

November 15, 2016:

TL* THE CONTACT OWNS A 2016 CHEVROLET SILVERADO 1500. WHILE ATTEMPTING TO ACCELERATE FROM A STOP, THE VEHICLE FAILED TO ACCELERATE. THE CONTACT COASTED INTO A PARKING LOT AND NOTICED THAT THE FRONT PASSENGER SIDE AXLE INDEPENDENTLY SHIFTED TO THE REAR OF THE CHASSIS, WHICH POTENTIALLY CAUSED A SPARK TO THE TIRES. THE VEHICLE WAS TAKEN TO THE DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 4,000.

135.   On July 20, 2018, the following incident was reported:

8 SPEED TRANSMISSION CLUNKS WHEN SHIFTING INTO 2 GEAR AND AT TIMES FEELS LIKE YOU GOT REAR ENDED. WHEN IT DOWN SHIFTS INTO THE LOWER GEARS ITS ALSO CLUNKS AND IS NOT SMOOTH. THIS IS HAPPENING WHEN

GOING AT SLOW SPEEDS AND IS WORSE AFTER A COLD
START. THE VEHICLE SHIFTS FINE AT HWY SPEEDS. I HAVE
ALREADY BROUGHT IT TO THE DEALERSHIP TWICE AND
PROBLEM IS STILL THERE. TALKING TO OTHER PEOPLE
WITH GM 8 SPEED TRANSMISSION AND THEY ARE HAVING
THE SAME ISSUE. 8 SPEED TRANSMISSION NEEDS
RECALL.POSSIBLY TORQUE CONVERTER.

136.   Another incident involving a 2017 Chevrolet Silverado was reported on

July 18, 2018:

ENGINE HESITATION, OR MISFIRING. JERKING, OR
TRANSMISSION SHUTTERING WHEN ENGINE IS AT LOW
RPM AND ON INCLINE. (I.E. WHEN TRAVELING ABOUT
45MPH AND START UP A HILL, THE RPM'S ARE ABOUT 1300
AND THE TRANSMISSION DOESN'T GEAR DOWN, SO IT
STARTS SHUTTERING UNTIL YOU GIVE IT MORE
ACCELERATION THAN USUAL.) AFTER DEALING WITH THIS
ISSUE FOR NEARLY 8 MONTHS AND 15K MILES, I BELIEVE
THIS SAFETY ISSUE SHOULD BE RECALLED. DEALER
ORIGINALLY ACKNOWLEDGE THE PROBLEM BUT WAS
UNSURE OF THE CAUSE. AFTER 5 REPAIR ATTEMPTS THE
DEALER SAY THEY CAN'T DUPLICATE AND THE VEHICLE
PERFORMS AS DESIGNED.

137.   Another incident involving a Chevrolet Silverado was reported on May

9, 2018:

TRANSMISSION ABRUPTLY SHIFTING. FEEL LIKE THE
TRUCK IS BEING HIT BY ANOTHER VEHICLE. I DON'T KNOW
WHEN IT'S GONNA DO IT BUT WHEN IT DOES, ITS SCARY.
THE OTHER DAY WHILE TRYING TO BACK UP INTO MY
DRIVE WAY, THE WOULD NOT MOVE WHEN I PUSHED ON
THE PEDAL. THEN ON IT'S OWN, THE TRUCK BURNED
RUBBER BACKWARDS WHEN I TOOK MY FOOT OFF OF THE
GAS PEDAL. I ALMOST DROVE INTO MY GARAGE! THIS
TRUCK IS NOT SAFE AND NEEDS TO BE REMOVED FROM

SERVICE! THIS IS AN ONGOING PROBLEM THAT YOU NEVER KNOW WHEN IT'S GOING TO HAPPEN DURING YOU DRIVE.

138.  Another incident involving a Chevrolet Silverado was reported on

March 27, 2018:

VEHICLE HESITATION AND SURGES IN ACCELERATION. THIS CONDITION IS A SAFETY ISSUE AS IT HESISTATES PULLING INTO TRAFFIC, SURGES IN ACCELERATION HAVE CAUSED LOSS OF TIRE TRACTION ON ICE COVERED ROADWAYS NEARLY RESULTING IN A COLLISION. DEALERS HAVE ACKNOWLEDGED AN ISSUE BUT ADVISE THEY ARE STILL WAITING ON A FIX FROM GM.

139.  Another incident involving a Chevrolet Silverado was reported on

March 22, 2018:

PURCHASED MY 17 CHEVROLET SILVERADO 1500 ON 11/28/17 AND RETURNED IT TO THE DEALERSHIP ON 12/1/17. THIS WAS DUE TO A SEVERE SHUDDERING & SHIFTING IN THE TRANSMISSION & SEVERE SHAKE IN THE FRONT END AT 70-90MPH. THEY BALANCED & ROTATED THE TIRES, SAYING THE ISSUE WAS FIXED, I PICKED THE VEHICLE BACK UP ON 12/4/17 BUT THE ISSUE WAS NOT FIXED & AN ELECTRICAL ISSUE HAD ALSO OCCURRED. I TOOK THE VEHICLE BACK ON 12/7 /18 WITH THE SAME COMPLAINTS REGARDING THE TRANSMISSION & SHAKING IN THE FRONT END, AS WELL AS THE ELECTRICAL ISSUE. THE DEALERSHIP CALLED ME ON 12/8/17, TOLD ME THEY HAD BEEN UNABLE TO DUPLICATE THE ISSUES, FINDING NOTHING WRONG. I LEFT IT OVER THE WEEKEND, WENT IN MONDAY MORNING & SPOKE TO THE SERVICE MANAGER DIRECTLY. HE TOLD ME HE HAD PURCHASED THE SAME VEHICLE WITH THE SAME TRANSMISSION ISSUES. SAID THERE WAS A POSSIBLE FIX BY EXCHANGING THE TRANSMISSION FLUID & THEY WOULD USE A NEW MACHINE PICO TO CHECK IT OUT. THEY HAD TO REPLACE THE TORQUE CONVERTER DUE TO MALFUNCTIONING & PERFORM A PROGRAMMING MODULE

UPDATE ON RADIO, I PICKED IT UP ON 12/22/17, ISSUE WITH THE TRANSMISSION WAS STILL NOT RESOLVED. I TOOK IT TO A DIFFERENT DEALERSHIP FOR TRANSMISSION SHUDDER, SHIFT & SHAKE ISSUE MOST NOTICEABLE AT 70-90MPH, & RADIO ISSUE. THEY WERE ADVISED TO PERFORM A MODULE UPDATE ON THE TRANSMISSION & GIVEN 2 OPTIONS ON THE RADIO, THEY CHOSE TO REPLACE THE SCREEN. I TOOK IT BACK TO THAT SAME DEALERSHIP, MODULE UPDATE MADE TRANSMISSION/FRONT END ISSUE WORSE, ESPECIALLY COMING OUT OF A CURVE. THEY'VE REPLACED MY 2 BACK TIRES SAID THEY WERE BAD & SHOULD FIX THE SHAKING ISSUE IN THE FRONT END. UNABLE TO DUPLICATE TRANSMISSION ISSUES THUS THEY CANNOT REPAIR IT. OWNERS WITH THE SAME ISSUES ARE BEING TOLD GM KNOWS BUT CAN'T FIX TRANSMISSION ISSUE.

140.   Another incident involving a Chevrolet Silverado was reported on

February 26, 2018:

8 SPEED TRANSMISSION SHIFT VERY ROUGH FROM 1-2 AND 2-1 GEARS, FREQUENTLY HESITATES, MAKES CLUNKING SOUND. HAVE TAKEN IT TO GM DEALER AND AM INFORMED THAT YES, THAT'S THE WAY THE 8 SPEEDS ARE. THIS IS A $50K+ TRUCK. THIS TRANSMISSION ISSUE CAUSES AND CAN CAUSE HESITATION WHEN NEEDING TO ACCELERATE, THUS CREATING A SAFETY HAZARD.

141.   Another incident involving a 2017 Chevrolet Silverado was reported on

February 13, 2018:

TRANSMISSION SHIFTS HARD AND VEHICLE SURGES AT LOW SPEED WITH ACCOMPANING "CLUNK". PROBLEM OCCURS IN BOTH UPSHIFT AND DOWN SHIFT. DEALER INFORMS ME THAT IS A "LEARNING" CURVE FOR VEHICLE TO UNDERSTAND MY DRIVING HABITS. HOWEVER I SEE ON SEVERAL AUTOMOTIVE FORUMS THAT THIS HAS BEEN AN ISSUE FOR SOME TIME AND HAS YET TO BE RESOLVED.

142.   Another incident involving a Chevrolet Silverado was reported on

February 1, 2018:

>THE CONTACT OWNS A 2017 CHEVROLET SILVERADO 1500.
>WHILE DRIVING 25 MPH, THE VEHICLE SHIFTED HARD
>FROM FIRST TO SECOND GEAR. THE FAILURE OCCURRED
>EVERYDAY SINCE THE VEHICLE WAS PURCHASED IN APRIL
>OF 2017. THE VEHICLE WAS TAKEN TO O'REILLY
>CHEVROLET (6160 E BROADWAY BLVD, TUCSON, AZ 85711)
>WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION
>CONTROL MODULE FAILED. THE DEALER REPROGRAMMED
>THE TRANSMISSION, WHICH FAILED TO REMEDY THE
>FAILURE. THE VEHICLE WAS BROUGHT BACK TO THE
>DEALER AND THE VALVE BODY FOR THE TRANSMISSION
>WAS REPLACED AND THE TRANSMISSION FLUID WAS
>CHANGED. THE FAILURE RECURRED. THE MANUFACTURER
>WAS NOTIFIED OF THE FAILURES. THE FAILURE MILEAGE
>WAS 16,000.

143.   Another incident involving a 2017 Chevrolet Silverado was reported on

January 6, 2018:

>NOTICED AFTER PURCHASE THAT THERE IS VIBRATION
>LIKE A BAD TIRE 35-42 MPH.

>VIBRATION FELT IN SEAT, CONSOLE AND STEERING WHEEL
>58-65   MPH.   TRANSMISSION   DOWN   SHIFTS   HARD
>SOMETIMES FEELS LIKE BEING BUMPED FROM BEHIND, IT
>ALSO HESITATES AND JERKS AFTER LETTING OFF THE
>ACCELERATOR AND ACCELERATING AGAIN BETWEEN 25-
>45 MPH.

>WHEN ACCELERATING IT SURGES, JERKS AND STUMBLES.
>SOMETIMES WHEN ACCELERATING THE TRANSMISSION
>DOWNSHIFTS AND HANGS IN THAT GEAR UNTIL YOU LET
>OFF THE ACCELERATOR.

>UNDER HEAVY ACCELERATION THERE IS VIBRATION IN
>THE POWER TRAIN AND THE TRANSMISSION SEEM NOISY.

AT 25 MPH IT SHUTTERS LIKE THE TRANSMISSION IS IN TO HIGH OF A GEAR UNDER LIGHT ACCELERATION.

RETURNED TO WALDORF CHEVROLET WHERE I PURCHASED IT AND WAS TOLD THEY BALANCED 2 TIRES AND RESET THE ROAD FORCE.SCANNED TRANSMISSION NO CODES TRANSMISSION OK AFTER SHOP FOREMAN ROAD TESTED FOR 21 MILES NO OTHER REPAIRS NEEDED.

PICKED IT UP DRIVING HOME NOTICED ALL THE PROBLEMS WERE STILL THERE AND AFTER INSPECTION OF MY TRANSMISSIONS NOTICED THAT THE TRANSMISSIONS WERE BALANCED STILL HAD THE OLD WEIGHTS STILL ON THE TRANSMISSIONS WITH NEW WEIGHTS ALSO.

MADE ANOTHER APPOINTMENT THIS TIME TO HAVE SHOP FOREMAN (RICK) RIDE WITH ME TO SHOW HIM WHAT IT WAS DOING WHICH WE DID AND LEFT MY TRUCK AGAIN.

AFTER 8 DAYS I AM TOLD IT WAS READY I WAS TOLD THEY DID A PICO SCOPE TEST AND THE DRIVESHAFT WAS BEING REPLACED THEN ONLY TESTED IT WAS OK. CHECKED RUN OUT ON FLANGES ALL WITHIN SPECS. FOUND THE RIGHT REAR TIRE BAD. THEY PUT STEEL WHEEL FROM ANOTHER TRUCK ON AND ROAD TESTED WITH NO CHANGE. THEY DROVE ANOTHER TRUCK AND IT RIDES THE SAME. EVEN HAS THE SHUTTERS ON HARD ACCELERATION. SAID THEY CALLED GM TAC BACK AND THEY DONT SEE A PROBLEM WITH THIS.

WRITTEN DOCUMENTS BE SENT VIA MAIL.

MADE ANOTHER APPOINTMENT

144.   Another incident involving a Chevrolet Silverado was reported on

October 27, 2017:

TRANSMISSION ON MY NEW 2016 Z71 LT 4X4 JUMPS INTO LOW GEAR WHEN SLOWING DOWN. I TOOK IT TO THE DEALERSHIP MULTIPLE TIMES, BUT KEEP GETTING TOLD IT SHIFTS FINE. TOOK IT AGAIN AND HAD A MANAGER DRIVE

THE TRUCK WITH ME INSIDE AND AGREED THE
TRANSMISSION WAS NOT GETTIN INTO GEAR IN A NORMAL
WAY. TOON IT BACK TO GET IT FIXED AND WAS TOLD
TRANSMISSION IS FINE. I NEED THIS FIXED OR I WILL BE
RETURNING HE TRUCK AS A LEMON TITLE.

145. Another incident involving a Chevrolet Silverado was reported on April

5, 2017:

THE CONTACT OWNS A 2017 CHEVROLET SILVERADO 1500.
WHILE DRIVING 45 MPH, THE TRANSMISSION FAILED TO
SHIFT PROPERLY AND MADE A CLUNKING SOUND. THE
FAILURE RECURRED MULTIPLE TIMES. THE VEHICLE WAS
TAKEN TO A DEALER WHERE IT WAS DIAGNOSED THAT THE
TRANSMISSION FAILED AND NEEDED TO BE
REPROGRAMMED. THE VEHICLE WAS REPAIRED, BUT THE
FAILURE RECURRED. THE MANUFACTURER WAS MADE
AWARE OF THE ISSUE. THE APPROXIMATE FAILURE
MILEAGE WAS 30.

146. On October 4, 2019, the following was reported as to a 2018

Chevrolet Silverado:

SEVERAL TIMES, WHILE DRIVING RIGHT AROUND 55 MPH,
THE TRANSMISSION DOWNSHIFTED FOR NO REASON ON
THRUWAY CONDITIONS. WHEN THIS HAPPENED, IT WAS
ALMOST LIKE SLAMMING ON THE BRAKES QUICKLY. ON
ALL OCCASIONS, MY BODY LURCHED FORWARD. IF
SOMEONE WAS BEHIND ME, I PROBABLY WOULD HAVE
BEEN REAR ENDED. ON ANOTHER OCCASION, WITH MY SON
IN THE TRUCK, WE STOPPED AT A RED LIGHT AND THE
TRANSMISSION CLUNKED SO VIOLENTLY, THAT WE BOTH
THOUGHT WE WERE REAR ENDED AT FIRST. I DESCRIBED
THE ISSUE TO MY GM SERVICE SHOP WHO SAID THAT THEY
COULDN'T FIND AN ISSUE AND THAT THE CODES WERE ALL
NORMAL. I WAS ADVISED THAT THE CLUNK AT THE RED
LIGHT WAS COMMON, AS THE TRANSMISSION HAS TO
RELIEVE PRESSURE. NO WAY IS THIS NORMAL! I GOT ON

LINE TO REVIEW FORUMS AND IT APPEARS THIS IS A VERY PREVALENT ISSUE. YESTERDAY, I LOST MY TRANSMISSION COMPLETELY ON A THRUWAY. I HEARD A LOUD CLUNK AND THE RPMS SPIKED. I LEFT THE HIGHWAY ASAP BUT COULD NOT GO OVER 30 MPH OR THE RPMS WOULD JUST SPIKE WITHOUT MOTION RESPONSE. EXITING THE THRUWAY AT THIS SPEED WAS VERY DANGEROUS! EVEN WITH HAZARDS ON, DRIVERS SELDOM SLOW DOWN OR MOVE OVER, ESPECIALLY 18 WHEELERS. THESE TRANSMISSIONS ARE CLEARLY A SAFETY HAZARD.

147. On November 28, 2018, the following was reported:

THE EIGHT SPEED AUTOMATIC TRANSMISSION STUTTERS AND ACTS LIKE IT DOESN'T KNOW WHAT GEAR TO GO INTO UNDER LIGHT TO NORMAL ACCELERATION. THIS OCCURS WHILE COLD AND DURING THE WARMING PERIOD, (NORMALLY UP TO AROUND 180 DEGREES), BUT TENDS TO RESOLVE AFTER THE ENGINE IS COMPLETELY WARMED UP. THIS TRANSMISSION PROBLEM IS CONTINUOUS AND HAPPENS EVERY TIME AFTER THE VEHICLE SITS ALL NIGHT OR IF IT HAS SIMPLY SIT FOR A FEW HOURS. IT IS VERY APPARENT, OTHER PASSENGERS ASK WHAT IS WRONG WITH THE VEHICLE WHEN THEY RIDE IN IT. I BOUGHT THE VEHICLE NEW, BUT WHEN I TOOK THE TEST DRIVE IT WAS ALREADY WARMED UP. THEREFORE I WAS UNAWARE OF THE ISSUES PRESENT. I WENT BACK TO THE SALESMAN TO DESCRIBE THE PROBLEM AND WAS INFORMED THIS HAPPENS WITH ALL THE 2018 EIGHT SPEED SILVERADO'S HE HAS DRIVEN ON THEIR LOT. I LOOKED ON THE INTERNET AND FOUND THESE TRANSMISSIONS HAVE A LEARN CYCLE, SO I DECIDED TO GIVE IT SOME TIME TO SEE IF WAS A LEARNING CURVE WITH THE COMPUTER. IT NEVER CLEARED UP. I LATER BROUGHT THE VEHICLE INTO THE DEALERSHIP FOR THE INITIAL SERVICE AND DESCRIBED WHAT HAD BEEN HAPPENING WITH IT TO THE SERVICE DEPARTMENT. I LEFT THE VEHICLE OVERNIGHT SO THE TECHNICIAN COULD DRIVE FIRST THING IN THE MORNING AND PERFORM AN SERVICES. THE NEXT DAY I WAS CALLED AND TOLD MY VEHICLE WAS READY. UPON ARRIVAL I WAS

INFORMED THE TECHNICIAN WAS ABLE TO DUPLICATE THE PROBLEMS I DESCRIBED, BUT IT WAS NORMAL FOR THE EIGHT SPEED TRANSMISSION. HOWEVER, IT BECOMES WORSE TO BRING IT BACK IN FOR FURTHER DIAGNOSIS. I CALLED GM, THEY ALSO LOOKED INTO THE CASE FOR ABOUT A WEEK, THEN CALLED BACK AND STATED THAT IS NORMAL FOR THE TRANSMISSION. I BOUGHT THE VEHICLE NEW WITH ABOUT 2,500 MILES ON IT, (DEMO), AND HAVE HAD IT ONLY A FEW MONTHS. IT CURRENTLY HAS LESS THAN 10,000 MILES ON IT.

148.    On April 3, 2019, the following was reported, noting it could be a

"serious safety issue":

THE TRANSMISSION SLIPS OR SHUDDER, ALSO HAS FREE WHEELED WHEN GOING DOWN HILL AT SLOW SPEEDS, ALSO OCCURS IN REVERSE, USUALLY ABOUT 1 TO 2 CAR LENGTHS. HAVE RETURNED TO THE DEALER SEVERAL TIMES AND BEEN TOLD THAT GM DOES NOT HAVE A REMEDY. HAD THE SERVICE RECOMMENDATION OF A TRANSMISSION FLUED FLUSH DONE TWICE WITH DIFFERENT FLUID INSTALLED WITH NO CHANGE. HAS BEEN IN THE DEALERS SHOP FOR 3 WEEKS WITH GM LOOKING AT THE PROBLEM, NO SOLUTION IN SIGHT. NO CONFIDENCE THAT GM CAN FIX THE PROBLEM. THIS COULD DEVELOP INTO A SERIOUS SAFETY ISSUE.

149.    On July 19, 2019, the following was reported as to a 2019 Chevrolet

Silverado:

8L90 AUTOMATIC TRANSMISSION WILL LURCH FORWARD ABRUPTLY WHEN SHIFTING FROM 1-2 GEAR. ALSO, HARD SHIFT FROM 1-2 WHEN COLD.

150.    On September 30, 2019, the following was reported:

TL* THE CONTACT OWNS A 2019 CHEVROLET SILVERADO 1500. WHEN THE GEAR WAS SHIFTED INTO REVERS AND THEN SHIFTED BACK INTO DRIVE, THE BEHICLE JERKED

AND LUNGED FORWARD. ON ONE OCCASIONI, THE CONTACT NEARLY STRUCK A PEDESTRIAN. THE VEHICLE WAS TAKEN TO AN UNKNOWN DEALER FOR DIAGNOSTIC TESTING. THE DEALER TEST DROVE VEHICLE AND WAS ABLE TO RECREATE THE FAILURE; HOWEVER, THE DEALER WAS UNABLE TO RECEIVE A FAILURE CODE. THE CONTACT ALSO STATED THAT THE DEALER TEST DROVE ANOTHER 2019 CHEVROLET SILVERADO 1500 AND WAS ABLE TO RECREATE THE SHIFT FAILURE. THE MANUFACTURER WAS CONTACTED AND PROVIDED CASE NUMBER: 9-548-7097056. THE VEHICLE WAS NOT REPAIRED. THE FAILURE MILEAGE WAS 1,200.

151.   On October 31, 2019, the following was reported:

TV THE CONTACT OWNS A 2019 CHEVROLET SILVERADO 1500. WHILE DRIVING, THE VEHICLE WOULD SHIFT EXTREMELY HARD FROM FIRST INTO SECOND GEAR AND LUNGED FORWARD. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE CONTACT CALLED UFTRING CHEVROLET (1860 WASHINGTON RD, WASHINGTON, IL 61571, (309) 444-3151) AND WAS INFORMED THAT THE FAILURE WAS A KNOWN ISSUE BY THE MANUFACTURER. THE VEHICLE WAS NOT TAKEN TO A DEALER OR INDEPENDENT MECHANIC FOR DIAGNOSTIC TESTING. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND DID NOT ASSIST. THE FAILURE MILEAGE WAS APPROXIMATELY 10,000.

152.   On November 13, 2019, the following was reported:

TL• THE CONTACT OWNS A 2019 CHEVROLET SILVERADO 1500. WHILE DRIVING 70 MPH, THE VEHICLE DOWNSHIFTED TO 20 MPH. OCCASIONALLY, THE VEHICLE WOULD STOP MOVING AND SHUT OFF. ADDITIONALLY, THE VEHICLE FAILED TO SHUT OFF AT TIMES. FURTHERMORE, THE CHECK ENGINE, ENGINE REDUCED POWER LOW FUEL, SERVICE TRAILER BRAKE SYSTEM, SERVICE 4WD, SHIFT TO PARK, SERVICE ABS, REDUCED STEERING ASSIST, BACK UP

CAMERA. SERVICE ESC, AND REDUCE TRANSMISSION
FUNCTION WARNING INDICATORS ILLUMINATED. THE
VEHICLE WAS TAKEN TO DELLENBACH MOTORS (3111 S
COLLEGE AVE, FORT COLLINS, CO 80525, (970) 226-2438)
WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION
CONNECTION FAILED. THE VEHICLE WAS REPAIRED;
HOWEVER THE FAILURE RECURRED. THE MANUFACTURER
WAS CONTACTED AND PROVIDED CASE NUMBER: 9-
5621232945, BUT DID NOT ASSIST THE FAILURE MILEAGE
WAS 1,800. THE VIN WAS INVALID.

153.   On December 5, 2019, the following was reported:

WAS DRIVING BACK HOME GOING AROUND 65MPH WHEN
ALL OF THE SUDDEN IT DOWN SHIFTED AND EVENTUALLY
LOSE POWER. I PULLED OVER RESTARTED TRUCK AND
CHECK ENGINE LIGHT TURNED ON AND WOULD NOT SHIFT
OUT OF FIRST GEAR. I COULD NOT TAKE IT TO THE
DEALERSHIP THAT DAY AS IT WAS SUNDAY AND WOULD
HAVE TO WAIT TILL MONDAY. MONDAY 10/14/19 CAME AND
I TOOK IT TO THE DEALERSHIP. DEALERSHIP HAS STILL NOT
FIXED THE PROBLEM, THEY HAVE ALREADY REPLACED
THE PC MODULE, AND VALVE BODY. NOW THEY ARE THEY
SAYING THEY ARE GOING TO REPLACE THE WIRING
HARNESS ON IT. I DO HAVE A GM CASE 49-564919828,
HOWEVER THEY ARE NC HELP AND BASICALLY TELL ME
THE SAME THING AS THE DEALERSHIP DOES. TRUCK HAS
BEEN AT THE DEALERSHIP SINCE 10/14/19 AND HAVE STILL
NOT FIXED IT, TODAYS DAY 12/05/19.

154.   On December 12, 2019, the following was reported:

ONGOING COMMUNICATION BETWEEN LOCAL DEALER
AND CHEW/GM EXECUTIVE SUPPORT TEAM TO FIX
SHUDDER/VIBRATION IS NOT RESOLVED. CHEW STATES
'NORMAL CHARACTERISTIC FOR THIS MODEL VEHICLE,
2019 SILVERADO 5.3, 8 SPEED. I VEHEMENTLY DISAGREE.
GM APPROVED TORQUE CONVERTS SWAP AND THEN
PROBLEM GOT MUCH WORSE. THEY NOW SAY,
RESOLUTION IS FINAL, THIS IN NORMAL! PLEADED WITH

DEALERSHIP GENERAL MGR, TO CONTACT DISTRICT
SUPERVISORS TO RE-EVALUATE. NOW THEY ARE GOING TO
RUN PICO TEST AND COMPARATIVE ANALYSIS AGAINST 2
NEW TRUCK ON THEIR LOT MY TRUCK ONLY HAS 6K MILES
AND SHOULD SHAKE AND VIBRATE, BUT IT DOES AND
GETTING WORSE. HARMONIC DISTORTION WITHIN CAB
GETTING WORSE. SEEMS THE MORE MILES I PUT ON IT, THE
WORSE IT GETS. AFTER DRAIN AND FLUSH OF
TRANSMISSION, PER TSB, NOW ALSO HAD DELAYED
SHIFTING, AND HAVING TO BRAKE HARD WHEN
DOWNSHIFTING BECAUSE IT WANTS TO LURCH FORWARD.
FRUSTRATING AT BEST, BUT SAFETY AND RISK OF INJURY
ARE MY IMMEDIATE CONCERN. NEED HELP!

155. On May 3, 2020, the following incident was reported as to a 2020

Chevrolet Silverado:

IT CUT OFF AT A STOP AND AFTER I STOP WITH WITH MY
FOOT ON THE BRAKES. I FELL BUMP IN THE REAR OF THE
TRUCK, LIKE I BEEN REAR END AND THE REAR SHAKES.
SOME THE THE AS WELL. IT CUT OF AFTER I STOP A FEW
SECONDS AND START RIGHT BACK UP. IN DRIVE WAY IDLES
ABOUT 15 OR LONGER, IT CUTS OFF. I HAVE TO RESTART IT.
AND TAKING OFF IN HESITATION AND SOME TIMES
MOVEMENT IN THE REAR AND UNDER THE TRUCK. BOTH
STATIONARY AND IN MOTION.

156. On June 23, 2020, the following incident was reported as to a 2020

Chevrolet Silverado:

I WAS STOPPED N THE DRIVE THRU AT IN-N-OUT WITH MY
FOOT ON THE BRAKE AND THE ECO SYSTEM HAD TURNED
OFF THE MOTOR. IT SPONTANEOUSLY TURNED BACK ON
WITHOUT ME LIFTING MY FOOT OFF OF THE BRAKE AND
THE TRANSMISSION ENGAGED AND THE TRUCK
LAUNCHED FORWARD APPROXIMATELY 12-18 INCHES.
THIS IS THE SECOND TIME THIS HAS HAPPENED TO ME. IT
ALSO HAPPENED ONE NIGHT ABOUT 2 MONTHS AGO. THIS

COULD HAVE BEEN VERY DANGEROUS, I COULD HAVE HIT SOMEONE OR THEIR CAR OR I COULD HAVE EVEN RECEIVED WHIPLASH MYSELF. *TR

157.   On August 27, 2020, the following was reported:

2020 SILVERADO 1500 CUSTOM CREW CAB 4.6L, V6. PURCHASED TRUCK ONAUGUST 10, 2020. TOOK IT TO DEALER ON AUGUST 17, 2020 BECAUSE OF JERKING FORWARD AT LOW SPEED (20-25 MPH) AND REAR BRAKES MAKING A DEEP RUBBING SOUND. OF COURSE, TECHNICIAN SAID THERE WERE NO PROBLEMS (BECAUSE HE COULD NOT DUPLICATE) THE JERKING MOTION. AFTER PICKING UP MY TRUCK, I NOTICED THAT THEY DID NOT EVEN ADDRESS THE BRAKE ISSUE, NOR DID THE SERVICE ADVISOR NOTE IT ON THE FORM.

158.   On October 3, 2020, the following was reported:

I'M THE OWNER OF A NEWLY BOUGHT (6/5/2020 PURCHASED DATE) 2020 GMC CANYON. I TOOK MY TRUCK INTO THE DEALERSHIP AND COMPLAINED THAT I HAVE EXPERIENCED TRANSMISSION ISSUES WHEN DOWNSHIFTING OR ACCELERATING. MY MOST COMMON ISSUE IS 'SHUDDERING' WHEN THE TRUCK ACCELERATES AND SUDDEN 'JERKING' WHEN DOWNSHIFTING GEARS WHEN DRIVING UP AN INCLINE OR EVEN COMING TO A COMPLETE STOP. THE DEALERSHIP SAID THEY HAVEN'T HAD ANY PROBLEMS WITH THE 2020 CANYONS AND UNLESS IT READS A 'CODE' THERE'S NOTHING THEY CAN DO. GM SAID TELL THE CUSTOMER TO DRIVE IT AND WE WILL CALL IF WE GET ANY FURTHER INFORMATION. THIS IS A SERIOUS PROBLEM. I WAS DRIVING THE VEHICLE AND BECAUSE OF THE SUDDEN JERKING AND TRANSMISSION & OR ENGINE ISSUES WITH THE VEHICLE THE RPMS REVED UP TO OVER 4500 RPMS AND I WAS STUCK OUT IN THE MIDDLE OF A LANE AND COULD NOT GO ANYWHERE. I HAD CARS AVOIDING ME SO THAT WAY THEY WOULD NOT HIT ME HEAD ON OR ON THE SIDE OF MY TRUCK. THIS IS A SERIOUS AND FATAL ACCIDENT WAITING TO HAPPEN AND THE

ISSUE IS GM KNOWS ABOUT IT BECAUSE IT HAPPENED
WITH THEIR 2015- 2019 COLORADO AND CANNON SERIES.
DESPITE MANY COMPLAINTS AND NUMEROUS LAWSUITS
ABOUT THESE SERIOUS ISSUES, THERE ARE CURRENTLY NO
ONGOING INVESTIGATIONS REGARDING TRANSMISSION
AND ENGINE DEFECTS FOR THESE VEHICLES WITHIN GM
FOR THE 2020 CANON. I HAVE PAID ALMOST $50,000 FOR A
VEHICLE THAT SHOULD HAVE A LEMON LAW PUT ON IT
BECAUSE GM KNOWS THEY ARE PRODUCING BAD
TRANSMISSION/ENGINES AND NOT DOING ANYTHING
ABOUT IT. I ASKED GM CORPORATE AND THE LOCAL
DEALERSHIP WHAT AM I SUPPOSED TO DO WHEN I'M IN
ANOTHER SITUATION WHERE THE VEHICLE DOES NOT
WANT TO GET IN GEAR AND IS SHAKING AND SHUTTERING
AND JERKING AND REVVING UP THE RPMS AND THE NEXT
TIME. I SAID I PROBABLY WOULDN'T BE SO LUCKY AS TO
HAVING PEOPLE AVOID ME AND THEN ME AND MY
DAUGHTER WIND UP IN A HEAD ON COLLISION AND WE
DON'T MAKE IT OUT ALIVE.

159.   On June 4, 2021, the following incident was reported for a 2020

Chevrolet Silverado:

Transmission slipped then went limp at 35-40 mph. Truck would not
accelerate at all. Had towed back to dealership.

160.   On June 9, 2021, the following incident was reported, noting that "GM

knows they have an issue" based on the service manager's response:

Wife was headed to town when the truck started bucking and surging
then leaving her stranded along side the road. NO MIL on until 5 mins
after the bucking and surging started. called GM and basically said oh
we will just fix it. Didn't care since we were able to start it back up and
drive it home and then have it towed to the retailer next day. Truck has
6000 miles on the odometer. GM knows they have an issue as Service
manager explained tech tips they have on this truck.

161.   On September 2021, a driver reported harsh shifting as "effect[ing] safety":

> Upon first start with 6-8 hours of being parked, the first shift from gear 1 to gear 2 has a massive hesitation that cause all passengers to lurch forward. It has not caused in issues for the quiet street we live on but in a high traffic area it would effect safety of entering into traffic. This issue happens every morning.

### h.   Chevrolet Colorado

162.   On September 1, 2017, the following incident was reported as to a 2017 Chevrolet Colorado:

> AIR CONDITIONING IS INTERMITTENT/BLOWS WARM/EMITS FOG FROM VENTS. THE DEALER SAYS NO FIX AVAILABLE YET CITES PER DOC ID:5125499.SAYS ENGINEERING IS STUDYING PROBLEM. MINE STOPS WORKING-BLOWS WARM WITH IN 1/2 HOUR. ALSO IN STOP/GO TRAFFIC THE TRANSMISSION DOWNSHIFTS ABRUPTLY AND CAUSES TRUCK TO ACCELERATE FORWARD-HAVE TO APPLY BRAKES HARD TO AVOID COLLISION. DEALER SAYS CAN NOT REPEAT BUT SHIFTING IS CONSISTENTLY ABRUPT AND I HAVE ASKED ABOUT SOFTWARE UPDATES TO ALLIEVIATE THIS SAFTY CONCERN TO NO AVAIL

163.   Another incident involving a Chevrolet Colorado was reported on September 13, 2017:

> THE CONTACT OWNS A 2017 CHEVROLET COLORADO. WHILE DRIVING AT AN UNKNOWN SPEED, THE VEHICLE ACCELERATED AND JERKED. ADDITIONALLY, THE BRAKES WERE APPLIED, BUT FAILED TO RESPOND AND THE BRAKE PEDAL TRAVELED TO THE FLOORBOARD. IN ADDITION, THE CONTACT HEARD AN ABNORMAL SCRATCHING NOISE. THERE WERE NO WARNING INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN SEVERAL TIMES TO GILROY

CHEVROLET (6720 AUTOMALL CT, GILROY, CA 95020, 408-842-9301), BUT THEY WERE UNABLE TO DUPLICATE THE BRAKE FAILURE. THE DEALER DIAGNOSED THE ACCELERATION FAILURE AS THE FOUR WHEEL DRIVE BEING ENGAGED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED AND PROVIDED CASE NUMBER: 8-4000-730943. NO FURTHER ASSISTANCE WAS PROVIDED. THE FAILURE MILEAGE WAS APPROXIMATELY 17,759.

164.   Another incident involving a Chevrolet Colorado was reported on

November 1, 2017:

WHEN AUTOMATIC TRANSMISSION DOWNSHIFTS INTO 1ST GEAR COMING TO A STOP, IT LUNGES FORWARD. IF WHEN NOSING INTO A PARKING SPACE WITH ANY KIND OF POLE OR VEHICLE DIRECTLY IN FRONT OF MY TRUCK, NOT LEAVING ENOUGH SPACE MY TRUCK WOULD HIT WHATEVER. WHEN DRIVING SLOWLY WITH MY 8 SPEED AUTOMATIC TRANSMISSION SOMETIMES IT RATTLES AS IF I AM ON A RUMBLE STRIP AND SOMETIMES IT JUST CLUNKS OR THUDS. THIS AND OTHER SHIFT ISSUES MAKE ME EVEN MORE HYPER VIGILANT WHEN DRIVING. 6 MONTHS AFTER I PURCHASED MY BRAND NEW 2017 COLORADO, DURING A SPELL OF NEGATIVE DEGREE WEATHER I LOST THE FOLLOWING: MY CRUISE CONTROL, TRACTION CONTROL, FOUR-WHEEL DRIVE; MY ENGINE LIGHT CAME, OIL LIGHT ALL LIGHTS CAME ON AND MY RADIO STOPPED WORKING. I WAS TOLD BY MY CHEVY DEALER THAT THIS WAS NORMAL IN COLD WEATHER. NEXT, I WAS INFORMED IT MUST BE BECAUSE I WASHED MY VEHICLE THE DAY BEFORE. THIS WENT ON FOR A FEW MONTHS, WITH ME SHOWING THEM VIDEOS AND THEM TELLING ME THEY COULD NOT DUPLICATE THE ISSUE. OCTOBER OF 2018 THEY REPLACED MY RADIO BECAUSE EVIDENTLY THE RADIO HAD A BULLETIN THAT SHOWED ALL OF THE THINGS I HAD COMPLAINED ABOUT. I WANT TO SAY THIS HAPPENED IN EXCESS OF 10 OR MORE TIMES. DRIVING TO MY MOTHERS ONE EVENING IN THE DARK MY DASH LIGHTS WERE NOT

DIMMING CORRECTLY AND THEN WENT OUT. AS I GOT TO A FOUR WAY INTERSECTION WITH CARS COMING THEY CAME ON SO BRIGHTLY I ALMOST GOT IN AN ACCIDENT WHICH PROMPTED ME TO MAKE AN APPOINTMENT AND I WASN'T WILLING TO HEAR SILLY EXCUSES.

165.   Another incident involving a Chevrolet Colorado was reported on April 9, 2018:

8 SPEED AUTOMATIC TRANSMISSION - ROUGH SHIFTING, USUALLY WHEN DRIVING BETWEEN 40 AND 60 MILES PER HOUR. TRUCK INTERMITTENTLY FEELS LIKE IT IS RIDING OVER RUMBLE STRIPS. TRANSMISSION SEEMS TO BE HUNTING. POSSIBLE ISSUE WITH TORQUE CONVERTER.

166.   Another incident involving a Chevrolet Colorado was reported on April 30, 2018:

8-SPEED AUTOMATIC TRANSMISSION IN INDECISIVE WHEN IT COMES TO SHIFTING BETWEEN LOWER GEARS WHILE DRIVING. TRANSMISSION MAKING CLUNKING "THUD" SOUND WHEN SHIFTING OUT OF PARK AND INTO REVERSE. GEAR HUNTING EXPERIENCED AT LOWER SPEEDS AND GEARS WHILE VEHICLE ATTEMPTS SHIFTING.

167.   Another incident involving a Chevrolet Colorado was reported on June 21, 2018:

8 SPEED TRANSMISSION HAS HARD SHIFT WHEN AT LOW SPEEDS AND WHEN GOING INTO REVERSE

168.   Another incident involving a 2017 Chevrolet Colorado was reported on June 19, 2018:

WHEN DRIVING AT LOW SPEEDS MY 8 SPEED AUTO TRANSMISSION - CLUNKS OR THUDS - SPECIALLY FROM 1ST - 2ND - ITS SOUNDS LIKE A BANG - TOOK IT TO DEALER -

SAID CHEVY KNOWS ABOUT IT - BUT THERE IS NO FIX
YET.....GREAT!

169.   Another incident involving a Chevrolet Colorado was reported on June

30, 2018:

WHEN AUTOMATIC TRANSMISSION DOWNSHIFTS INTO 1ST
GEAR COMING TO A STOP, IT DOES SO HARSHLY AND
LUNGES FORWARD. WHEN NOSING INTO A PARKING SPACE
WITH A CONCRETE WALL AT THE FRONT OF THE PARKING
SPACE, IF I HAD NOT ALLOWED ENOUGH SPACE FOR THE
LUNGE, THE VEHICLE WOULD HAVE IMPACTED THE WALL.
THIS CONDITION, ALONG WITH OTHER TRANSMISSION
SHIFT IRREGULARITIES, HAPPENS PERIODICALLY AND I
MUST REMAIN AWARE, ESPECIALLY COMING TO A STOP
NEAR A CROSS WALK.

170.   Another incident involving a Chevrolet Colorado was reported on July

7, 2018:

EXPERIENCING    ELECTRICAL    PROBLEMS    CAUSING
STARTING ISSUES, WHILE DRIVING FAILURES IN DASH
INDICATOR LIGHS, SPEEDOMETER, TACHOMETER, SHIFT
CONTROL    INDICATOR    LIGHTS,    AND    TRANSMISSION
CONTROL. LOSS OF POWER TO THE POINT TRUCK ALMOST
COMES TO A STOP AND THEN SURGES, TWICE IT HAS
ACCELERATED TRAVELING UP TO 50FT ESTIMATED.

171.   On April 27, 2018, the following incident was reported as to a 2018

Chevrolet Colorado:

IN MAY 2018 I PURCHASED A NEW CHEVY SILVERADO LT
Z71 PU. I LIVE IN COLORADO AND WHEN I DRIVE THE
TRUCK    DOWN    THE    I-70    MOUNTAIN    PASS    THE
TRANSMISSION IS DOWNSHIFTED BEYOND WHAT IO
WOULD CALL A SAFE DOWN SHIFT. IM TRAVELING DOWN
THE PASS, JUST COASTING, DOWN HILL ASSIST MODE IS OFF
@ ROUGHLY 55 MPH THE TRANSMISSION DOWN SHIFT

HARD. THE RPM GOES FROM ~1850 TO ~3800 RPM. THE
ENGINE AND TRANSMISSION AND ENGINE BOTH MAKE A
LOT OF NOISE WHEN THIS HAPPENS. I TRAVELED THE PASS
ABOUT 8 TIME NOW AND THE TRUCK DOES THIS FUNNY
SHIFT EVERYTIME AND I HAVE PICTURE SHOWING 4
EVENTS. I'VE TAKING THE DRIVE INTO THE DEALER AND
SINCE THE COMPUTER DOESN'T LOG A ERROR CODE THE
DEALER DOESN'T KNOW WHAT TO DO. THIS PAST WEEK
THEY GAVE ANOTHER 2018 P/U WITH THE SAME TRANNY
AND ENGINE AND THAT TRUCK DID NOT DO THE SAME
DOWNSHIFT. I BELIEVE THERE IS SOMETHING WRONG
WITH MY TRUCK AND ALSO IF THIS EVENT HAPPENED IN
THE WINTER ON A SNOWY ROAD THE TRUCK WOULD SPIN
OUT OF CONTROL AND CAUSE A ACCIDENT AND IS A HUGE
SAFETY CONCERN. I ALSO FILED A COMPLAINT WITH GM
BUT THEY ARE REALLY NOT HELP TO RESOLVE THIS
PROBLEM. THE DEALER LOOKED AT THE TRUCK AGAIN
TODAY, NO CODES RECORDED, THE RESET THE
TRANSMISSION MEMORY TODAY TO TRY AND SATISFY MY
NEED TO DO SOMETHING. I NOW WAITING TO HEAR BACK
FROM THE DEALER ON THE NEXT STEPS. I WILL ALSO CALL
GM AGAIN TO GIVE THEM THIS INFORMATION. I AM
ATTACHING PICTURE THAT CLEARLY SHOW THIS
PROBLEM. I ALSO GIVEN THE DEALER THE SAME PICTURES.

172.    Another incident involving a Chevrolet Colorado was reported on

October 3, 2018:

SEVERAL TIMES, WHILE DRIVING RIGHT AROUND 55 MPH,
THE TRANSMISSION DOWNSHIFTED FOR NO REASON ON
THRUWAY CONDITIONS. WHEN THIS HAPPENED, IT WAS
ALMOST LIKE SLAMMING ON THE BRAKES QUICKLY. ON
ALL OCCASIONS, MY BODY LURCHED FORWARD. IF
SOMEONE WAS BEHIND ME, I PROBABLY WOULD HAVE
BEEN REAR ENDED. ON ANOTHER OCCASION, WITH MY SON
IN THE TRUCK, WE STOPPED AT A RED LIGHT AND THE
TRANSMISSION CLUNKED SO VIOLENTLY, THAT WE BOTH
THOUGHT WE WERE REAR ENDED AT FIRST. I DESCRIBED
THE ISSUE TO MY GM SERVICE SHOP WHO SAID THAT THEY

COULDN'T FIND AN ISSUE AND THAT THE CODES WERE ALL
NORMAL. I WAS ADVISED THAT THE CLUNK AT THE RED
LIGHT WAS COMMON, AS THE TRANSMISSION HAS TO
RELIEVE PRESSURE. NO WAY IS THIS NORMAL! I GOT ON
LINE TO REVIEW FORUMS AND IT APPEARS THIS IS A VERY
PREVALENT ISSUE. YESTERDAY, I LOST MY TRANSMISSION
COMPLETELY ON A THRUWAY. I HEARD A LOUD CLUNK
AND THE RPMS SPIKED. I LEFT THE HIGHWAY ASAP BUT
COULD NOT GO OVER 30 MPH OR THE RPMS WOULD JUST
SPIKE WITHOUT MOTION RESPONSE. EXITING THE
THRUWAY AT THIS SPEED WAS VERY DANGEROUS! EVEN
WITH HAZARDS ON, DRIVERS SELDOM SLOW DOWN OR
MOVE OVER, ESPECIALLY 18 WHEELERS. THESE
TRANSMISSIONS ARE CLEARLY A SAFETY HAZARD.

173. Another incident involving a Chevrolet Colorado was reported on

November 2, 2018:

THE EIGHT SPEED AUTOMATIC TRANSMISSION STUTTERS
AND ACTS LIKE IT DOESN'T KNOW WHAT GEAR TO GO INTO
UNDER LIGHT TO NORMAL ACCELERATION. THIS OCCURS
WHILE COLD AND DURING THE WARMING PERIOD,
(NORMALLY UP TO AROUND 180 DEGREES), BUT TENDS TO
RESOLVE AFTER THE ENGINE IS COMPLETELY WARMED UP.
THIS TRANSMISSION PROBLEM IS CONTINUOUS AND
HAPPENS EVERY TIME AFTER THE VEHICLE SITS ALL NIGHT
OR IF IT HAS SIMPLY SIT FOR A FEW HOURS. IT IS VERY
APPARENT, OTHER PASSENGERS ASK WHAT IS WRONG
WITH THE VEHICLE WHEN THEY RIDE IN IT. I BOUGHT THE
VEHICLE NEW, BUT WHEN I TOOK THE TEST DRIVE IT WAS
ALREADY WARMED UP. THEREFORE I WAS UNAWARE OF
THE ISSUES PRESENT. I WENT BACK TO THE SALESMAN TO
DESCRIBE THE PROBLEM AND WAS INFORMED THIS
HAPPENS WITH ALL THE 2018 EIGHT SPEED SILVERADO'S
HE HAS DRIVEN ON THEIR LOT. I LOOKED ON THE
INTERNET AND FOUND THESE TRANSMISSIONS HAVE A
LEARN CYCLE, SO I DECIDED TO GIVE IT SOME TIME TO SEE
IF WAS A LEARNING CURVE WITH THE COMPUTER. IT
NEVER CLEARED UP. I LATER BROUGHT THE VEHICLE INTO

THE DEALERSHIP FOR THE INITIAL SERVICE AND DESCRIBED WHAT HAD BEEN HAPPENING WITH IT TO THE SERVICE DEPARTMENT. I LEFT THE VEHICLE OVERNIGHT SO THE TECHNICIAN COULD DRIVE FIRST THING IN THE MORNING AND PERFORM AN SERVICES. THE NEXT DAY I WAS CALLED AND TOLD MY VEHICLE WAS READY. UPON ARRIVAL I WAS INFORMED THE TECHNICIAN WAS ABLE TO DUPLICATE THE PROBLEMS I DESCRIBED, BUT IT WAS NORMAL FOR THE EIGHT SPEED TRANSMISSION. HOWEVER, IT BECOMES WORSE TO BRING IT BACK IN FOR FURTHER DIAGNOSIS. I CALLED GM, THEY ALSO LOOKED INTO THE CASE FOR ABOUT A WEEK, THEN CALLED BACK AND STATED THAT IS NORMAL FOR THE TRANSMISSION. I BOUGHT THE VEHICLE NEW WITH ABOUT 2,500 MILES ON IT, (DEMO), AND HAVE HAD IT ONLY A FEW MONTHS. IT CURRENTLY HAS LESS THAN 10,000 MILES ON IT.

174.    Another incident involving a 2018 Chevrolet Colorado was reported on

November 16, 2018:

I HAVE A 2018 CHEVROLET COLORADO LT 4WD CREW CAB. MULTIPLE TIMES ON A COLD START THE ENGINE IS MISFIRING. THE CHECK ENGINE LIKE COMES ON, THE VSA, AND T/C LIGHTS ALL COME ON AND A NOTIFICATION ON THE DASH SAYING STABILITRAK IS DISABLED. THE VEHICLE SHAKES TERRIBLY. THE CHECK ENGINE LIGHT WILL FLASH AND THEN GO SOLID. I AM AN AUTOMOTIVE TECHNICIAN. I KNOW THAT A MISFIRE SHOULD SET A HARD DTC. WHEN THE VEHICLE IS TURNED OFF AND STARTED SEVERAL HOURS LATER THERE IS NO CHECK ENGINE LIGHT OR ANY OTHER LIGHT ON. THE DEALERSHIP IN MARYSVILLE, OH HAD MY TRUCK FOR 3 DAYS AND TOLD ME THEY CLEANED A BUNCH OF TERMINALS AT SEVERAL CONNECTORS. WHATEVER THAT IS SUPPOSED TO DO. THEY SAID THEY STARTED THE VEHICLE SEVERAL TIMES AFTER AND EVERYTHING WAS GOOD. THE NEXT DAY AFTER I PICKED THE TRUCK UP, IT DID THE SAME EXACT THING! EXTREMELY FRUSTRATING! I KNOW A CONTINUOUS MISFIRE LET'S UNBURNED FUEL INTO THE CATALYTIC

CONVERTER WHICH LEADS TO PREMATURE BREAKDOWN OF THE CATALYST. SO MY QUESTION IS WHAT IS BEING DONE ABOUT THESE ISSUES? ANOTHER ISSUE IS WITH THE TRANSMISSION. ON A COLD START THERE IS A CLUNK NOISE. THEN WHEN YOU ARE DRIVING AT CRUISING SPEED AND YOU LET OFF THE THROTTLE AND DEPRESS THROTTLE AGAIN THERE IS A SHUDDER. ALSO, WHEN YOU COME TO A COMPLETE STOP THE VEHICLE TRIES TO JOLT FORWARD. THIS IS EXTREMELY CONCERNING ESPECIALLY ON A VEHICLE WITH ROUGHLY 18,000 MILES ON IT. THIS NEEDS TO BE ADDRESSED PROMPTLY!!

175.   On March 21, 2019, the following was reported as to a 2019

Chevrolet Colorado:

VEHICLE TRANSMISSION SEEMS TO LATE DOWN SHIFT WHEN SLOWING, CAUSING THE VEHICLE TO JUMP FORWARD ONCE SHIFTING HAS COMPLETED.

176.   On June 12, 2019, the following was reported:

LATE DOWN SHIFT … SHIFTS HARD… VEHICLE LURCHES FORWARD ON A STOP

177.   On July 15, 2019, the following was reported:

I EXPERIENCE HARSH SHIFTS FROM 1.2 GEAR AND WHEN DOWNSHIFTING 2-1. IT JOLTS THE WHOLE TRUCK IT SOMETIMES RANDOMLY DOWNSHIFTS FOR NO REASON WHEN I DRIVING ON THE HIGHWAY I AM AFRAID THAT SOMETHING IS GOING TO FAIL IN THE DRIVETRAIN WHEN IM DRIVING.

178.   On December 31, 2020, the following was reported as to a 2020

Chevrolet Colorado:

THE VEHICLE IS EXPERIENCING A SHAKE AND/OR SHUDDER DURING LIGHT THROTTLE ACCELERATION BETWEEN 25 AND 80 MPH STEADY STATE DRIVING WHEN

TRANSMISSION IS NOT ACTIVELY SHIFTING GEARS. THE CONDITION IS AS IF I WERE DRIVING OVER RUMBLE STRIPS. TSB 18-NA-355 ADDRESSES THIS ISSUE IN 2017 - 2019 CHEVY COLORADO PICKUP TRUCKS WITH THE 8 SPEED TRANSMISSION. THE 2020 MODEL SHOULD BE ADDED AS IT DOES NOT APPEARED TO BE FIXED AT THIS TIME. I PURCHASED THIS VEHICLE BRAND NEW FROM THE FACTORY WITH ONLY 5 MILES ON IT. THE SHUDDER ISSUE HAS BEEN PERSISTENT FROM THE VERY FIRST DAY I DROVE IT.

179.   On August 12, 2021, the following "scary and unsafe situation" was

reported as to a 2021 Chevrolet Colorado:

I purchased a brand new Colorado earlier this year. The vehicle currently has about 9,000 miles on the odometer. On two recent occasions within 1 1/2 weeks of each other while driving at highway speeds, there was a clunk noise and the transmission acted as if it had been shifted into neutral. The truck would not accelerate, and the RPMs were very high as I was pushing the accelerator and the vehicle was not responding but the engine was revving. This was an extremely scary and unsafe situation as cars were behind me and I narrowly avoided being hit as I tried to get over to the side of the road without any ability to accelerate. The first time it happened, after placing the vehicle in park and waiting a few minutes, I was able to get it back into gear and I drove straight to the dealer. The dealer "was unable to replicate the problem" and told me it was probably just a one-time "glitch." Approximately 1 1/2 weeks later, it happened again. I took it back to the dealer. The dealer stated that the computer showed error codes P0700 and P2817, both of which are faulty transmission codes. The dealer stated that the technician cleared the codes, drove the vehicle, and was once again "unable to replicate the problem." The dealer stated that it was going to request assistance from Chevy's engineers because it could not figure out what was wrong with the vehicle. I don't believe the vehicle is safe to drive at this point, as I narrowly avoided being in an accident on two occasions within 1 1/2 weeks of each other due to the failure of the vehicle's transmission to work appropriately.

### i.  GMC Sierra

180.  On January 28, 2015, the following incident was reported as to a 2015

GMC Sierra:

> I HAD MADE A COMPLAINT TO CHAPDELAINE BUICK- GMC
> THAT MY BRAND NEW TRUCK DID NOT SEEM TO GO INTO
> FOUR WHEEL DRIVE. I WAS TOLD TO BRING THE TRUCK TO
> THE DEALERSHIP AND THEY WOULD CHECK IT FOR ME. I
> WAS TOLD BY THE SERVICE DEPARTMENT THAT THE
> TRUCK WORKED JUST FINE IN FOUR WHEEL DRIVE. I THEN
> NOTICED THAT THE TRUCK SEEM TO SHIFT VERY ROUGH
> AND I CALLED THE SERVICE DEPARTMENT AND TOLD
> THEM THAT SOMETHING HAD TO BE WRONG. THE SERVICE
> DEPARTMENT ASKED ME TO BRING THE TRUCK BACK
> DOWN TO THEM THE NEXT DAY AND THEY WOULD TAKE
> IT FOR A TEST DRIVE. WHILE I WAS DRIVING THE TRUCK TO
> THE DEALERSHIP IT SHIFTED FROM DRIVE INTO NEUTRAL.I
> COASTED TO A STOP PUT THE VEHICLE INTO PARK SHUT
> OFF AND RESTARTED THE ENGINE AND THEN SHIFTED
> BACK INTO DRIVE AND TRIED TO DRIVE AGAIN. THIS TIME
> THE VEHICLE SERVICE ENGINE LIGHT CAME ON AND THE
> VEHICLE STAYED IN LOW GEAR AND WOULD NOT SHIFT
> INTO A HIGHER GEAR. THE BEST SPEED I COULD MAKE WAS
> 10 MPH. I STOPPED THE VEHICLE AND RESTARTED TWO
> MORE TIMES. ON THE SECOND TRY THE VEHICLE DID GO
> INTO DRIVE. I MADE IT TO THE DEALERSHIP AND THEY
> TOOK IT FOR A TEST DRIVE AND UPON THEIR RETURN
> GAVE ME A LOANER VEHICLE. THEY HAD TO REBUILD THE
> TRANSMISSION ON MY BRAND NEW TRUCK WHICH TOOK
> ABOUT THREE DAYS. THANKFULLY THIS EVENT TOOK
> PLACE ON A BACK ROAD WITH LITTLE TRAFFIC. IF IT HAD
> HAPPENED ON A BUSY ROAD AN ACCIDENT MIGHT HAVE
> OCCURRED. *TR

181.  Another incident involving a GMC Sierra was reported on August 7,

2015:

THE CONTACT OWNS A 2015 GMC SIERRA. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS, THE TRANSMISSION VIBRATED CAUSING A HESITATION WHEN THE GEARS SHIFTED. THE CONTACT MENTIONED THAT THE FAILURE WAS MOST SEVERE WHILE DRIVING AT SPEEDS BETWEEN 40-50 MPH. THE VEHICLE WAS TAKEN TO A DEALER WHO CHANGED THE GEAR RATIO AND ADJUSTED THE REAR END. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 250.

182.  Another incident involving a 2015 GMC Sierra was reported on

November 3, 2015:

THE TRANSMISSION SEEMS TO SLIP OR HESITATE AT TAKEOFF. THE RUNNING LIGHTS ARE TOO DIM TO SEE DOWN THE ROAD.

183.  Another incident involving a GMC Sierra was reported on July 22,

2016:

2015 GMC SIERRA HAS A DELAY THROTTLE RESPONSE. DOES IT AT ALL SPEEDS AND FROM TAKE OFF. TOOK TO DEALER AND SERVICE ADVISOR PULLED TRUCK IN SHOP. GOT OUT AND SAID IT DOES HAVE A DELAY. THE RAN VIN NUMBER THROUGH GMC DATA BASE AND TOLD ME. MANUFACTURE SAID IT WAS A NORMAL THING. IT'S NOT NORMAL AND NEVER HAD A VEHICLE WITH A THROTTLE DELAY.

184.  Another incident involving a 2015 GMC Sierra was reported on July

25, 2016:

DELAYED ENGAGEMENT IN DRIVE, TRANSMISSION CLUNKS, RPM FLARES AND TRUCK QUITS MOVING UNEXPECTEDLY. SHUDDER AT 3- 50 MPH, VIBRATES STEERING WHEEL AND LEAVES AN UNEASY FEELING THE TRUCK IS GOING TO QUIT MOVING.

185.   Another incident involving a GMC Sierra was reported on September 10, 2016:

> FIRST OF ALL THE HEADLIGHTS ARE VERY DIM AND AT NIGHT CANNOT SEE NOTHING.DEALER SAID IT IS WHAT IS .VERY BAD !! ALSO MY SIERRA ON WINDOW STICKER STATES COMES WITH ALL TERRAIN TIRES IT DOES NOT HAVE ALL TERRAIN TIRES . THEY ARE 265/65/R18 GOODYEAR WRANGLER SRA .I WORKED FOR GOODYEAR AND THOSE TIRES ARE ALL SEASON !!! NOT ALL TERRAIN AS SPECIFIED ON WINDOW STICKER !! I TALKED TO DEALER AND CALLED CUSTOMER SERVICE AT GM THEY NEVER CALL BACK AND THEY SAID THOSE ARE THE RIGHT TIRES.THEY ARE NOT ACCORDING TO MY ATTORNEY WHO STATES THE WINDOW STICKER IS TOTALLY INCORRECT AND IS FRAUDULENT CHECK YOUR TIRES AND WINDOW STICKERS AND COMPARE AND LOOK ON GOODYEARS WEBSITE YOU WILL SEE.ALSO MY TRANSMISSION CLUNKS AND KNOCKS AND SHIFTS INCORRECTLY DEALER STATES ITS NORMAL I SPEND 40K ON A NEW TRUCK AND ALL I HAVE ARE PROBLEMS AND GM DOES NOTHING. IT DOWNSHIFTS HORRIBLE WHAT CAN I DO???

186.   Another incident involving a GMC Sierra was reported on December 2, 2016:

> TL* THE CONTACT OWNS A 2015 GMC SIERRA 1500. WHILE DRIVING VARIOUS SPEEDS, THE TRANSMISSION VIBRATED AND CAUSED A HESITATION WHEN THE GEARS SHIFTED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER AND REPAIRED; HOWEVER, THE FAILURE RECURRED SEVERAL TIMES. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 50.

187.   Another incident involving a 2015 GMC Sierra was reported on December 8, 2016:

EXTREME LAG/DELAY- HARSH ENGAGEMENT WHEN SHIFTING FROM PARK TO REVERSE. ITS LIKE YOU ARE BACKING INTO SOMETHING? WHEN CRUISING 28-32 MPH AND RELEASING ACCELERATOR(AS IF YOU WERE COASTING INTO A TURN) WHEN SLOWING THE VEHICLE SEEMS TO SHIFT UP AND LUNGE ENTERING THE TURN.

CLUNKS AND SHIFTS HARD WHEN CRUISING NORMALLY WHEN YOU HAVE TO RELEASE THE GAS PEDAL AND SLIGHTLY REACCELERATE, CAUSING THE DRIVER TO HESITATE.

VEHICLE SHUTTERS AND HARD ACCEL 10X WORSE WHEN TOWING A 7000 # TRAILER (TRUCK IS RATED OVER 12,000 LBS. TOWING).

188.  The following incident was reported on March 21, 2016 as to a 2016

GMC Sierra:

WHILE DRIVING MY TRUCK, IT HAS HAD 3 ALERTS ON DASH FOR "SERVICE STABILITRAK, POWER STEERING USE CAUTION AND TRAILER BRAKE." VEHICLE GAUGES ALL DROP TO ZERO WHILE OPERATING VEHICLE AND GO ON AND OFF. THE VEHICLE WHEN THIS OCCURS ALSO DISENGAGES FROM GEAR, VEHICLE IS AN AUTOMATIC. THEN ENGINE REVS UP WHEN IT SLIPS OUT OF GEAR AND GENERALLY GOES BACK IN GEAR AS GAUGES COME BACK ON. THE POWER STEERING SEEMS TO ALSO LOSE SOME POWER. WHEN THIS OCCURS, IF YOU DEPRESS THE GAS PEDAL, YOU DO NOT GET ANY MORE POWER. THIS IS TECHNICALLY THE 6TH OCCURRENCE. IT HAS BEEN BACK TO DEALER (GRIFFIN GMC OF MONROE, NC) AND COMPUTER CODES WERE CLEARED AND NOTHING REPORTED IE...TECHNICALLY FOUND THAT WOULD CAUSE THIS ISSUE PER THE DEALERSHIP AS UNABLE TO RE-PRODUCE THE CAUSE. I RETURNED THE TRUCK TODAY AFTER THIS 6TH OCCURRENCE DUE TO MY FEAR OF DRIVING THE VEHICLE WITH MY CHILDREN AND GETTING INVOLVED IN AN ACCIDENT. I HAVE VIDEO OF THIS LAST OCCURRENCE OF DASHBOARD GAUGES AND SHARED

THEM WITH THE DEALERSHIP. FIRST OCCURRENCE PICTURES ARE FEB 29, 2016 AND SUNDAY, MARCH 20, 2016. VEHICLE HAS APPROXIMATELY 2000 MILES ON ODOMETER. ENTIRE TIME, VEHICLE HAS BEEN RUNNING ON LOCAL ROAD, EITHER AT STOP OR DRIVING BELOW 45MPH MOVING STRAIGHT AHEAD. I COULD NOT REPLICATE OR CAUSE THE ISSUE TO HAPPEN AGAIN ON PURPOSE, VERY RANDOM.

189.   Another incident involving a GMC Sierra was reported on September

8, 2016:

TL* THE CONTACT OWNS A 2016 GMC SIERRA 1500. WHEN THE SHIFTER WAS ENGAGED, THE VEHICLE DID NOT REGISTER THE CORRECT GEAR AND FAILED TO MOVE. WHEN THE VEHICLE DID RECOGNIZE THE CORRECT GEAR, IT ACCELERATED UNINTENTIONALLY. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION WAS DEFECTIVE AND PARTS IN THE TRANSMISSION NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED; HOWEVER, THE FAILURE RECURRED. THE VEHICLE WAS RETURNED TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE TRANSMISSION NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 150. UPDATED 10/18/16*LJ

190.   Another incident involving a GMC Sierra was reported on May 3, 2017:

GM 8 SPEED TRANSMISSION IS FULL OF PROBLEM. IT CONSTANTLY HESITATES, HANG GEARS, BUCKS, AND POSES VARIOUS SAFETY CONCERNS. FOR INSTANCE IF MERGING ONTO THE HIGHWAY THE TRANSMISSION WILL HESITATE AND THE TRUCK WILL BE UNRESPONSIVE TO GAS PEDAL INPUT FOR A PERIOD OF TIME SOMETIMES UP TO 12 SECS. THIS HESITATION CAUSES A SAFETY CONCERN WHEN ATTEMPTING TO MERGE INTO TRAFFIC. GM ACKNOWLEDGES THESE CONCERNS BUT STATES THAT IT IS

OPERATING AS DESIGNED BUT ARE WORKING ON SOFTWARE UPDATES TO IMPROVE TRANSMISSION PERFORMANCE. THIS HAS BEEN A CONSTANT ISSUE SINCE I PURCHASED THE TRUCK.

191. Another incident involving a GMC Sierra was reported on May 4, 2017:

8 SPEED TRANSMISSION BUCKS, HESITATES, LURCHES FORWARD, CLUNKS, WHILE IN DRIVE. THE CONTINENTAL TIRES ARE CUPPING, WHICH GM SAYS IS CHARACTERISTIC OF THE BRAND. THE TRUCK VIBRATES WHILE AT 25MPH, AROUND 50MPHM AND 65-75MPH. WHILE IN AWD/4WD AT 30 AND 50MPH, THE DRIVELINE MAKES A WHINING NOISE AND VIBRATES SOMETIMES.

192. Another incident involving a GMC Sierra was reported on September

15, 2017:

THIS ISSUE STARTED A FEW MONTHS AFTER I PURCHASED THE TRUCK TOOK IT TO TWO DEALERS THEY SAY ITS NORMAL. CALLED GMC & THEY HAVE NO RECALL. WHEN DRIVING THE TRUCK & HAVE TO SLOW DOWN IN TRAFFIC THE AUTOMATIC TRANSMISSION DOWN SHIFTS & HAS A VERY NOTICABLE JERK. WILL ACTUALLY JERK THE HOLE TRUCK. PEOPLE WHO HAVE RODE WITH ME TELL ME I HAVE A TRANSMISSION PROBLEM. WHAT CAN I DO

193. Another incident involving a GMC Sierra was reported on March 20,

2018:

PLEASE MAKE GM RESOLVE THE ISSUES WITH THE 8 SPEED TRANSMISSIONS IN THE TRUCKS. 2016 SL T Z71. I PURCHASED THE TRUCK NEW. IT'S NEVER SHIFTED PROPERLY. HESITATIONS, CLUNKING, JERKING, SHUTTER, HARD DOWN SHIFTS .... EVERYTIME I TAKE IT IN, THEY SAY IT'S DUE FOR AN UPDATE. THE TRUCK HAS HAD 4 UPDATES AND NONE OF THEM HAVE FIXED A THING. I HAD IT IN BEFORE THE 36,000 MILE BUMPER TO BUMPER WARRANTY WAS UP AND WAS TOLD IT WAS UP TO DATE. THEN LAST

WEEK, I TOOK IT IN AND WAS TOLD IT WAS "SEVERAL
UPDATES BEHIND." (54,XXX) MILES. TO TOP IT OFF,
GENERAL MOTORS WOULDN'T PAY FOR THE $400 UPDATE,
WHICH DIDN'T FIX ANYTHING AT ALL!!! THE TRUCK
JERKED BEFORE WE GOT A BLOCK FROM THE DEALERSHIP.
GM SAYS THAT EVEN THOUGH THE TRUCK IS STILL UNDER
A FACTORY 60,000 MILE POWERTRAIN WARRANTY,
TRANSMISSION UPDATES ARENT COVERED. THE 120,000
EXTENDED WARRANTY WOULDN'T COVER IT BECAUSE
THEY SAY IT SHOULD BE COVERED UNDER THE FACTORY
POWERTRAIN WARRANTY! I ABSOLUTELY LOVE THE
TRUCK OTHER THAN THE JUNK TRANSMISSION IN IT. I
DON'T THINK IT'S SAFE OR MUCH FUN HAVING A VEHICLE
THAT STARTS TO GO THEN FALLS FLAT ON ITS FACE FOR A
FEW SECONDS BEFORE SLAMMING INTO THE NEXT GEAR.
THIS IS A MAJOR PROBLEM WITH A HUGE NUMBER OF
TRUCKS. DON'T BELIEVE ME? GOOGLE "2016 SIERRA
TRANSMISSION ISSUE" OR ANYTHING OF THE SORT.
YOU'LL SEE. I'M REALLY NOT ASKING FOR MUCH. I DIDN'T
WANT TO PUT MY FAMILY IN A POTENTIALLY UNSAFE
VEHICLE ..... YET HERE WE ARE. LIKE I SAID, 1'M NOT
ASKING FOR MUCH. ALL I WANT IS FOR MY TRUCK TO SHIFT
NORMAL. TO GO WHEN IT NEEDS OR HAS TO. MY TRUCK
HAS HAD 4 UPDATES AND WAS SEVERAL UPDATES BEHIND
LAST TIME, THAT'S ROUGHLY AN UPDATE EVERY 10,000
MILES AND NOW THEY'RE NOT COVERED? ON TWO
SEPARATE OCCASIONS, IT'S SHIFTED SO HARD THAT IT
JARRED MY NECK AND MADE IT SORE FOR A FEW DAYS IVE
EVEN PULLED OVER ON THE SIDE OF THE ROAD THINKING
WE WERE REAR-ENDED. SO HAS MY WIFE. NOT SAFE-NOT
NECESSARY!

194.   Another incident involving a GMC Sierra was reported on July 30,

2018:

TRUCK SHIFTS REALLY HARD AND IS UNPREDICTABLE. I
ALMOST DROVE THROUGH MY GARAGE DOOR THE OTHER
DAY SHIFTING TO DRIVE FROM REVERSE. TRUCK WILL
LUNGE FORWARD OR DELAY IN SHIFTING. THERE HAVE

BEEN A FEW TIMES IVE HAD TO SLAM ON THE BRAKES BEFORE I BACKED INTO SOMETHING. I HAVE BROUGHT IT IN 3-4 TIMES FOR THE ISSUE AND GMC WONT REMEDY THE PROBLEM.

195.   Another incident involving a GMC Sierra was reported on August 8,

2018:

8 SPEED TRANSMISSION BUCKS, HESITATES, LURCHES FORWARD, CLUNKS, WHILE STARTUNG ACCELERATION OR COMING TO A STOP. I TRY TO KEEP A BIG GAP BETWEEN MY TRUCK AND CARS IN FRONT OF ME AT STOP SIGNS BECAUSE IT RANDOMLY LURCHES FORWARD AND I ALMOST HAVE BUMPED CARS IN FRONT OF ME. I HAVE HAD THE TRUCK INTO THE DEALER SO MANU TIMES TO FIX THE VIBRATION ISSUES AS WELL, THEY SAID 3 TIRES THAT CAME IN THE BRAND NEW TRUCK WERE DEFECTIVE SO I HAD TO REPLACE THEM ALL AND THE SHAKE IS STILL THERE, THE BALANCED, REBALANCED, ROAD FORCE BALANCE AND NOTHING WORKS. LAST TIME AT THE DEALER SAID IT IS PROBABLY THE TIRES, HE SAID DON'T ROTATE THEM AGAIN AND WHEN THEY WEAR OUT HE WILL PUT ME IN A BETTER TIRE. I AM PAST MY WARRANTY SO THE DEALER SAYS ANY COSTS ARE MY RESPONSIBILITT, IF THE NHTSA COULD PLEASE STEP IN TO ASSIST US TO MAKE GM FIC THEAE VEHICLES WHICH ARE A SAFETY HAZARD.

196.   Another incident involving a GMC Sierra was reported on September

21, 2018:

TRANSMISSION - WHEN DRIVING THE VEHICLE IT DOES A HARD SHIFT WHEN ACCELERATING AND DECELERATING. I HAVE TAKEN THE VEHICLE INTO THE DEALER TWICE. THEY ARE SAYING THAT IS A "STATE OF THE ART" COMPUTER THAT NEEDS TO BE RESET!!! I AM TAKING IT BACK IN FOR A 3RD TIME. THE CARE IS 2 YEARS OLD WITH 31 K MILES.

197.    Another incident involving a GMC Sierra was reported on October 27,

2018:

> TRANSMISSION    SHIFTS    ABRUPTLY    AND    TORQUE
> CONVERTER CAUSES SHUDDER AT HIGHWAY SPEEDS.
> TRUCK HAS BEEN SERVICED TWICE FOR THE SAME ISSUE
> BY DEALER AND DEALER RECENTLY TOLD ME PROBLEM IS
> UNRESOLVABLE.

198.    Another incident involving a GMC Sierra was reported on November

6, 2018:

> THE CONTACT OWNS A 2016 GMC SIERRA 1500. WHILE
> DRIVING 65 MPH IN STOP AND GO TRAFFIC, THE CONTACT
> DETECTED A SHUTTER AND HEARD AN ABNORMAL NOISE
> WHEN SHIFTING GEARS. THE VEHICLE WAS TAKEN TO
> MARTY'S BUICK GMC … WHERE THE TRANSMISSION WAS
> REPROGRAMMED AND FLUSHED. THE VEHICLE WAS THEN
> TAKEN TO BEST CHEVROLET . . . WHERE THE CONTACT WAS
> INFORMED THAT THE CAUSE OF THE FAILURE COULD NOT
> BE DETERMINED. THE VEHICLE WAS NOT REPAIRED. THE
> MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE
> FAILURE MILEAGE WAS 96,794.

199.    An incident involving a 2017 GMC Sierra was reported on July 20,

2017:

> THE CONTACT OWNS A 2017 GMC SIERRA 1500. WHILE
> DRIVING 30 MPH, THE TRANSMISSION FAILED AFTER A
> COMPLETE STOP. WHEN THE ACCELERATOR PEDAL WAS
> DEPRESSED, THE RPMS INCREASED. WHEN SHIFTING FROM
> SECOND TO FIRST GEAR, THE TRANSMISSION SHIFTED INTO
> FIRST GEAR WITH EXTREME FORCE AND CAUSED THE
> VEHICLE TO ABRUPTLY ACCELERATE. THE CONTACT HAD
> TO ENGAGE THE BRAKE PEDAL WITH FORCE TO AVOID A
> CRASH. THE FAILURE WAS EXPERIENCED NUMEROUS
> TIMES. THE VEHICLE WAS TAKEN TO WALSH CHEVY BUICK

GMC (2330 NORTH BLOOMINGTON STREET, STREATOR, IL, 61364 815-673-4333) WHERE THE TRANSMISSION SYSTEM WAS REPROGRAMMED TWICE AND THE ELECTRONIC CONTROL MODULE WAS REPLACED. HOWEVER, THE FAILURE WAS NOT CORRECTED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS 112. UPDATED 08/30/17*LJ

200.   Another incident involving a GMC Sierra was reported on July 27,

2017:

THE CONTACT OWNS A 2017 GMC SIERRA. WHILE DRIVING APPROXIMATELY 5 MPH, THE VEHICLE FAILED TO SHIFT OUT OF GEAR AND THERE WAS A DELAY OF THREE TO FOUR SECONDS BEFORE SHIFTING INTO SECOND GEAR. THE FAILURE RECURRED EVERY MORNING. THE VEHICLE WAS TAKEN TO THE DEALER (JIM CAUSLEY, LOCATED AT 38111 GRATIOT AVE, CLINTON TOWNSHIP, MI 48036) WHERE IT WAS CONFIRMED THAT GM WAS AWARE OF THE ISSUE. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND INFORMED THE CONTACT THAT THERE WAS NO RECALL ON HIS VIN. NO FURTHER ASSISTANCE WAS OFFERED. THE APPROXIMATE FAILURE MILEAGE WAS 4,500. UPDATED 11/13/17 *BF

201.   Another incident involving a GMC Sierra was reported on October 17,

2017:

UNINTENDED ACCELERATION – WHEN SLOWING DOWN TO COME TO A STOP THE VEHICLE WILL OCCASIONALLY ENGAGE A LOWER GEAR VERY SUDDENLY AND LURCH FORWARD. THE RESULTING FORCE IS ENOUGH TO OVERPOWER THE BRAKING EFFORT BEING PROVIDED BY THE DRIVER AND THE VEHICLE WILL MOVE FORWARD SEVERAL FEET BEFORE THE DRIVER CAN REACT AND APPLY MORE BRAKING FORCE TO STOP THE VEHICLE. THE ISSUE OCCURS RANDOMLY AND INFREQUENTLY AT VERY

SLOW SPEEDS (5-10MPH). THERE HAVE BEEN SEVERAL OCCASIONS WHERE I'VE BEEN BRAKING TO STOP AT A STOP LIGHT AND BEEN FORCED INTO THE MIDDLE OF AN INTERSECTION. I'M CONCERNED THE ISSUE COULD CAUSE THE VEHICLE TO STRIKE THE CAR IN FRONT OF IT OR A PEDESTRIAN CROSSING IN FRONT OF THE VEHICLE AS IT STOPS FOR A CROSSWALK. MULTIPLE UNSUCCESSFUL REPAIR ATTEMPTS HAVE BEEN MADE BY THE DEALER. I ATTEMPTED TO FORCE THE MANUFACTURER TO BUY THE VEHICLE BACK FROM ME THROUGH THE MASSACHUSETTS LEMON LAW AND SINCE THAT TIME THEY HAVE DENIED THE EXISTENCE OF A PROBLEM. I HAVE SEEN SEVERAL INSTANCES ONLINE WHERE CONSUMERS WITH THE IDENTICAL VEHICLE (ALL WITH THE 8 SPEED TRANSMISSION) COMPLAINED OF THE SAME PROBLEM.

202.   Another incident involving a GMC Sierra was reported on February 23,

2018:

TRANSMISSION HARSH 1-2 SHIFT WHEN IT IS UNDER LIGHT THROTTLE AND SOMETIME DOES NOT SHIFT OR MAKE NOSE. GMC DEALER ARE AWARE ABOUT THIS ISSUES ON ALL GM TRUCK MODEL OF 2015 TO 2017 WITH 8SPED TRANSMISSION SINCE APRIL 2017. I HAVE ATTACHED DOCUMENTS GIVEN BY DEALER.

203.   Another incident involving a 2017 GMC Sierra was reported on June

1, 2018:

WHEN DRIVING AT SLOW PARKING LOT SPEEDS OR WHEN COMING TO A COMPLETE STOP THE VEHICLE INTERMITTENTLY LUNGES, SURGES OR JOLTS, CAUSING THE VEHICLE TO MOVE FORWARD OR BACKWARDS UNANTICIPATED. SOMETIMES THE JOLT FEELS LIKE ANOTHER VEHICLE HAS HIT THIS VEHICLE FROM THE REAR, AGAIN CAUSING IT TO LUNGE FORWARD.

204.   Another incident involving a 2017 GMC Sierra was reported on June

15, 2018:

> I BOUGHT THIS TRUCK USED WITH 12,918 MILES ON IT,
> APRIL 2018. WHEN DRIVING(ESPECIALLY ON HIGHWAY),
> AND CHANGING SPEEDS, TRANSMISSION CLUNKS AND
> LURCHES-AUTOMATIC TRANSMISSION. IT SOUNDS AND
> FEELS AS IF DRIVE TRAIN WILL FALL OUT. I HAVE TAKEN
> IT TO DEALER TWICE. THE FIRST TIME, THEY KEPT IT FOR 3
> DAYS, THE SECOND TIME, FOR ONE. THE MECHANIC IS
> ABLE TO REPLICATE THE NOISE/LURCHING, BUT THEY ARE
> UNABLE TO FIND A CAUSE OR CORRECTION. THEY TELL ME
> IT IS NOT DANGEROUS, BUT I AM CONCERNED THAT THE
> NOISE/MOVEMENT, COULD CAUSE MYSELF OR ANOTHER
> FAMILY MEMBER TO SWERVE OR BRAKE HARD AND CAUSE
> AN ACCIDENT. THE MECHANIC HAS TRIED "UPDATING THE
> SOFTWARE" BUT THAT DID NOT FIX IT. SEVERAL OTHER
> GMC SIERRA OWNERS TELL ME THEY HAVE HAD SAME
> PROBLEM.

205.   Another incident involving a GMC Sierra was reported on December

6, 2018:

> THE TRANSMISSION SHIFTS EXTREMELY ROUGH FROM 1ST
> TO 2ND GEAR IN PARKING LOTS AT A SLOW SPEED AND ON
> NORMAL   HIGHWAY   OR   STREET   DRIVING   AND
> EXPERIENCES THE SAME THING WHILE SLOWING DOWN TO
> STOP 2. THE ENGINE HAS RECENTLY BEEN HAVING A
> AWKWARD SHAKE TO IT WHILE IN IDEAL AFTER IT HAS
> BEEN RUNNING AND WARM 3. WHILE BACKING UP AND
> TURNING THE WHEEL, THE FRONT SUSPENSION WILL LET
> OUT A LOUD CLUNK SOUND AND THE SOUND WILL RETURN
> WHEN TURNING THE TRANSMISSIONS BACK FORWARD
> AFTER PUTTING IT INTO DRIVE.

206.   Another incident involving a 2017 GMC Sierra was reported on

December 18, 2018:

I HAVE HAD SEVERAL INSTANCES WHERE YOU PUSH THE ACCELERATOR AND YOU START TO GO AND THEN IT JUST STOPS MOVING LIKE THE TRANSMISSION HAS DISENGAGED. STARTED TO TURN INTO ONCOMING TRAFFIC THIS MORNING AND HAD TO STOP AS AS IT DID THIS AND I WAS GOING TO GET HIT!!! IT DOES IT A LOT, FIRST TIME I WOULD HAVE BEEN HIT!!! GM SAYS THEY KNOW IT'S A PROBLEM, AT SHOP NOW AGAIN FOR IT! GOING TO GET SOMEONE KILLED!!!!

207.  Another incident involving a 2017 GMC Sierra was reported on

January 10, 2019:

TRANSMISSION HAS SURGING AND HESITATION. DEALER CANNOT FIX.

208.  Another incident involving a 2017 GMC Sierra was reported on

February 4, 2019:

TRUCK LAGS POWER WHEN PRESSING THE GAS PEDAL AT TIMES AFTER PUTTING TRANSMISSION INTO DRIVE FROM REVERSE. TRANSMISSION SHIFTS HARD INTO AND OUT OF FIRST GEAR AND AT TIMES FEELS LIKE IT IS SKIPPING 2ND GEAR DURING A DOWNSHIFT.

209.  Another incident involving a 2017 GMC Sierra was reported on March

12, 2019:

TRANSMISSION SHIFT FROM 1ST GEAR. THERE IS A PROBLEM IN THE GEAR SHIFT FROM 1ST TO 2ND IT SLAMS THE TRANSMISSION WHEN YOU STOP AND START. THERE IS A HEATER IN THE TRANSMISSION THAT PUTS EXTRA DEGRADATION ON THE OIL CAUSING IT TO NEED REPLACEMENT VERY EARLY. DEALER KNOWS OF THE ISSUE BUT HAS NO FIX FOR IT ONLY STATED THEY NOTED THE FILE IN CASE IT FAILS. UNACCEPATABLE FOR A 55,000. PLEASE LOOK INTO THIS.

210.   On January 8, 2019, the following was reported as to a 2018 GM

Sierra:

> BRAND NEW 2018 SIERRA 1500 Z71. WHEN DRIVING THE
> TRUCK FOR THE FIRST TIME AFTER SITTING FOR A
> NUMBER OF HOURS (6+HRS) THE TRUCK EXPERIENCES A
> "HARD" 1-2 SHIFT. THIS OCCURS 100% OF THE TIME WHEN I
> LEAVE FOR WORK IN THE MORNING. SOMETIMES IT FEELS
> LIKE THE TRANSMISSION SLIPPED, THIS IS THE HARD
> SHIFT FEELING. OTHER TIMES THE TRUCK LOSES
> ACCELERATION, CUTS OUT, FEELS LIKE THE TRUCK HAS
> RAN OUT OF FUEL. ONLY HAPPENS WHEN THE TRUCK HAS
> BEEN SITTING FOR A LONG PERIOD. WHEN I TOOK THE
> TRUCK IN TO HAVE THIS LOOKED INTO I WAS TOLD THIS
> IS A KNOWN ISSUE WITHOUT A RESOLUTION. IVE
> ATTACHED A SCAN'D COPY OF THE DOCUMENT THEY
> GAVE ME #16-NA-361.

211.   On February 14, 2019, the following was reported:

> EXTREMELY HARD SHIFTING ON LOWER GEARS. WHEN
> SLOWING WHEN IT GOES FROM 2ND TO 1ST IT FEELS LIKE I
> GOT REAR-ENDED. NOT ALL THE TIME BUT ONCE A DAY
> AT LEAST. IT ALSO SHUDDERS WHEN SLOWLY
> ACCELERATING IN TRAFFIC, SOMETIMES THE RPM GOES
> WAY HIGH AND IT LURCHES FORWARD WHEN IT
> UPSHIFTS.

212.   On April 2, 2019, the following was reported:

> WHILE THE TRUCK IS IN MOTION AND WHEN
> ACCELERATING AROUND 15-20 MPH THE TRANSMISSION
> WILL SOMETIMES "HUNT" FOR A GEAR CAUSING THE
> TRUCK TO NOT ACCELERATE. THIS RESULTS IN A MILD
> JERKING OF THE TRUCK WHEN IT IS TRYING TO
> ACCELERATE AND FEELS LIKE THE TRANSMISSION IS
> SLIPPING/SKIPPING. THIS IS MORE APPARENT WHEN
> GOING UP A GRADE VERSUS ON A FLAT SURFACE. SO I
> HAVE TO PUSH HARDER ON THE GAS PEDAL WAITING FOR

THE TRUCK TO SHIFT. THIS IS A SAFETY ISSUE SINCE
WHEN NOT PROPERLY ACCELERATING INTO TRAFFIC, AN
ACCIDENT IS MORE LIKELY TO OCCUR. I SEE THAT THIS
ISSUE HAS ALREADY BEEN REPORTED IN ANOTHER
INCIDENT ON YOUR WEBSITE. I HAVE HAD THIS ISSUE
SINCE I BOUGHT THE TRUCK ON 02/2018 AND THE REASON
I HAVE WAITED TO REPORT IS DUE TO THE DEALER
STATING TO ALLOW THE COMPUTER TO UPDATE/LEARN
YOUR DRIVING HABITS. I HAVE 11,000 MILES ON THE
TRUCK NOW AND STILL EXPERIENCING THE ISSUE.

213.   On April 25, 2019, the following incident was reported as to a 2019

GMC Sierra:

TRANSMISSION JERKS INTO GEAR WHEN SLOWING DOWN.
WHEN SPEEDING UP TRUCK WILL JERK. SERVICE
MANAGER SAID IT WAS NORMAL TRUCK FEELS LIKE IT
THE REAR END FALLS OUT WHEN STOPPING.

214.   On July 23, 2019, the following incident was reported:

RECENTLY PURCHASED A 2019 GMC SIERRA AND IT SHIFTS
HARD AT LOWER SPEEDS OR WHEN MOVING FROM A
STOPPED POSITION AND THEN ACCELERATING, OR WHEN
DECELERATING. WHILE PARKING THE CAR AT ONE POINT
THE SHIFT WAS SO HARD THAT IT FELT LIKE A HIT, AND
THEN THE KIDS CONFUSEDLY ASKING 'WHAT WAS THAT?.
GM IS GIVING US THE RUNAROUND AND UNWILLING TO
FIX WHAT I HAVE NOW FOUND OUT, HAS BEEN A KNOWN
PROBLEM. THEY BASED EVERYTHING OUT OF WHAT THE
MODULES REPORT WHEN THE CAR IS HOOKED UP TO THE
COMPUTER BASICALLY, IF THE MODULES ARE OK THEN
THE CAR IS REPORTEDLY OK. NOT THE CASE.

215.   On August 23, 2019, the following incident was reported:

TL' THE CONTACT OWNS A 2019 GMC SIERRA 1500. WHILE
DRIVING 10 MPH, THE CONTACT HEARD AN ABNORMAL
NOISE AND THE VEHICLE BEGAN TO HESITATE. THERE
WERE NO WARNING INDICATORS ILLUMINATED. THE

CONTACT ALSO STATED THAT THE VEHICLE DOWNSHIFTED FROM THIRD TO FIRST GEAR INDEPENDENTLY. THE VEHICLE WAS TAKEN TO GEOFF PENSKE BUICK GMC (LOCATED AT 100 S MUSEUM RD, SHILUNGTON, PA 19607, (610) 370-6673) TO BE DIAGNOSED, BUT THE FAILURE COULD NOT BE DUPUCATED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED. THE FAILURE MILEAGE WAS 5,500. THE CONSUMER STATED WHEN AT A TRAFFIC UGHT CAR, IT CLUNKS AND DROPPING INTO FIRST GEAR WHEN COMING TO A STOP •TR WHEN STOPPING FOR TRAFFIC THE TRANSMISSION SEEMS TO 'CLUNK AS IF IT IS IN A HIGHER GEAR AND THEN DROPS INTO FIRST AFTER THE VEHICLE COMES TO A STOP. FEELING UKE THE GEARS ARE MOVING WHEN THE VEHICLE IS NOT. WHEN LEAVING A STOP IT SOMETIMES HESITATE AND THE ENGINE WILL REV UKE IT IS IN NEUTRAL THEN QUICKLY LUNGE FORWARD AT TIMES SO HARD IT FEELS LIKE IT HAS BEEN HIT FROM BEHIND.*JB

216. On August 12, 2020, the following was reported as to a 2020 GMC

Sierra:

AT 550 MILES HAD TO TOW TO DEALER. THEY SAID NEEDED TO REPROGRAM TRANSMISSION. NOW AT 4000 MILES, WENT TO START AND VEHICLE WILL NOT DO ANYTHING. NO POWER. IT IS BEING TOWED TO DEALER AGAIN. PRETTY MUCH BOUGHT A LEMON AS IT LOOKS NOW.

217. On September 23, 2020, the following was reported:

TRANSMISSION KICKS WHEN COMING TO A COMPLETE STOP.

218. On May 27, 2021, the following "hard" shifting was reported during

both up and down shifting for a 2021 GMC Sierra:

TRANSMISSION SHIFTS HARD WHEN SHIFTING UP AND WHEN DOWNSHIFTING. VEHICLE JERKS WHEN GOING

SPEEDS <40 AFTER COMING OFF HIGHWAY AT HIGHWAY SPEEDS >70.

### j.    GMC Canyon

219.   An incident involving a 2017 GMC Canyon was reported on August 1,

2018:

TRANSMISSION BEGAN SHIFTING HARD. BEFORE LONG WHOLE TRUCK RATTLED WHEN SHIFTING. ALMOST A GRINDING SOUND. CHEVY DIAGNOSED TORQUE CONVERTER HAS GONE BAD. BACK ORDERED FOR 2 WEEKS.

220.   Another incident involving a 2017 GMC Canyon was reported on

December 31, 2018:

TORQUE CONVERTER FAILS AT 12000 MILES FOR MANY. THERE IS A GMC NOTICE OUT SINCE 2016. MINE FAILED AT 16000 MILES AND THE ONE THEY REPLACED WILL LIKELY FAIL AGAIN IN ANOTHER 16K MILES. THIS IS BAD. I NOTICED IT WHEN I PRESSED ON THE ACCELERATOR AND AS I INCREASED SPEED UP TO 45 MPH. IT RATTLED AND ROCKED BADLY. THE GMC REPAIRMAN SAID, "YEAP.....EVER SINCE 2016 ALL THESE DAMN TORQUE CONVERTERS HAVE BEEN FAILING IN THE CANYONS AND COLORADOS BECAUSE GM AND CHEVY CHANGED THE SIZE AND STRENGTH OF THE METAL USED IN ORDER TO REDUCE THE WEIGHT OF TRHE VEHICLE. WE WILL REPLACE IT, BUT I CAN ASSURE YOU IT WILL FAIL AGAIN AND YOU'LL HAVE TO BRING IT BACK TO USE FOR CHANGE OUT AGAIN." WOW....WHAT A BUNCH OF CRAP.

221.   On August 28, 2018, the following incident was reported as to a 2018

GMC Canyon:

TRANSMISSION JERKS FROM 4TH TO 5TH. SOMETIMES FEELS LIKE SOMEONE HIT YOU IN THE REAR ENDED.

222.   Another incident involving a 2018 GMC Canyon was reported on

September 7, 2018:

> TRANSMISSION CLUNKS FEELS LIKE YOUR HIT IN THE REAR
> END. I THOUGHT I WAS REAR ENDED 3 TIMES SO FAR. MY
> TRANSMISSION SURGES FORWARD FROM 4TH TO 5TH
> GEAR. VERY DANGEROUS TO WEAR I DON'T WANT TO
> DRIVE THE TRUCK.

223.   Another incident involving a 2018 GMC Canyon was reported on

September 7, 2018:

> THE AUTOMATIC TRANSMISSION SHIFTS AGGRESSIVELY
> THE FIRST GEARS FROM A COLD STARTED ENGINE AFTER
> ENGAGING FROM PARK TO DRIVE. SLUGGISH SHIFTING
> AND ACCELERATION.

224.   Another incident involving a 2018 GMC Canyon was reported on

December 14, 2018:

> RUMBLING OF TRANSMISSION. CLUCKY START. GM DEALER
> ACKNOWLEDGES THE PROBLEM AND HAS TRIED TO REPAIR
> VEHICLE. GM SAYS AT THIS TIME THE TRUCK 8 SPEED
> TRANSMISSIONS ARE NOT FIXABLE

225.   On January 7, 2021, the following delayed acceleration and jerking was

reported:

> I AM THE OWNER OF A 2020 CANYON SLE THAT WAS
> PURCHASED IN JUNE OF 2020. THE VEHICLE HAS ABOUT
> 20,000 MILE ON IT CURRENTLY. I HAVE BEEN
> EXPERIENCING A "LAG" ON ACCELERATION AFTER
> COMING TO A STOP. THIS FEELS LIKE THE TRANSMISSION
> ISN'T DOWN SHIFTING ALL THE WAY. AT TIME WHEN
> ACCELERATING FROM A STOP THE TRUCK WILL ACT AS IT
> IS IN A HIGH GEAR THEN SUDDENLY SLAM INTO A FIRST

GEAR. I HAVE TAKE MY TRUCK TO JESSUP GMC IN PALM SPRINGS AND THEY SAY THE TECH CAN NOT REPRODUCE THE PROBLEM. THIS SOUNDS LIKE THE SAME ISSUE THE 2015-1019 MODELS HAVE IN REFERENCE TO BULLETIN: 18-NA-355 DATED AUGUST 2019

226.   On January 5, 2022, the following was reported, noting "downshift"

issue and that the dealer was "backed up for weeks" and unable to look at the car:

When rolling to stop signs or red lights, the vehicle occasionally fails to downshift properly and will attempt to continue pushing the vehicle when trying to stop. On multiple occasions, the vehicle acts as if it cannot be stopped due to the transmission failing to downshift. One must aggressively apply the brakes to get the vehicle to come to a stop. Unable to have the vehicle checked out at a local dealer, due to being backed up for weeks when trying to have it looked at. No visual indication/warning is given when this happens. There is a current class action lawsuit for models up to 2019, but this needs to be extended to 2020 models as well, as multiple online forums discuss this issue being prevalent in newer models of the 8-speed transmission.

**4.    Well-Publicized Criticism of the Shift Defect in Trade Publications Demonstrate GM's Knowledge of the Shift Defect Before 2020.**

227.   GM was also made aware of the Shift Defect through criticisms of

automotive journalists, who identified the problems described above in online trade

publications. In an article on gmauthority.com describing updates to its 2019

transmission, the publication emphasizes:

In prior-generation, K2 platform Silverado and Sierra, the GM 8-speed was often criticized for its jerky and unexpected shifting behavior that ultimately worsened the satisfaction of driving and/or riding in the pickup. Whether the improvements made to the 8-speed gearbox in the all-new T1 platform 2019 Sierra and Silverado will address these issues is unknown. (*See* Alex Luft, "GM 8-Speed Automatic Enhanced For 2019 Silverado, Sierra" dated July 18, 2018, available at

http://gmauthority.com/blog/2018/07/gm-8-speed-automatic-enhanced-for-2019-silverado-sierra/ (last accessed May 7, 2019).)

228.   And a January 11, 2018 article on the trutheaboutcars.com described the ongoing problems associated with the Shift Defect, reporting:

> The 1-2 shift sounds and feels like it's going to rip the diff out of the axle, which is a common complaint about the eight-speed transmission in these vehicles. The AWD mode, which lives between 2WD and 4-High and which is basically the "4WD" in the Escalade/Denali, is laughably slow to respond to spinning rear transmissions. (*See* Jack Baruth,"2017 Silverado LTZ Long-term Test – 10,000 Miles and Counting" dated January 11, 2018, available at https://www.thetruthaboutcars.com/2018/01/long-term-test-2017-silverado-ltz-10000-miles/ (last accessed May 7, 2019).)

229.   Finally, the automotive journalists at motortrend.com highlighted the flaws GM's eight-speed transmission in comparison with its new 10-speed transmissions:

> Simply put, . . . . we were unimpressed by how the Silverado's volume 5.3-liter DFM V-8 and its eight-speed automatic performed. We're disappointed to find that GM didn't fix the old 5.3's biggest flaws: its sloppy throttle response at low speeds and its transmission's over eagerness to get to its top gear. The truck feels powerful enough once it's moving, but getting there is frustrating. 'The engine has power, but it's being tag-teamed by the unholy GM duo of a lazy throttle pedal and a transmission that hates to downshift,' features editor Scott Evans said. 'Every time you want to move, you've got to get deep into the throttle before anything useful happens. The shifts aren't as smooth as the 10-speed automatic, either, so you notice every time it's forced to drop two gears to maintain speed up a hill.'
>
> The 6.2-liter V-8 and its 10-speed auto, which is only available as an option on the top-level Silverado LTZ and Silverado High Country, improves things immensely. The big V-8 has plenty of power on tap, and it sounds especially great when you bury your foot into the throttle. The 10-speed automatic is worlds better than the eight-speed, too. It

feels modern and well sorted—basically the polar opposite of the eight-speed automatic. Its shifts are seamless and nearly unnoticeable, and it doesn't display the hunting behavior of the other transmission, either. (*See* Christian Seabaugh, "2019 CHEVROLET SILVERADO FIRST TEST: PENCILS DOWN" dated September 14, 2018 available at https://www.motortrend.com/cars/chevrolet/silverado-1500/2019/2019-chevrolet-silverado-first-test-review/ (last accessed May 7, 2019).)

230.   These well-publicized criticisms disclosing the Shift Defect, in addition to GM's own documents and hundreds of consumer complaints, show GM's awareness of the Shift Defect.

## C.   Plaintiffs' Experiences

### 1.   Matthew Battle's Experience

231.   Plaintiff Matthew Battle purchased a new, 2020 GMC Canyon from Sellers Buick GMC in Farmington, Michigan. The vehicle was equipped with an 8L90 or 8L45 transmission.

232.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

233.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

234.   At the time of purchase, Plaintiff had reviewed marketing materials for the vehicle online, including visiting GM's website. Plaintiff also discussed the purchase with an authorized dealer. In addition, prior to purchasing the Class

Vehicle, Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

235.   Plaintiff, acting as a reasonable consumer, relied on the materials he reviewed, and the discussions he had, before making his purchase.

236.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission.  GM's omissions were material to Plaintiff.

237.   Shortly after purchase, Plaintiff's transmission exhibited hard shifting, clunking and jerking. This Shift Defect reduced, and continues to reduce, Plaintiff's satisfaction with the vehicle.  Also, the Shift Defect raises a safety concern.

238.   On or about November 12, 2021, Plaintiff provided notice to GM about the Shift Defect when he brought his vehicle into Sellers Buick GMC in Farmington, Michigan because of the transmission problems, including hard shifting. At that time, Plaintiff had only 9,904 miles on the vehicle. Plaintiff additionally provided notice to GM about the Shift Defect when he informed the dealership about the transmission problems when he brought his vehicle in for service in or about November 2020, February 2021, and August 2021. In or about November 2020, Plaintiff had only approximately 3,780 miles on the vehicle. In or about February 2021, Plaintiff had only approximately 5,598 miles on the vehicle. In or about August 2021, Plaintiff had only approximately 8,466 miles on the vehicle.

239.   On or about February 17, 2022, Plaintiff also sent a notice letter to GM advising of the Shift Defect, to no avail.

240.   Despite an attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit a Shift Defect.

241.   GM did not disclose the Shift Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff, acting as a reasonable consumer, would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

242.   As a result of the Shift Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase or lease another vehicle from GM in the future, though he would like to do so.

### 2.    Juan Castaneda's Experience

243.   Plaintiff Juan Castaneda purchased a new, 2021 GMC Canyon from Cardinale Oldsmobile GMC Truck in Seaside, California. The vehicle was equipped with an 8L90 or 8L45 transmission.

244.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

245.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the way it was intended to be used.

246.   Prior to purchase, Plaintiff reviewed marketing materials for the vehicle online and test drove similar vehicles to the Class Vehicle.

247.   At the time of purchase, Plaintiff reviewed the Class Vehicle's window sticker and discussed the purchase with an authorized dealer.

248.   Plaintiff, acting as a reasonable consumer, relied on the materials he reviewed, and the discussions he had, before making his purchase.

249.   None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

250.   Shortly after purchase, Plaintiff's transmission exhibited hard shifting, clunking, jerking and vibrating. This Shift Defect reduced, and continues to reduce, Plaintiff's satisfaction with the vehicle. Also, the Shift Defect raises a safety concern.

251.   On or about September 25, 2021, Plaintiff provided notice to GM about the Shift Defect when he brought his vehicle into Winter Chevrolet in Pittsburg, California and advised of the transmission problems he was having, including hard shifting. At that time, Plaintiff had only 3,550 miles on the vehicle.

252.   On or about February 17, 2022, Plaintiff also sent a notice letter to GM about the Shift Defect, to no avail.

253.   Despite an attempted repair, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit a Shift Defect.

254.   GM did not disclose the Shift Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

255.   As a result of the Shift Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future.  Plaintiff does not intend to purchase or lease another vehicle from GM in the future, though he would like to do so.

**3.     David Figueroa's Experience**

256.   Plaintiff David Figueroa purchased a new, 2021 GMC Canyon from Buick GMC of Mahwah in Mahwah, New Jersey. The vehicle was equipped with an 8L90 or 8L45 transmission.

257.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

258.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the way it was intended to be used.

259. At the time of purchase, Plaintiff had reviewed marketing materials for the vehicle online and discussed the purchase with an authorized dealer. Plaintiff reviewed the Class Vehicle's window sticker and test drove the Class Vehicle at the Dealership.

260. Plaintiff, acting as a reasonable consumer, relied on the materials he reviewed, and the discussions he had, before making his purchase.

261. None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

262. Shortly after purchase, Plaintiff's transmission exhibited hard shifting, clunking and jerking. This Shift Defect reduced, and continues to reduce, Plaintiff's satisfaction with the vehicle. Also, the Shift Defect raises a safety concern.

263. On or about December 3, 2020, Plaintiff provided notice to GM about the Shift Defect when he brought his Vehicle into Buick GMC of Mahwah because of the transmission problem. At that time, Plaintiff had only 4,659 miles on the vehicle. Plaintiff additionally provided notice to GM about the Shift Defect when he brought his Vehicle into Buick GMC of Mahwah because of the transmission problem. At that time, Plaintiff had only 6,900 miles on the vehicle

264. On or about February 17, 2022, Plaintiff also sent a notice letter to GM advising of the Shift Defect, to no avail.

265.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiff's vehicle, which continues to exhibit a Shift Defect.

266.   GM did not disclose the Shift Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

267.   As a result of the Shift Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiff does not intend to purchase or lease another vehicle from GM in the future, though he would like to do so.

**4.   Walter and Janice Helms' Experience**

268.   Plaintiffs Walter and Janice Helms purchased a new, 2021 GMC Sierra from Gee Automotive Companies in Liberty Lake, Washington. The vehicle was equipped with an 8L90 or 8L45 transmission.

269.   Plaintiffs purchased the vehicle primarily for personal, family, or household use.

270.   At all times, like other Class Members, Plaintiffs have driven the vehicle in a foreseeable manner and in the manner in which it was intended to be used.

271.   Prior to purchasing his Class Vehicle, Plaintiffs researched the vehicle online and reviewed marketing materials, including television commercials.

272.   At the time of purchase, Plaintiffs had reviewed marketing materials for the vehicle, reviewed the Class Vehicle's window sticker and also discussed the purchase with an authorized dealer.

273.   Plaintiffs, acting as reasonable consumers, relied on the materials they reviewed, and the discussions had, before making their purchase.

274.   None of the information provided to Plaintiffs disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiffs.

275.   Shortly after purchase, Plaintiffs' transmission exhibited hard shifting, vibrating and jerking. This Shift Defect reduced, and continues to reduce, Plaintiffs' satisfaction with the vehicle. Also, the Shift Defect raises a safety concern. When Plaintiffs noticed the Shift Defect, Plaintiffs had approximately 1,900 miles on the vehicle. On or about February 24, 2022, Plaintiffs provided notice to GM about the Shift Defect when Mr. Helms brought the Vehicle into George Gee Buick, GMC, Porsche because of the Shift Defect. At that time, Plaintiffs had only approximately 2,149 miles on the vehicle.

276.   On or about February 17, 2022, a notice letter was sent to GM advising of the Shift Defect, to no avail.

277.   Despite attempted repairs, GM's authorized dealership has failed to adequately repair Plaintiffs' vehicle, which continues to exhibit a Shift Defect.

278.   GM did not disclose the Shift Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiffs would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

279.   As a result of the Shift Defect, Plaintiffs have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purposes and are, accordingly, unable to rely on GM's advertising or labeling in the future. Plaintiffs do not intend to purchase or lease another vehicle from GM in the future, though they would like to do so.

**5.   Robert Gribble's Experience**

280.   Plaintiff Robert Gribble purchased a used, 2021 Chevrolet Silverado from Expressway Chevrolet Buick GMC in Mt. Vernon, Indiana. The vehicle was equipped with an 8L90 or 8L45 transmission.

281.   Plaintiff purchased the vehicle primarily for personal, family, or household use.

282.   At all times, like other Class Members, Plaintiff has driven the vehicle in a foreseeable manner and in the way it was intended to be used.

283. At the time of purchase, Plaintiff had reviewed marketing materials for the vehicle online and discussed the purchase with an authorized dealer. In addition, prior to purchasing the Class Vehicle, Plaintiff test drove the Class Vehicle at the Dealership.

284. Plaintiff, acting as a reasonable consumer, relied on the materials he reviewed, and the discussions had, before making his purchase.

285. None of the information provided to Plaintiff disclosed any defects in the vehicle or its transmission. GM's omissions were material to Plaintiff.

286. Shortly after purchase, Plaintiff's transmission exhibited hard shifting and jerking. This Shift Defect reduces Plaintiff's satisfaction with the vehicle and also raises a safety concern.

287. On or about March 8, 2022, Plaintiff sent a notice letter to GM advising of the Shift Defect, to no avail.

288. GM did not disclose the Shift Defect in its advertising materials, on its websites, or to its dealers. Had GM done so, Plaintiff would have learned of that material information, and would not have purchased the vehicle or paid the price he paid for it.

289. As a result of the Shift Defect, Plaintiff has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for its ordinary and advertised purpose and is, accordingly, unable to rely on GM's advertising or

labeling in the future.  Plaintiff does not intend to purchase or lease another vehicle from GM in the future, though he would like to do so.

**D.   Fraudulent Concealment Allegations**

290.   Most of Plaintiffs' claims arise out of GM's fraudulent concealment of the Shift Defect and the problems it causes, and its representations about the quality, durability, and performance of the Class Vehicles, including their 8L90 and 8L45 transmissions.

291.   To the extent that Plaintiffs' claims arise from GM's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, including specifically at the time they purchased their Class Vehicles, GM knew of the Shift Defect; GM was under a duty to disclose the Shift Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and GM never disclosed the Shift Defect to Plaintiffs or the public at any time or place or in any manner.

292.   Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to GM:

293.   **Who**: as noted in Part B, *supra*, GM personnel knew of but actively concealed the Shift Defect from Plaintiffs and Class members while simultaneously

touting the quality, durability and performance of the Class Vehicles and their 8L90 and 8L45 transmissions. In addition to management, the GM personnel at issues include former GM Assistant Chief Engineer Bill Goodrich, and former GM Chief Engineer Kaveh Kavoos, who participated in public appearances or were quoted in press releases touting the 8L transmissions, when they were well aware they suffered from a Shit Defect. This also includes Cadillac President Johan deNyssen who had heard from dealers about the Shift Defect and did not inform customers. Similarly, Brand Quality Manager Mark Gordon who apprised dealers to tell customers the Shift Defect was normal, when it knew it was not, and a redesign for the 8L was needed but would not be ready until MY23.

294. **What**: GM knew that the Class Vehicles suffer from the Shift Defect. GM concealed the Shift Defect and made contrary representations about the quality, durability, performance, and other attributes of the Class Vehicles.

295. **When**: GM concealed material information regarding the Shift Defect at all times and made representations about the quality, durability, and performance of the Class Vehicles, starting no later than 2014, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale, and on an ongoing basis, and continuing to this day. GM has not disclosed the truth about the Shift Defect in the Class Vehicles to anyone outside of GM. GM has never taken any action to inform consumers about the true nature of the Shift Defect

in Class Vehicles. And when consumers brought their Class Vehicles to GM complaining of the symptoms associated with the Shift Defect, GM denied any knowledge of, or responsibility for, the Shift Defect, and called it a "normal" characteristic.

296.   **Where**: GM concealed material information regarding the true nature of the Shift Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality, durability, and performance of the Class Vehicles and their 8L90 and 8L45 transmissions. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on GM's website.

297.   **How**: GM concealed the Shift Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles. GM actively concealed the truth about the existence and nature of the Shift Defect from Plaintiffs and Class members, even though it knew about the Shift Defect and knew that information about the Shift Defect would be important to a reasonable consumer, and GM promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

298.   **Why**: GM actively concealed material information about the Shift Defect in Class Vehicles, and simultaneously made representations about the quality,

durability, and performance of the Class Vehicles and their 8L90 and 8L45 transmissions, for the purpose of inducing Plaintiffs and Class members to purchase the Class Vehicles, rather than purchasing or leasing competitors' vehicles. Had GM disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of the Shift Defect, and would not have bought the Class Vehicles or would have paid less for them.

**E.     GM Has Actively Concealed the Shift Defect**

299.   Despite its knowledge of the Shift Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the Shift Defect from Plaintiffs and Class Members. Specifically, Defendant failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase or repair, and thereafter:

A.     any and all known material defects or material nonconformities of the Class Vehicles, including the Shift Defect;

B.     that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

C.     that the Class Vehicles were defective, even though GM learned of the Shift Defect before it placed the Class Vehicles in the stream of commerce.

COMPLAINT- 114

300.    More troubling, Defendant did not issue any recall and otherwise refuses to acknowledge the Defect, despite TSBs as early as 2014 recognizing the Defect, but do not acknowledge that since 2018 a redesign was planned ("Gen 2") specifically to address the Shift Defect.

301.    GM has also directed its authorized dealerships to inform Plaintiffs and members of the Class that the jerking, hesitation, surging, and lurching are normal and that no repairs are necessary. This result in customers and dealers often trying unnecessary repairs or changes, like tires, suspension, etc., that does not correct the Shift Defect.

302.    Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Shift Defect, and caused them to expend money at their dealerships and/or be unable to drive their vehicles for stretches of time, while they are being constantly repaired.

303.    Moreover, when vehicles are brought to Defendant's dealers for repair, whether covered by warranty or not, Class Members are provided with ineffective repairs in which defective parts are replaced with other defective parts, as experienced by Plaintiffs.

304.    As a result, Class Members continue to experience the Shift Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many

Class Members, like Plaintiffs, are current owners who rely on their vehicles daily, compensation for repairs, related expenses, and diminution in value is not sufficient.

305.   Defendant has not recalled all the Class Vehicles to repair the Shift Defect, has not offered to its customers a free suitable repair or free replacement of parts related to the Shift Defect, under the recall or otherwise, and has not reimbursed all Class Vehicle owners who incurred costs for repairs related to the Shift Defect.

306.   Class Members have not received the value for which they bargained when they purchased the Class Vehicles.

307.   As a result of the Shift Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

308.   The existence of the Shift Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase a Class Vehicle. Whether a vehicle's transmission contains a defect causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had Plaintiffs and other Class Members known of the Shift Defect, they would have paid less for the Class Vehicles or would not have purchased them.

309.   Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class

Members further expect and assume that GM will not sell vehicles with known safety defects, such as the Shift Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

310.   The Class Vehicles do not function as GM intended; no manufacturer intends for a vehicle's transmission and related components to result in lurching, jerking, sudden acceleration, delayed acceleration, and present substantial safety risks as a result.

**F.     The Agency Relationship Between GM US, LLC and its Network of Authorized Dealerships**

311.   To sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships.

312.   Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase Defendant vehicles are the intended third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements

which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.,* 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

313.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

314.    Defendant issued the express warranty to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Because Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties

315.    In promoting, selling, and repairing its defective vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the

public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

A.     The authorized GM US LLC dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, service bulletins, TSBs, and other documents;

B.     Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

C.     The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

D.     Defendant has provided training and partnered with various technical schools to provide GM-specific training for technicians, so that dealerships are able to hire technicians that have completed GM-overseen certification course;

E.      Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

F.      Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Defendant's authorization;

G.      Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

H.      Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Shift Defect by prescribing and implementing the relevant TSBs cited herein.

316.   GM's warranty booklets make it abundantly clear that GM's authorized dealerships are GM's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships."

317.   For example, the booklets state, that GM "will provide repairs to the vehicle during the warranty period" and also that "[t]o obtain warranty repairs, take

the vehicle to a [Buick, Cadillac, Chevrolet, or GMC] dealer facility within the warranty period and request the needed repairs."

318.   The booklets direct Plaintiffs and class members, should they have warranty problems, to first "contact the owners of the dealer facility or the general manager." Next, Plaintiffs and class members are directed to contact GM directly as a Customer Assistance Center. However, the booklet states, "[w]hen contacting [GM], remember that your concern will likely be resolved at a dealer's facility."

319.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

## CLASS ACTION ALLEGATIONS

320.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Classes pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (c)(4). As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rules 23(a) and 23(b)(3). This action also satisfies the requirements of Rule 23(c)(4).

321.   Pursuant to Fed. R. Civ. Proc. 23(a), (b)(3) and/or (c)(4), Plaintiffs assert classes based on the applicable state law of where the Plaintiff purchased a Class Vehicle. **Class Vehicles** are GM vehicles from MY19 to the present manufactured and sold new after March 1, 2019, equipped with 8L45 or 8L90 automatic transmissions. The proposed Classes include:

A.   **California Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in California.

B.   **Michigan Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Michigan.

C.   **New Jersey Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in New Jersey.

D.   **Indiana Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Indiana.

E.   **Washington Class:** All original purchasers or current owners of Class Vehicles who purchased the Vehicles from authorized GM dealers in Washington.

322.   Excluded from the Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to seek certification under a different Class definition if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

323.   **Numerosity:** Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

324.   **Typicality:**  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased a Class Vehicle designed, manufactured, and distributed by GM, and equipped with the defective GM 8L45 or 8L90 transmissions. The representative Plaintiffs, like all Class Members, have been

damaged by GM's misconduct in that they have overpaid for Class Vehicles that would be priced lower had consumers and competitors knew of the Shift Defect; they have purchased vehicles of diminished value due to the Shift Defect; they did not receive the benefit of their bargain, as GM's own service proposals recognize. Furthermore, the factual bases of GM's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class as a whole.

325. **Commonality:** There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting only individual Class Members. These common legal and factual issues include the following:

(a)    Whether Class Vehicles contain defects relating to the GM 8L45 or 8L90 Transmission;

(b)    Whether the defects relating to the GM 8L45 or 8L90 Transmission constitute an unreasonable safety risk;

(c)    Whether the defective nature of the GM 8L45 or 8L90 Transmission constitutes a material fact;

(d)    Whether Defendant has a duty to disclose the defective nature of the GM 8L45 or 8L90 Transmission to Plaintiffs and Class Members;

(e)    Whether Defendant knew or reasonably should have known of the defects relating to the GM 8L45 or 8L90 Transmission before it sold Class Vehicles

to Plaintiffs and Class Members and, if so, how long Defendant has known of the defect;

(f)      Whether Defendant breached the implied warranty of merchantability pursuant to the laws of the Class Jurisdictions; and

(g)      Whether Defendant breached express warranties pursuant to the laws of the Class Jurisdictions.

(h)      Whether and how much Defendant's misconduct and the Shift Defect have inflicted economic harm upon purchasers of the Class Vehicles.;

326.   **Adequate Representation:**   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

327.   **Predominance and Superiority:**   Plaintiffs and the Class Members have all suffered and will continue to suffer harm and damages as a result of GM's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for GM's misconduct. Absent a class

action, Class Members will continue to incur damages, and GM's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

328.   This action is also certifiable under the provisions of Fed. R. Civ. Proc. 23(b)(2) because GM has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole and necessitating that any such relief be extended to members of the Class on a mandatory, class-wide basis.

329.   In the alternative, the common issues regarding GM's liability and the existence of the Shift Defect can be decided class-wide under Rule 23(c)(4).

330.   Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

<u>**TOLLING OF THE STATUTES OF LIMITATIONS**</u>

**A.     Fraudulent Concealment**

331.   As previously described, any applicable statute(s) of limitations has been tolled by GM's knowing and active concealment and denial of the facts alleged

herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Shift Defect prior to this class action litigation being commenced.

332. GM was and remains under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by GM, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

333. GM has known of the Shift Defect in the Class Vehicles since at least 2014, and has concealed from, or failed to, notify Plaintiffs, Class Members, and the public of the full and complete nature of the Shift Defect, even when directly asked about it by Plaintiffs and Class Members during communications with GM, GM Customer Assistance, GM dealerships, and GM service centers. GM continues to conceal the Shift Defect to this day.

**B.     Estoppel**

334. GM was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. GM actively concealed—and continues to conceal—the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles. Plaintiffs and Class Members reasonably relied upon

GM's knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

## C.   Discovery Rule

335.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Class Vehicles suffered from the Shift Defect. Plaintiffs and the Class Members had no realistic ability to discern that the GM 8L45 and 8L90 Transmissions in Class Vehicles were defective until (at the earliest) after the Shift Defect manifested in their 8L90 and 8L45 transmissions and/or component parts failed.

336.   Even then, Plaintiffs and Class Members had no reason to know that such manifestations were caused by a defect in the Class Vehicles because of GM's active concealment of the Shift Defect. Not only did GM fail to notify Plaintiffs or Class members about the Shift Defect, GM, in fact, denied any knowledge of, or responsibility for, the Shift Defect when directly asked about it.

337.   Thus, Plaintiffs and Class Members were not reasonably able to discover the Shift Defect until after they had purchased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Shift Defect was causing failure in the 8L90 and 8L45 transmissions of their Vehicles.

## CAUSES OF ACTION

### COUNT 1:  FRAUDULENT CONCEALMENT UNDER THE EACH SUBCLASS STATE'S COMMON LAW

338.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

339.  Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Class, against Defendant.

340.  GM omitted material facts concerning the Class Vehicles.

341.  As described above, GM made material omissions and affirmative misrepresentations regarding the Class Vehicles.

342.  GM knew these representations were false when made.

343.  The vehicles purchased by Plaintiffs were, in fact, defective, unsafe and unreliable, because the Shift Defect in the 8L90 and 8L45 transmissions causes unsafe conditions, including, but not limited to, Class Vehicles suddenly lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion. These conditions deprive the purchasers of the benefit of their bargain, diminish resale value, and present a safety hazard because they severely affect the driver's ability to control the car's speed, acceleration, and deceleration.

344.  GM had a duty to disclose that these vehicles were defective, unsafe and unreliable, in that the Shift Defect in the 8L90 and 8L45 transmissions causes

unsafe conditions, because Plaintiffs relied on GM's representations that the vehicles they were purchasing were safe and free from defects.

345.  The aforementioned omission was material, because if it had been disclosed Plaintiffs would not have bought their vehicles.

346.  The aforementioned representations were also material because they were facts that would typically be relied on by a person purchasing a new or used motor vehicle. GM intentionally made the false statements in order to sell vehicles and avoid the expense and public relations nightmare of a recall.

347.  Plaintiffs relied on GM's reputation-along with their failure to disclose the Shift Defect and GM's affirmative assurances that their vehicles were safe and reliable and other similar false statements—in purchasing the Class Vehicles.

348.  GM had a duty to disclose the true facts about the Class Vehicles because they were known and/or accessible only to GM who had superior knowledge and access to the facts, and the facts were not known to or reasonably discoverable by Plaintiffs and the Class. As stated above, these omitted and concealed facts were material because they directly impact the safety, reliability and value of the Class Vehicles. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, is of material concern to a reasonable consumer.

## COUNT 2:  VIOLATION OF CALIFNORNIA CONSUMER LEGAL REMEDIES ACT CAL. CIV. CODE § 1750, *ET SEQ.*

349.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

350.   Juan Castenada ("California Plaintiff") brings this cause of action on his own behalf and on behalf of the California Class.

351.   Defendant is a "person" as defined by California Civil Code § 1761(c).

352.   California Plaintiff and members of the California Class are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use in California.

353.   By failing to disclose and concealing the defective nature of the transmissions from California Plaintiff and California Class Members, Defendant violated California Civil Code § 1770(a), as it represented that the Class Vehicles and their transmissions had characteristics and benefits that they do not have and represented that the Class Vehicles and their transmissions were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

354.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

355. Defendant knew that the Class Vehicles and their transmissions suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

356. Because of their reliance on Defendant's omissions, owners of the Class Vehicles, including California Plaintiff and California Class Members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Shift Defect, California Plaintiff and California Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

357. Defendant was under a duty to California Plaintiff and California Class Members to disclose the defective nature of the transmissions and/or the associated repair costs because:

(a) Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions;

(b) California Plaintiff and California Class Members could not reasonably have been expected to learn or discover that their transmissions had a dangerous safety defect until it manifested; and

(c) Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn of or discover the Shift Defect.

358.   In failing to disclose the defective nature of transmissions, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

359.   The facts Defendant concealed from or failed to disclose to California Plaintiff and California Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay less. Had California Plaintiff and California Class Members known that the Class Vehicles' transmissions were defective, they would not have purchased the Class Vehicles or would have paid less for them.

360.   California Plaintiff and California Class Members are reasonable consumers who do not expect the transmissions installed in their vehicles to exhibit problems such as the Shift Defect. This is the reasonable and objective consumer expectation relating to a vehicle's transmissions.

361.   Because of Defendant's conduct, California Plaintiff and California Class Members were harmed and suffered actual damages in that, on information and belief, the Class Vehicles experienced and will continue to experience problems such as the Shift Defect.

362.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California Plaintiff and California Class Members suffered and will continue to suffer actual damages.

363.   California Plaintiff and California Class Members provided Defendant with notice of its violations of the CLRA pursuant to California Civil Code § 1782(a). Defendant has failed to provide appropriate relief for its violations of the CLRA within 30 days, California Plaintiff now seeks monetary, compensatory, and punitive damages.

## COUNT 3:  VIOLATION OF CALIFORNIA BUS. & PROF. CODE, §17200 *ET SEQ.*

364.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

365.   California Plaintiff brings this cause of action on his own behalf and on behalf of the members of the California Class.

366.   Because of their reliance on Defendant's omissions, owners of the Class Vehicles, including California Plaintiff and California Class Members, suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Shift Defect, California Plaintiff and California Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs of repair.

367.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

368.   California Plaintiff and California Class Members are reasonable consumers who do not expect their transmissions to be defective.

369.   Defendant knew the Class Vehicles and their transmissions were defectively designed or manufactured, would fail prematurely, and were not suitable for their intended use.

370.   In failing to disclose the Shift Defect, Defendant has knowingly and intentionally concealed material facts and breached its duty not to do so.

371.   Defendant was under a duty to California Plaintiff and California Class Members to disclose the defective nature of the Class Vehicles and their transmissions because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles' transmissions; and

(b)   Defendant actively concealed the defective nature of the Class Vehicles and their transmissions from California Plaintiff and California Class Members.

372.   The facts Defendant concealed from or failed to disclose to California Plaintiff and California Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase Class Vehicles. Had they known of the Shift Defect, California Plaintiff and California Class Members would have paid less for Class Vehicles equipped with the subject transmissions or would not have purchased them at all.

373.   Defendant continued to conceal the defective nature of the Class Vehicles and their transmissions even after Class Members began to report problems.

374.   Defendant's conduct was and is likely to deceive consumers.

375.   Defendant's acts, conduct, and practices were unlawful, in that they constituted:

(a)   Violations of California's Consumers Legal Remedies Act;

(b)   Violations of the Song-Beverly Consumer Warranty Act;

(c)   Violations of the Magnuson-Moss Warranty Act; and

(d)   Breach of Express Warranty under California Commercial Code section 2313.

376.   By its conduct, Defendant has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

377.   Defendant's unfair or deceptive acts or practices occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the purchasing public.

378.   As a direct and proximate result of Defendant's unfair and deceptive practices, California Plaintiff and California Class Members have suffered and will continue to suffer actual damages.

379.   Defendant has been unjustly enriched and should be required to make restitution to California Plaintiff and California Class Members to §§ 17203 and 17204 of the Business & Professions Code.

## COUNT 4:  BREACH OF IMPLIED WARARNTY PURSUANT TO THE SONG-BEVERLY CONSUMER WARRANTY ACTCAL. CIV. CODE §§ 1792 AND 1791.1, *ET SEQ.*

380.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

381.   California Plaintiff brings this cause of action on his own behalf and on behalf of the members of the California Class.

382.   California Plaintiff and the California Class Members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

383.   GM is and was at all relevant times a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

384.   The Class Vehicles are and were at all relevant times "are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

385.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Cal. Civ. Code §§ 1791.1(a) & 1792.

386.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed vehicles equipped with the

8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom California Plaintiff and the California Class Members bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to California Plaintiff and the California Class Members, with no modification to the defective transmissions.

387.   GM provided California Plaintiff and California Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

388.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

389.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiff and California Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their

transmissions and the existence of the Shift Defect at the time of sale or thereafter. GM knew of this defect at the time these sales occurred.

390.   GM also knew since 2018 when it budgeted for a Gen 2 program, that there was no satisfactory fix that would preclude purchasers from experiencing the Shift Defect.

391.   As a result of GM's breach of the applicable implied warranties, California Plaintiff and the California Class Members of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Shift Defect, California Plaintiff and the California Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs of repair.

392.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of violation of California Civil Code §§ 1792 and 1791.1.

393.   California Plaintiff and the California Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

394.   California Plaintiff and the California Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure

its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from California Plaintiff and the California Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

395.   Nonetheless, California Plaintiff and members of the California Class provided notice to GM of the breach of implied warranties when they repeatedly took their vehicles to an authorized GM dealership and requested warranty repairs. California Plaintiff also provided GM with notice by letter dated February 17, 2022.

396.   Because California Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant. California Plaintiff and the members of the California Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and California Plaintiff and the members of the California Class, on the other hand.  Furthermore, GM provided warranties directly to California Plaintiff and the members of the California Class and California Plaintiff and the members of the California Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

397. Nonetheless, privity is not required here because California Plaintiff and the members of the California Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM vehicles, as well as service and perform warranty repairs on GM's behalf. California Plaintiff and the members of the California Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

398. As a direct and proximate cause of GM's breach, California Plaintiff and California Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

399. As a direct and proximate result of GM's breach of the implied warranty of merchantability, California Plaintiff and California Class Members have been damaged in an amount to be proven at trial.

## COUNT 5: BREACH OF EXPRESS WARRANTY, CAL. COM. CODE §§ 2313 AND 10210

400. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

401. California Plaintiff brings this cause of action on his own behalf and on behalf of the members of the California Class.

402.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

403.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

404.   GM provided all purchasers of the Class Vehicles with the express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under California state law.

405.   GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

406.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Shift Defect does not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or

GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

407.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

408.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

409.   The Shift Defect at issue in this litigation was present at the time the Class Vehicles were sold to California Plaintiff and California Class Members.

410.   California Plaintiff and California Class Members relied on GM's express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

411. Further, California Plaintiff and members of the California Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform California Plaintiff and members of the California Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Shift Defect.

412. Under the express Warranties, GM was obligated to correct the Shift Defect in the vehicles owned by California Plaintiff and California Class Members.

413. Although GM was obligated to correct the Shift Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

414. In fact, GM has known since 2018 when it budgeted for a Gen 2 program for the 8L transmissions, that there was no satisfactory fix that would preclude purchasers from experiencing the Shift Defect.

415. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced

defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

416. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

417. Because California Plaintiff purchased his vehicles from an authorized GM dealership, they are in privity with Defendant. California Plaintiff and the members of the California Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and California Plaintiff and the members of the California Class, on the other hand. Furthermore, GM provided warranties directly to California Plaintiff and the members of the California Class and California Plaintiff and the members of the California Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

418. Nonetheless, privity is not required here because California Plaintiff and the members of the California Class are the intended third-party beneficiaries of

contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. California Plaintiff and the members of the California Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

419. Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Shift Defect. The time limits are unconscionable and inadequate to protect California Plaintiff and the members of the California Class. Among other things, California Plaintiff and members of the California Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Shift Defect existed between GM and members of the Class.

420. California Plaintiff and California Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

421.   California Plaintiff and California Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Plaintiff and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal and external sources.

422.   Nonetheless, California Plaintiff provided notice to GM of the breach of express warranties when they repeatedly took their vehicles to an authorized GM dealership and requested warranty repairs. California Plaintiff also provided GM with notice by letter dated February 17, 2022.

423.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Shift Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Shift Defect.

424.   Because GM has not been able to remedy the Shift Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes, rendering them null and void.

425.   As a direct and proximate cause of GM's breach, California Plaintiff and California Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their

Class Vehicles. Additionally, California Plaintiff and California Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

426.   California Plaintiff and California Class Members have been damaged in an amount to be determined at trial. Plaintiff and the other Class Members are entitled to legal and equitable relief against GM, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 6:  BREACH OF EXPRESS WARRANTY, IND. CODE §§ 26-1-2-313 AND 26-1-2.1-210

427.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

428.   Plaintiff Gribble ("Indiana Plaintiff") brings this cause of action on behalf of himself and on behalf of members of the Indiana Class.

429.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under IND. CODE §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

430.   The Class Vehicles are and were at all relevant times "goods" within the meaning of IND. CODE §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

431.   GM provided all purchasers of the Class Vehicles with the express warranty described herein, which became a material part of the bargain.

432.   GM provided all purchasers of Cadillac-branded Class Vehicles with the Cadillac Warranty and all purchasers and lessees of Chevrolet or GM-branded Class Vehicles with the Chevrolet/GM Warranty.

433.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Transmission Defect does not fall into any of the above excluded categories, it is covered under GM's express warranty. GM agreed to provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles and for up to 4 years or 50,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Bumper-to-Bumper Limited Warranties").

434.   Furthermore, under the Powertrain Component of the Warranties, GMC expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder,

etc.)" are covered under the Warranties for up to 5 years or 60,000 miles, whichever comes first, for Chevrolet or GM-branded Class Vehicles, and for up to 6 years or 70,000 miles, whichever comes first, for Cadillac-branded Class Vehicles (the "Powertrain Warranties").

435.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

436.   The Shift Defect at issue in this litigation was present at the time the Class Vehicles were sold to Indiana Plaintiff and the Indiana Class Members.

437.   Plaintiff relied on GM's express warranties, which were a material part of the bargain, when purchasing his Class Vehicle.

438.   Further, Plaintiff and members of the Indiana Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Indiana Plaintiffs and members of the Indiana Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Shift Defect.

439.   Under the express Warranties, GM was obligated to correct the Shift Defect in the vehicles owned or leased by Indiana Plaintiff and the Indiana Sub-Class Members.

440.   Although GM was obligated to correct the Shift Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

441.   In fact, GM has known since 2018 when it budgeted for a Gen 2 program for the 8L transmissions, that there was no satisfactory fix that would preclude purchasers from experiencing the Shift Defect.

442.   GM breached the express warranties by performing illusory repairs or none at all. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Indiana Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

443.   GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

444.   Because Indiana Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant. Indiana Plaintiffs and the members of the Indiana Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Indiana Plaintiff and the members of the Indiana Class, on the other hand. Furthermore, GM provided warranties directly to Indiana Plaintiff and the members of the Indiana Class and Indiana Plaintiff and the members of the Indiana Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

445.   Nonetheless, privity is not required here because Indiana Plaintiff and the members of the Indiana Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. Indiana Plaintiff and the members of the Indiana Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

446.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the

warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Shift Defect. The time limits are unconscionable and inadequate to protect Indiana Plaintiff and the members of the Indiana Class. Among other things, Indiana Plaintiff and members of the Indiana Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Shift Defect existed between GM and members of the Class.

447. Indiana Plaintiff and the Indiana Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

448. Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Shift Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Shift Defect.

449. Because GM has not been able to remedy the Shift Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Indiana Plaintiff and Indiana Class Members whole, rendering them null and void.

450.    Indiana Plaintiff and the Indiana Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

451.    Nonetheless, Indiana Plaintiff provided notice to GM of the breach of express warranties when he took his vehicle in for servicing and via letter on March 8, 2022.

452.    As a direct and proximate cause of GM's breach, Indiana Plaintiff and the Indiana Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Indiana Plaintiff and the Indiana Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

453.    As a direct and proximate result of GM's breach of express warranties, Indiana Plaintiff and the Indiana Class Members have been damaged in an amount to be determined at trial.

## COUNT 7: BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY IND. CODE §§ 26-1-2-314 AND 26-1-2.1-212

454.    Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

455.    Indiana Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Indiana Class.

456.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under IND. CODE §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

457.    The Class Vehicles are and were at all relevant times "goods" within the meaning of IND. CODE §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

458.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under IND. CODE § 26-1-2-314 and 26-1-2.1-212.

459.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed vehicles equipped with the 8L90 and 8L45 transmissions to customers through authorized dealers, like those from whom Indiana Plaintiff and the Indiana Class Members bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the

authorized dealers to Indiana Plaintiff and the Indiana Class Members, with no modification to the defective transmissions.

460.   GM provided Indiana Plaintiff and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

461.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their transmissions that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their transmissions would be fit for their intended use while the Class Vehicles were being operated.

462.   Contrary to the applicable implied warranties, the Class Vehicles and their transmissions at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design or manufacture of their transmissions and the existence of the Shift Defect at the time of sale or lease and thereafter. GM knew of this defect at the time these sale or lease transactions occurred.

463.   As a direct and proximate cause of GM's breach, Indiana Plaintiff and the Indiana Class Members suffered damages and continue to suffer damages,

including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

464. GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of IND. CODE § 26-1-2-314 and 26-1-2.1-212.

465. Indiana Plaintiff and the Indiana Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

466. Indiana Plaintiff and the Indiana Class Members were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the transmissions or components thereof, and through other internal sources.

467. Nonetheless, Indiana Plaintiff and members of the Indiana Class provided notice to GM of the breach of implied warranties when they repeatedly took their vehicles to an authorized GM dealership and requested warranty repairs. Indiana Plaintiff also provided GM with notice by letter dated March 8, 2022.

468. Because Indiana Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant. Indiana Plaintiff and the members of the

Indiana Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Indiana Plaintiff and the members of the Indiana Class, on the other hand. Furthermore, GM provided warranties directly to Indiana Plaintiff and the members of the Indiana Class and Indiana Plaintiff and the members of the Indiana Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

469.   Nonetheless, privity is not required here because Indiana Plaintiff and the members of the Indiana Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM vehicles, as well as service and perform warranty repairs on GM's behalf. Indiana Plaintiff and the members of the Indiana Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships

470.   As a direct and proximate cause of GM's breach, Indiana Plaintiff and members of the Indiana Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

471.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Indiana Plaintiff and members of the Indiana Class have been damaged in an amount to be proven at trial

### COUNT 8:  VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS §445.903, *ET SEQ*.

472.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

473.   Plaintiff Matthew Battle ("Michigan Plaintiff") brings this claim on behalf of himself and the Michigan Class.

474.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  MICH. COMP. LAWS § 445.903(1).

475.   GM engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  (i) "Representing that goods or services have … characteristics … that they do not have"; (ii) "Representing that goods or services are of a particular standard … if they are of another"; (iii) "Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer"; and (iv) "Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." MICH. COMP. LAWS § 445.903(1). By failing to disclose and actively concealing the Shift Defect, by marketing its Class Vehicles

and their transmissions as high quality, durable, and high-performance, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold, GM engaged in deceptive business practices prohibited by the Michigan CPA.

476.   In the course of their business, GM violated the Michigan CPA by knowingly misrepresenting and/or intentionally concealing material facts regarding the Class Vehicles and the existence of the Shift Defect. Specifically, in marketing, offering for sale, and selling the defective Class Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices prohibited by MICH. COMP. LAWS § 445.903(1):

A.   representing that the Class Vehicles have characteristics or benefits that they do not have;

B.   representing that the Class Vehicles are of a particular standard and quality when they are not; and

C.   concealing the existence of the Shift Defect and GM's ability to repair the Shift Defect.

477.   GM's scheme and concealment of the true characteristics of the Class Vehicles were material to Plaintiff and the Michigan Class members, and GM misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Michigan Class members would rely on the misrepresentations,

concealments, and omissions. The facts concealed or not disclosed by Defendant to Michigan Plaintiff and the Michigan Class Members are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains a defect causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had they known the truth, Plaintiff and the Michigan Class members would not have purchased the Class Vehicles, or would have paid significantly less for them.

478.   Plaintiff and the Michigan Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

479.   GM had an ongoing duty to Plaintiff and the Michigan Class members to refrain from unfair and deceptive practices under the Michigan CPA in the course of its business. Specifically, GM owed Plaintiff and the Michigan Class members a duty to disclose all the material facts concerning the Class Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiff and the Michigan Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

480.   Plaintiff and the Michigan Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

481.   Plaintiff and the Michigan Class seek monetary relief, declaratory relief, treble damages, punitive damages, and attorneys' fees against GM in an amount to be determined at trial.

## COUNT 9:  BREACH OF IMPLIED WARRANTY, MICH. COMP. LAWS § 440.2314

482.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

483.   Michigan Plaintiff Matthew Battle brings this claim on behalf of himself and the Michigan Class.

484.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

485.   The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

486.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under MICH. COMP. LAWS §§ 440.2314 and 440.2862.

487.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Michigan Plaintiff and members of the Michigan Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Michigan Plaintiff and members of the Michigan Class, with no modification to the defective Class Vehicles.

488.   GM provided Michigan Plaintiff and members of the Michigan Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

489.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

490.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Michigan Plaintiff and Michigan Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time

of sale and thereafter as more fully described above. GM knew of this defect at the time these sale transactions occurred.

491.   As a direct and proximate cause of GM's breach, Michigan Plaintiff and the Michigan Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

492.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and Michigan law.

493.   Michigan Plaintiff and members of the Michigan Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

494.   Michigan Plaintiff and members of the Michigan Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Michigan Plaintiff and the Class Members and through other internal sources.

495.   Nonetheless, Michigan Plaintiff and members of the Michigan Class provided notice to GM of the breach of implied warranties when they repeatedly

took their vehicles to an authorized GM dealership and requested warranty repairs. Michigan Plaintiff also provided GM with notice by letter dated February 17, 2022.

496.   Because Michigan Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant. Michigan Plaintiff and the members of the Michigan Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Michigan Plaintiff and the members of the Michigan Class, on the other hand. Furthermore, GM provided warranties directly to Michigan Plaintiff and the members of the Michigan Class and Michigan Plaintiff and the members of the Michigan Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

497.   Nonetheless, privity is not required here because Michigan Plaintiff and the members of the Michigan Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM vehicles, as well as service and perform warranty repairs on GM's behalf. Michigan Plaintiff and the members of the Michigan Class are the

beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

498.   As a direct and proximate cause of GM's breach, Michigan Plaintiff and members of the Michigan Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

499.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Michigan Plaintiff and members of the Michigan Class have been damaged in an amount to be proven at trial.

## COUNT 10:  BREACH OF EXPRESS WARRANTY, MICH. COMP. LAWS § 440.2313

500.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

501.   Michigan Plaintiff brings this claim on behalf of himself and the Michigan Class.

502.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under MICH. COMP. LAWS §§ 440.2104(1) and a "seller" of motor vehicles under § 440.2103(1)(c).

503.   The Class Vehicles are and were at all relevant times "goods" within the meaning of MICH. COMP. LAWS §§ 440.2105(1) and 440.2803(1)(h).

504.   The 8L90 and 8L45 transmissions were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

505.   Defendant provided all purchasers of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Michigan state law.

506.   GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

507.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Shift Defect does not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

508.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

509.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

510.   The Shift Defect at issue in this litigation was present at the time the Class Vehicles were sold to Michigan Plaintiff and the Michigan Class Members.

511.   The Warranty formed the basis of the bargain that was reached when Michigan Plaintiff and other members of the Michigan Class purchased their Class Vehicles.

512.   Further, Michigan Plaintiff and members of the Michigan Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Michigan Plaintiff and members of the

Michigan Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Shift Defect.

513. Under the express Warranties, GM was obligated to correct the Shift Defect in the vehicles owned by Michigan Plaintiff and Michigan Class Members.

514. Although GM was obligated to correct the Shift Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

515. GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

516. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

517.    Because Michigan Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant. Michigan Plaintiff and the members of the Michigan Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Michigan Plaintiff and the members of the Michigan Class, on the other hand. Furthermore, GM provided warranties directly to Michigan Plaintiff and the members of the Michigan Class and Michigan Plaintiff and the members of the Michigan Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

518.    Nonetheless, privity is not required here because Michigan Plaintiff and the members of the Michigan Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. Michigan Plaintiff and the members of the Michigan Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

519.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Shift Defect. The time limits are unconscionable and inadequate to protect Michigan Plaintiff and the members of the Michigan Class. Among other things, Michigan Plaintiff and members of the Michigan Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Shift Defect existed between GM and members of the Class.

520.   Michigan Plaintiff and the Michigan Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

521.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Shift Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Shift Defect.

522.   Because GM has not been able to remedy the Shift Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their

essential purposes because the contractual remedy is insufficient to make Michigan Plaintiff and Michigan Class Members whole, rendering them null and void.

523. Michigan Plaintiff were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

524. Nonetheless, Michigan Plaintiff provided notice to GM of the breach of express warranties when he repeatedly took his vehicle to an authorized GM dealership and requested warranty repairs. Michigan Plaintiff also provided GM with notice by letter dated February 17, 2022.

525. As a direct and proximate cause of GM's breach, Michigan Plaintiff and Michigan Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair..

526. As a result of GM's breach of the express warranty, Michigan Plaintiff and Michigan Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT 11:  VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*

527.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

528.   Plaintiff David Figueroa ("New Jersey Plaintiff") brings this count on behalf of himself and the New Jersey Class against Defendant.

529.   GM, New Jersey Plaintiff, and the New Jersey Class Members "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

530.   GM engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

531.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Jersey CFA.

532.   GM participated in unfair or deceptive trade practices that violated the New Jersey CFA. As described below and alleged throughout the Complaint, by

failing to disclose the Shift Defect, by concealing the Shift Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Shift Defect in the course of its business.

533. GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

534. GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

535. GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

536. GM knew or should have known that its conduct violated the New Jersey CFA.

537.   Defendant was under a duty to New Jersey Plaintiff and the New Jersey Class Members to disclose the defective nature of the Class Vehicles because:

      A.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      B.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      C.   Defendant actively concealed the defective nature of the Class Vehicles from New Jersey Plaintiff and the New Jersey Class Members at the time of sale and thereafter.

538.    By failing to disclose the Shift Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

539.   The facts concealed or not disclosed by Defendant to New Jersey Plaintiff and the New Jersey Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains a defect causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had New Jersey Plaintiff and the New Jersey Class Members known that the Class Vehicles suffered from the Shift Defect described herein, they would not have purchased the Class Vehicles or would have paid less for them.

540.   New Jersey Plaintiff and the New Jersey Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Shift Defect. That is the reasonable and objective consumer expectation for vehicles.

541.   As a result of Defendant's misconduct, New Jersey Plaintiff and the New Jersey Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

542.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Class Members have suffered and will continue to suffer actual damages.

543.   GM's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Class Members as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

544.   Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiff and the New Jersey Class Members seek an order enjoining GM's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

## COUNT 12:  BREACH OF IMPLIED WARRANTY, N.J. STAT. ANN. § 12A:2-314

545.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

546. New Jersey Plaintiff brings this count on behalf of himself and the New Jersey Class against Defendant.

547. GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

548. The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

549. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. § 12A:2-314.

550. GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New Jersey Plaintiff and members of the New Jersey Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiff and members of the New Jersey Class, with no modification to the defective Class Vehicles.

551. GM provided New Jersey Plaintiff and members of the New Jersey Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their lifter suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

552.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

553.  Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of this defect at the time these sale transactions occurred.

554.  As a result of GM's breach of the applicable implied warranties, New Jersey Plaintiff and members of the New Jersey Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Shift Defect, New Jersey Plaintiff and members of the New Jersey Class were harmed and suffered actual damages including economic damages at the point of

sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

555.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

556.   New Jersey Plaintiff and members of the New Jersey Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

557.   New Jersey Plaintiff and members of the New Jersey Class have had sufficient direct dealings with either GM or its agents (i.e., dealerships and technical support) to establish privity of contract between GM, on one hand, and New Jersey Plaintiff and members of the New Jersey Class on the other hand. Nonetheless, privity is not required here because New Jersey Plaintiff and members of the New Jersey Class are intended third-party beneficiaries of contracts between GM and its distributors and dealers, and specifically, of GM's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

558.    New Jersey Plaintiff and members of the New Jersey Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from New Jersey Plaintiff and the Class Members and through other internal sources.

559.    Nonetheless, New Jersey Plaintiff and members of the New Jersey Class provided notice to GM of the breach of express warranties when they took their vehicles to GM-authorized provider of warranty repairs. New Jersey Plaintiff also provided notice to GM of its breach of express warranty by letter dated February 17, 2022.

560.    As a direct and proximate cause of GM's breach, New Jersey Plaintiff and members of the New Jersey Class suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and members of the New Jersey Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

561.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, New Jersey Plaintiff and members of the New Jersey Class have been damaged in an amount to be proven at trial.

## COUNT 13:  BREACH OF EXPRESS WARRANTY, N.J. STAT. ANN. §12A:2-313

562.  Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

563.  New Jersey Plaintiff brings this count on behalf of himself and the New Jersey Class against Defendant.

564.  GM is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

565.  The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

566.  Defendant provided all purchasers of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under New Jersey state law.

567.  GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

568.  Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects

except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Shift Defect does not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

569.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/transaxle" and "any actuators directly connected to the transmission (slave cylinder, etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

570.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

571.   The Shift Defect at issue in this litigation was present at the time the Class Vehicles were sold to Plaintiffs and the Class Members.

572.   The Warranty formed the basis of the bargain that was reached when New Jersey Plaintiff and other members of the New Jersey Class purchased their Class Vehicles.

573.   Further, New Jersey Plaintiff and members of the New Jersey Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform New Jersey Plaintiff and members of the New Jersey Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Shift Defect.

574.   Under the express Warranties, GM was obligated to correct the Shift Defect in the vehicles owned by New Jersey Plaintiff and New Jersey Class Members.

575.   Although GM was obligated to correct the Shift Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

576.   GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely

informed Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

577. GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

578. Because New Jersey Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant. New Jersey Plaintiff and the members of the Washington Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and New Jersey Plaintiff and the members of the New Jersey Class, on the other hand. Furthermore, GM provided warranties directly to New Jersey Plaintiff and the members of the New Jersey Class and New Jersey Plaintiff and the members of the New Jersey Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

579.    Nonetheless, privity is not required here because New Jersey Plaintiff and the members of the New Jersey Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. New Jersey Plaintiff and the members of the New Jersey Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

580.    Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Shift Defect. The time limits are unconscionable and inadequate to protect New Jersey Plaintiff and the members of the New Jersey Class. Among other things, New Jersey Plaintiff and members of the New Jersey Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Shift Defect existed between GM and members of the Class.

581.    Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Shift Defect if GM determines the repairs are

appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Shift Defect.

582. Because GM has not been able to remedy the Shift Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make New Jersey Plaintiff and New Jersey Class Members whole, rendering them null and void.

583. New Jersey Plaintiff and the New Jersey Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

584. New Jersey Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

585. Nonetheless, New Jersey Plaintiff provided notice to GM of the breach of express warranties when he repeatedly took his vehicle to an authorized GM dealership and requested warranty repairs.

586. As a result of GM's breach of the applicable express warranties, owners of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of

the Shift Defect, New Jersey Plaintiff and New Jersey Class Members were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

587.   As a result of GM's breach of the express warranty, New Jersey Plaintiff and New Jersey Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT 14: VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE §§ 19.86.010, *ET SEQ.*

588.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

589.   Plaintiffs Walter and Janice Helms ("Washington Plaintiffs") bring this count on behalf of themselves and the Washington Class against Defendant.

590.   Washington Plaintiffs, the Washington Class Members, and GM are "persons" within the meaning of WASH. REV. CODE § 19.86.010(2).

591.   GM committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of WASH. REV. CODE. § 19.96.010.

592.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE § 19.86.020.

593.   GM participated in unfair or deceptive trade practices that violated the Washington CPA. As described below and alleged throughout the Complaint, by failing to disclose the Shift Defect, by concealing the Shift Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Shift Defect in the course of its business.

594.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

595.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

596.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

597.   GM knew or should have known that its conduct violated the Washington CPA.

598.   Defendant was under a duty to Washington Plaintiffs and the Washington Class Members to disclose the defective nature of the Class Vehicles because:

A.     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

B.     Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

C.     Defendant actively concealed the defective nature of the Class Vehicles from Washington Plaintiffs and the Washington Class Members at the time of sale and thereafter.

599.   By failing to disclose the Shift Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

600.   The facts concealed or not disclosed by Defendant to Washington Plaintiffs and the Washington Class Members are material because a reasonable person would have considered them to be important in deciding whether to purchase Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's transmission contains a defect causing lurching forward, sudden acceleration, delayed acceleration, and sudden loss of forward propulsion is a material safety concern. Had

Washington Plaintiffs and the Washington Class Members known that the Class Vehicles suffered from the Shift Defect described herein, they would not have purchased the Class Vehicles or would have paid less for them.

601. Washington Plaintiffs and the Washington Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Shift Defect. That is the reasonable and objective consumer expectation for vehicles.

602. Washington Plaintiffs provided notice of their claims and intention to represent a class of similarly situated consumers on February 17, 2022.

603. As a result of Defendant's misconduct, Washington Plaintiffs and the Washington Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

604. As a direct and proximate result of GM's unfair or deceptive acts or practices, Washington Plaintiffs and the Washington Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

605. GM is liable to Washington Plaintiffs and the Washington Sub-Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under WASH. REV. CODE. § 19.86.090. Because GM's actions were willful and knowing, Plaintiffs' damages should be trebled.

## COUNT 15:  BREACH OF IMPLIED WARRANTY, WASH. REV. CODE  § 62A.2-314

606.   Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

607.   Washington Plaintiffs bring this count on behalf of herself and the Washington Class against Defendant.

608.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under WASH. REV. CODE §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

609.   The Class Vehicles are and were at all relevant times "goods" within the meaning of WASH. REV. CODE §§ 62A.2-105(1) and 62A.2A-103(1)(h).

610.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under WASH. REV. CODE § 62A.2-314.

611.   GM knew or had reason to know of the specific use for which the Class Vehicles were purchased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Washington Plaintiffs and members of the Washington Class bought their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Washington Plaintiffs

and members of the Washington Class, with no modification to the defective Class Vehicles.

612. GM provided Washington Plaintiffs and members of the Washington Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

613. This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

614. Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Washington Plaintiffs and Washington Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale and thereafter as more fully described above. GM knew of this defect at the time these sale transactions occurred.

615. As a result of GM's breach of the applicable implied warranties, Washington Plaintiffs and members of the Washington Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Shift Defect, Washington Plaintiffs and members of the

Washington Class were harmed and suffered actual damages including economic damages at the point of sale and diminution of value of their Class Vehicles, as well as at the point of repair in the form of the cost of repair and additional losses.

616.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

617.   Because Washington Plaintiffs purchased their vehicle from an authorized GM dealership, they are in privity with Defendant. Washington Plaintiffs and the members of the Washington Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Washington Plaintiffs and the members of the Washington Class, on the other hand. Furthermore, GM provided warranties directly to Washington Plaintiffs and the members of the Washington Class and Washington Plaintiffs and the members of the Washington Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

618.   Nonetheless, privity is not required here because Washington Plaintiffs and the members of the Washington Class are the intended third-party beneficiaries

of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. Washington Plaintiffs and the members of the Washington Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

619. Washington Plaintiffs and members of the Washington Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

620. Washington Plaintiffs and members of the Washington Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Washington Plaintiffs and the Class Members and through other internal sources.

621. Nonetheless, Plaintiffs provided notice to GM of the breach of implied warranties when they repeatedly took their vehicle to an authorized GM dealership and requested warranty repairs. Washington Plaintiffs also provided notice by letter dated February 17, 2022.

622. As a direct and proximate cause of GM's breach, Washington Plaintiffs and members of the Washington Class suffered damages and continue to suffer

damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

623. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Washington Plaintiffs and members of the Washington Class have been damaged in an amount to be proven at trial.

## COUNT 16: BREACH OF EXPRESS WARRANTY, WASH. REV. CODE § 62A.2-313

624. Plaintiffs incorporate by reference and re-allege the allegations contained in paragraphs 1-337 of this Complaint.

625. Washington Plaintiffs brings this count on behalf of themselves and the Washington Class against Defendant.

626. GM is and was at all relevant times a "merchant" with respect to motor vehicles under WASH. REV. CODE §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 2.103(a)(4).

627. The Class Vehicles are and were at all relevant times "goods" within the meaning of WASH. REV. CODE §§ 62A.2-105(1) and 62A.2A-103(1)(h).

628. The 8L90 and 8L45 transmissions were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

629. Defendant provided all purchasers of the Class Vehicles with an express warranty described herein, which became a material part of the bargain.

Accordingly, GM's express warranty is an express warranty under Washington state law.

630.   GM provided all purchasers of Class Vehicles with the Chevrolet/GMC/Cadillac Warranties.

631.   Under the Warranties, GM expressly warranted the following: "The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Accordingly, the warranty covered all defects except for "slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period." Because the Shift Defect does not fall into any of the above excluded categories, it is covered under GM's express warranties, which provide such repairs "including towing, parts, and labor . . . at no charge" for up to 3 years or 36,000 miles for the Chevrolet or GMC-brand vehicles, or 4 years or 50,000 miles for the Cadillac-brand vehicles (the "Bumper-to-Bumper Limited Warranties").

632.   Furthermore, under the Powertrain Component of the Warranties, GM expressly warranted that the powertrain components listed therein, including the transmission and "all internally lubricated parts, case, torque converter, mounts, seals, and gaskets as well as any electrical components internal to the transmission/ transaxle" and "any actuators directly connected to the transmission (slave cylinder,

etc.)" are covered under the Warranties for up to 5 years or 60,000 miles for the Chevrolet or GMC brand vehicles, or 6 years or 70,000 miles for the Cadillac-brand vehicles (the "Powertrain Warranties").

633.   GM manufactured and/or installed the 8L90 and 8L45 transmissions and the transmissions' component parts in the Class Vehicles, and the 8L90 and 8L45 transmissions and their component parts are covered by the express Warranties.

634.   The Shift Defect at issue in this litigation was present at the time the Class Vehicles were sold to Washington Plaintiffs and the Washington Class Members.

635.   The Warranty formed the basis of the bargain that was reached when Washington Plaintiffs and other members of the Washington Class purchased their Class Vehicles.

636.   Further, Washington Plaintiff and members of the Washington Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Washington Plaintiffs and members of the Washington Class that the Class Vehicles were equipped with defective transmissions and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Shift Defect.

637.   Under the express Warranties, GM was obligated to correct the Shift Defect in the vehicles owned by Washington Plaintiffs and Washington Class Members.

638.   Although GM was obligated to correct the Shift Defect, none of the attempted fixes to the transmissions are adequate under the terms of the Warranties, as they did not cure the defect.

639.   GM breached the express Warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express Warranties, GM falsely informed Class Members that there was no problem with their Class Vehicles, performed ineffective procedures including software updates, and/or replaced defective components in the 8L90 and 8L45 transmissions with equally defective components, without actually repairing the Class Vehicles.

640.   GM and its agent dealers have failed and refused to conform the 8L90 and 8L45 transmissions to the express Warranties. GM's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

641.  Because Washington Plaintiffs purchased their vehicle from an authorized GM dealership, they are in privity with the Defendant. Washington Plaintiffs and the members of the Washington Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to

establish privity of contract between GM, on one hand, and Washington Plaintiffs and the members of the Washington Class, on the other hand. Furthermore, GM provided warranties directly to Washington Plaintiffs and the members of the Washington Class and Washington Plaintiffs and the members of the Washington Class are the intended beneficiaries of GM's express and implied warranties. The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

642.   Nonetheless, privity is not required here because Washington Plaintiffs and the members of the Washington Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. Washington Plaintiffs and the members of the Washington Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.

643.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold defective products without informing consumers about the Shift Defect. The time limits are

unconscionable and inadequate to protect Washington Plaintiffs and the members of the Washington Class.  Among other things, Washington Plaintiffs and members of the Washington Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Shift Defect existed between GM and members of the Class.

644.   Washington Plaintiffs and the Washington Class Members have complied with all obligations under the Warranties, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

645.   Because GM, through its conduct and exemplified by its own service bulletins, has covered repairs of the Shift Defect if GM determines the repairs are appropriately covered under the Warranties, GM cannot now deny that the Warranties cover the Shift Defect.

646.   Because GM has not been able to remedy the Shift Defect, any limitation on remedies included in the Warranties causes the Warranties to fail their essential purposes because the contractual remedy is insufficient to make Washington Plaintiffs and Washington Class Members whole, rendering them null and void.

647.   Washington Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Shift Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

648.   Nonetheless, Washington Plaintiffs provided notice to GM of the breach of express warranties when they repeatedly took their vehicle to an authorized GM dealership and requested warranty repairs. Washington Plaintiffs also provided GM with notice by letter dated February 17, 2022.

649.   As a direct and proximate cause of GM's breach, Washington Plaintiffs and Washington Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale and diminution of value of their Class Vehicles, and costs for repair.

650.   As a result of GM's breach of the express warranty, Washington Plaintiffs and Washington Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs on behalf of themselves, and all others similarly situated, requests the Court to enter judgment against GM, as follows:

COMPLAINT- 201

A.      An order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23, designating Plaintiffs as named representatives of the Class and designating the undersigned as Class Counsel for the Class;

B.      A declaration that Defendant is financially responsible for notifying all members of the Class about the defective nature of the GM 8L45 and 8L90 transmission, any repair or replacement available to remedy the defect and/or the need for periodic maintenance

C.      A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief.

D.      An order enjoining Defendant from further deceptive distribution, sales practices with respect to the Class Vehicles, and to remove and replace Plaintiffs and Class Members' transmissions with a suitable alternative product; enjoining Defendant from selling the Class Vehicles with the misleading information and defective transmissions; compelling Defendant to provide members of the Class with a replacement transmission that does not contain the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged at no cost to members of the Class and to notify all members of the Class that such warranty has been reformed;

E.      A declaration requiring Defendant to comply with the various provisions of the state and federal consumer protection statutes herein alleged and to make all the required disclosures;

F.      An award to Plaintiffs and members of the Class for actual, compensatory, exemplary, and statutory damages, including interest, including damages for economic loss including loss of the benefit of the bargain, overpayment damages, diminished value and the cost of repair to make the Class Vehicles conform to the benefit of the bargain, in an amount to be proven at trial;

G.      Any and all remedies provided pursuant to the state and federal consumer protection statutes herein alleged, including any applicable statutory and civil penalties;

H.      A declaration that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale of the Class Vehicles, or make full restitution to Plaintiffs and members of the Class;

I.      An award of attorneys' fees and costs, as allowed by law;

J.      An award of pre-judgment and post-judgment interest on any amounts awarded, as provided by law;

K.      Leave to amend the Complaint to conform to the evidence produced at trial;

L.     Plaintiffs demand that GM perform a recall, and repair all Class Vehicles at no expense to Plaintiffs and members of the Class; and

M.     Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(c), Plaintiffs demand a trial by jury of any and all issues in this action so triable.

RESPECTFULY SUBMITTED this 12th day of April, 2022.

*/s/ Theodore J. Leopold*
Theodore J. Leopold
**COHEN MILSTEIN
SELLERS & TOLL PLLC**
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
tleopold@cohenmilstein.com

*Interim Lead Counsel*

Douglas J. McNamara
Karina G. Puttieva
Paul Stephan
**COHEN MILSTEIN
SELLERS & TOLL PLLC**
1100 New York Ave. NW East Tower, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
kputtieva@cohenmilstein.com

Robert Gordon
Steven Calamusa
Geoff S. Stahl
Rachel A. Bentley
**GORDON & PARTNERS, P.A.**
4114 Northlake Blvd.,
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 799-4050
rgordon@fortheinjured.com
scalamusa@fortheinjured.com
gstahl@fortheinjured.com
rbentley@fortheinjured.com

Russell D. Paul
Amey J. Park
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
rpaul@bm.net
apark@bm.net

Mark A. Ozzello
Tarek H. Zohdy
Cody R. Padgett
Trisha K. Monesi
**CAPSTONE LAW APC**
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone: (310) 556-4811
Facsimile: (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Trisha.Monesi@capstonelawyers.com
Cody.Padgett@capstonelawyers.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
wk@millerlawpc.com

Joseph H. Meltzer
Melissa L. Troutner
Natalie Lesser
**KESSLER TOPAZ
MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
mtroutner@ktmc.com
nlesser@ktmc.com

Lynn Lincoln Sarko
Gretchen Freeman Cappio
Ryan McDevitt
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
rmcdevitt@kellerrohrback.com

*Plaintiffs' Steering Committee*

COMPLAINT- 206

Michael L. Pitt (P24429)
Beth Rivers (P33614)
**PITT McGEHEE PALMER
AND RIVERS, P.C.**
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067
Telephone: (248) 398-9800
Facsimile: (248) 398-9804
mpitt@pittlawpc.com
brivers@pittlawpc.com

*Plaintiffs' Liaison Counsel*